**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| THOMAS D. BROWN, SR., | ) |
| 3162 17th Street, N.W. | ) |
| Washington, DC  20010-2748 | )    Civil Action 07-0509 (RMU) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| HENRY M. PAULSON, JR., Secretary, | ) |
| Department of the Treasury, | ) |
| Defendant. | ) |

_____)

**DEFENDANT'S MOTION TO DISMISS**
**AND FOR SUMMARY JUDGMENT**

Defendant, Henry M. Paulson, Secretary, Department of the Treasury, ("Treasury"), by and through undersigned counsel, moves for partial dismissal of the plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and for partial summary judgment pursuant to Rule 56.  Plaintiff seeks injunctive and declaratory relief pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e) et seq., and also alleges disability discrimination.  Specifically, Plaintiff alleges that he has suffered: (1) reprisal; (2) discrimination based on race; (3) failure to accommodate a disability; and (4) hostile work environment.  See Compl. ¶¶ 22-40.  Several of Plaintiff's claims are barred by res judicata and collateral estoppel, and Defendant moves that those claims be dismissed pursuant to Rule 12(b)(6).  In addition, Defendant seeks summary judgment on Plaintiff's disability discrimination claims, because he has failed to show that he is an individual with a disability or that Defendants denied him a reasonable accommodation of his alleged disabilities.  Further, one of the employment actions that Plaintiff challenges is not adverse, and therefore cannot support a claim of race discrimination or reprisal.

1

In support of this motion, Defendant refers the Court to the supporting memorandum and exhibits thereto, and Defendant's Statement of Material Facts as to Which There is No Genuine Dispute.[1]  An order granting the relief sought is attached hereto.

Dated: September 25, 2007                    Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____/s/_____.____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/ Robin M. Meriweather_____.
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198  Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

---

[1] Plaintiff should take notice that any factual assertions contained in affidavits supporting this motion will be accepted by the Court as true unless plaintiff submits his own declaration or other documentary evidence contradicting the assertions in the attached affidavits.  See Neal v. Kelly, 963 F.2d 453 (D.C. Cir. 1992) and Rule 56(e) of the Federal Rules of Civil Procedure which provide as follows:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.  The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.  When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

**Of Counsel:**

NICHOLE JENKINS WASHINGTON
Office of the Chief Counsel
Department of the Treasury
Bureau Of Engraving and Printing

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                              )
THOMAS D. BROWN, SR.,                        )
3162 17th Street, N.W.                              )
Washington, DC  20010-2748                   )        Civil Action 07-0509 (RMU)
                              Plaintiff,                )
                                                              )
                       v.                                   )
                                                              )
HENRY M. PAULSON, JR., Secretary,      )
Department of the Treasury,                       )
                              Defendant.             )
_____)

**DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH**
**THERE IS NO GENUINE ISSUE**

Defendant Henry Paulson, in support of his Motion for Summary Judgment, respectfully

submits this statement of material facts as to which there is no genuine dispute in accordance

with Local Rule 7(h).[1]  Defendant believes that there are no material facts in dispute that would

preclude entry of partial summary judgment for Defendant.

1.        Plaintiff, Thomas Brown, Sr., an African-American male, was employed at the

Department of the Treasury Bureau of Engraving and Printing ("Defendant" or "Bureau") from

1971 until 2004 when he retired.

2.        On December 31, 2002, Plaintiff's physician, Dr. Laura Welch, informed

Defendant that Plaintiff could perform "all the duties listed" in the job description for

photoengravers (WE-4425).  See Exh. 6 (Welch letter).

---

[1]  Plaintiff should take notice that pursuant to Local Rule 7(h): [i]n determining a motion for
summary judgment, the court may assume that facts identified by the moving party in its
statement of material facts are admitted, unless such a fact is controverted in the statement of
genuine issues filed in opposition to the motion.  L. Civ. R. 7(h).

3.    On December 4, 2003, Plaintiff requested a change in his work hours so that his tour of duty would begin and end one hour earlier.  See Exh. 2 (December 2003 emails). Defendant requested that Plaintiff provide medical documentation to support his request for a change in his work hours.  See id.

4.    Plaintiff did not provide Defendant the medical documentation Defendant requested concerning Plaintiff's request for a change in his work hours.  See Exhs. 3 (Morres Affidavit), 4 (Diaz-Myers Affidavit).

5.    Plaintiff received an "achieved standards" performance rating for the rating period of October 1, 2001 through September 30, 2002.  See Exh. 8 (performance evaluations). Plaintiff also received an "achieved standards" performance rating for the rating period of October 1, 2002 through September 30, 2003.  See id.

6.    In Brown v. Snow,  Plaintiff Thomas Brown sued the Department of the Treasury. See Brown v. Snow, 407 F. Supp. 2d 61 (D.D.C. 2005).  On April 24, 2005, Judge Leon issued a decision in that case, granting the Defendant's motion for summary judgment in its entirety.  See Exh. 5 (Final Judgment).

7.    In Brown v. Snow, Plaintiff raised claims for retaliation, hostile work environment, and failure to accommodate in violation of Title VII and the Rehabilitation Act. See id. The claims were based primarily upon events that allegedly occurred in 2001, including allegations that: (a) on March 20, 2001 he was charged with being AWOL; (b) in May 2001 and September 2001 he was suspended for three days; (c) he suffered from "lower back pain and pain in his legs" and Defendant did not accommodate his disability; (d) Defendant accused him

of altering his time and attendance sheets; and (e) Defendant discriminated against him by

issuing a negative performance rating in December 2001.  See id. at  63-64, 67.

Dated: September 25, 2007                    Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____/s/_____.____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

_____/s/ Robin M. Meriweather_____.
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198  Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov


**Of Counsel:**

NICHOLE JENKINS WASHINGTON
Office of the Chief Counsel
Department of the Treasury
Bureau Of Engraving and Printing

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
THOMAS D. BROWN, SR.,                               )
3162 17th Street, N.W.                              )
Washington, DC  20010-2748                          )     Civil Action 07-0509 (RMU)
                    Plaintiff,                      )
                                                    )
          v.                                        )
                                                    )
HENRY M. PAULSON, JR., Secretary,                   )
Department of the Treasury,                          )
                    Defendant.                      )
_____)

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO
DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

**INTRODUCTION AND SUMMARY**

Plaintiff Thomas D. Brown, a former photoengraver with the Department of the

Treasury's Bureau of Engraving and Printing ("BEP" or "Defendant") has raised several claims

of employment discrimination arising out of his employment at BEP.  While some of those

claims may benefit from discovery, others are ripe for immediate adjudication.  For example,

many of the allegations in the complaint concern legal and factual issues that were litigated in a

prior employment action between the parties, and are barred by issue and claim preclusion.

Those claims must be dismissed pursuant to Rule 12(b)(6), and cannot be re-litigated here.

Further, the record developed during the administrative proceedings makes it clear that

Plaintiff will be unable to produce evidence sufficient to support a ruling in his favor on his

disability discrimination claims and a subset of his race discrimination and reprisal claims.

Specifically, Plaintiff has never established that he was an "individual with a disability" for

purposes of the Rehabilitation Act, and therefore cannot prevail on either the hostile work

environment or denial of reasonable accommodation claims premised on his alleged disabilities.

Moreover, Plaintiff's failure to provide medical documentation of his alleged impairments to Defendant, and Defendant's proposal of an alternative accommodation, would defeat Plaintiff's failure-to-accommodate claim even if he were disabled.  Finally, Plaintiff's allegation that Defendant gave him an "achieved standards" performance evaluation does not articulate an adverse action sufficient to support a prima facie case of retaliation or race discrimination.  Accordingly, Defendants move for dismissal in part and entry of summary judgment in part.

## **FACTUAL BACKGROUND**

The relevant facts are fully set forth in Defendant's Statement of Material Facts Not In Genuine Dispute.  However, the following brief summary of the facts provides context for this motion.

Plaintiff, Thomas D. Brown, Sr. ("Plaintiff" or "Brown"), an African American male, is a former Journeyman Photoengraver in the Photoengraving Branch, Office of Engraving, at the Department of the Treasury's Bureau of Engraving and Printing.  See Compl. ¶ 5.  He retired effective June 2004.  See id. ¶ 3.  Plaintiff asserts claims for reprisal, hostile work environment, discrimination based on race, and failure to accommodate a disability.  Plaintiff primarily bases those claims on events that allegedly transpired in 2003 and early 2004.  Specifically, he complains of: (1) receiving an "achieved standards" performance evaluation for the rating period covering October 2002 through September 2003; (2) being denied a reasonable accommodation of his request for a change in his work hours in December 2003; (3) being insulted and threatened by a co-worker on January 13, 2004; (4) being denied a training request on February 17, 2004; and (5) being harassed and retaliated against by his supervisor when he was told on March 3, 2004 to respond and complete an assignment by March 9, 2004.

Plaintiff also weaves in throughout his complaint allegations of discrimination dating as far back as 2001.  Specifically, Plaintiff's allegations in the 2001 timeframe are that: (1) he suffered from lower back pain as a result of a work related injury on or about February 28 or March 1, 2001, Compl. ¶ 6; (2) "[o]n or about August 6, 2001…his supervisors accused him with fraud on his time and attendance sheets," id. ¶ 7; (3) "on or about March 20, 2001, he was [reprimanded] for being two hours late," id. ¶ 9; (4) in 2001, he was charged with being AWOL, id. ¶ 9; (5) on April 18, 2001 and July 13, 2001 he was given a notice of proposed suspension for three and ten calendar days, respectively, id. ¶¶ 10, 14; (6) on "September 6, 2001 he was again suspended for a period of three days," id. ¶ 14; and (7) on or about December 10, 2001, he received an Employee Performance Appraisal of fully satisfactory, id. ¶ 15.

Defendant has made several requests for documentation to support Plaintiff's allegation that he suffers a disability, dating back to December 2002.  See Statement of Mat. Facts ¶ 3; Exh. 1 (Myers letters).  In December 2003, when reviewing Plaintiff's request for a change in his work schedule, Defendant again requested that Plaintiff provide medical documentation to support his allegation that he needed to adjust the schedule for medical reasons.  See Statement of Mat. Facts ¶ 3; Exh. 2 (email thread regarding schedule).  However, Plaintiff did not provide that information.  See Statement of Mat. Facts ¶ 4; Exhs. 3 (Morres Affidavit), 4 (Diaz-Myers Affidavit).

## STANDARD OF REVIEW

### A.     Motion to Dismiss

Defendant moves for partial dismissal under Federal Rule of Civil Procedure 12(b)(6),

because Plaintiff fails to state a claim upon which relief can be granted with respect to several

allegations in the complaint.  Rule 12(b)(6) requires dismissal if a plaintiff fails to plead "enough

facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127

S.Ct. 1955, 1974 (2007) (abrogating prior standard which required the moving party to show that

plaintiff can prove no set of facts in support of its claim which would entitle it to relief").  The

Court must accept the plaintiff's factual allegations as true, and allow the plaintiff the benefit of

all inferences.  See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir.

1997).  When reviewing a 12(b)(6) motion, the Court may consider the complaint itself, any

documents attached thereto, and "matters of which [courts] may take judicial notice."  Id.

### B.     Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Diamond v. Atwood, 43 F.3d

1538, 1540 (D.C. Cir. 1995); Molerio v. FBI, 749 F.2d 815, 823 (D.C. Cir. 1984).  Where no

genuine dispute exists as to any material fact, summary judgment is required.  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact is one that could change the outcome of the litigation.

Id. at 247.  The party moving for summary judgment need not prove the absence of an essential

element of the nonmoving party's case.  Celotex, 477 U.S. at 325.  "The burden on the moving

4

party may be discharged by 'showing' – that is, pointing out to the (Court) – that there is an absence of evidence to support the non-moving party's case." Id.  Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must proffer specific facts showing that a genuine issue exists for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Federal Rule of Civil Procedure 56 requires the party opposing summary judgment to go beyond the pleadings, and by affidavits, depositions, answers to interrogatories or admissions set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324; Banks v. C & P Tel. Co., 802 F.2d 1416 (D.C. Cir. 1986).  To avoid summary judgment, the plaintiff must state specific facts or present some objective evidence that would enable the court to find an entitlement to relief.

Summary judgment is appropriate "if the evidence [the nonmoving party submits] is merely colorable . . . or is not sufficiently probative . . . (T)he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252.  Neither is unsupported speculation enough to defeat a summary judgment motion; the existence of specific, material evidentiary facts must be shown.  See Fed. R. Civ. P. 56(e) (the nonmoving party may not rest on mere allegations but "must come forward with 'specific facts showing there is a genuine issue for trial'"); see also Burke v. Gould, 286 F.3d 513, 517-20 (D.C. Cir. 2002) (requiring a showing of specific, material facts); Hayes v. Shalala, 902 F.Supp. 259, 263 (D.D.C. 1995) (opposition to summary judgment must consist of more than mere unsupported allegations or denials); Johnson v. Digital Equip. Corp., 836 F.Supp. 14, 18 (D.D.C. 1993) (evidence that is merely colorable or not sufficiently probative is insufficient to defeat summary judgment).

## ARGUMENT

I. **THE DOCTRINES OF CLAIM AND ISSUE PROCLUSION BAR SEVERAL OF PLAINTIFF'S CLAIMS.**

A. **Res Judicata (Claim Preclusion) Prevents Plaintiff From Re-Litigating Issues That Were or Could Have Been Raised in a Prior Suit Between the Parties.**

The doctrine of claim preclusion (res judicata) bars Plaintiff from raising claims that he raised, or could have raised, in prior employment discrimination litigation. Claim preclusion prevents a party from relitigating issues that were actually litigated in an earlier action as well as those that could have been litigated but were not. See Apotex, Inc. v. Food and Drug Admin., 393 F.3d 210, 217-18 (D.C. Cir. 2004); see also Allen v. McCurry, 449 U.S. 90, 94 (1980); I.A.M. National Pension Fund v. Industrial Gear Mfg. Co., 723 F2d 944, 946, 950 (D.C. Cir. 1983). The doctrine helps "conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and [ ] prevent serial forum-shopping and piecemeal litigation." Hardison v. Alexander, 655 F.2d 1281, 1299 (D.C. Cir. 1981); see also Arizona v. California, 530 U.S. 392, 412 (2000) (noting that res judicata is "based on the avoidance of unnecessary judicial waste"). A claim is precluded if (1) there is a sufficient identity between the parties in the two suits, (2) there is a final judgment on the merits in an earlier action, and (3) there is a sufficient identity of the cause of action in the two suits. See Stanford v. Potomac Electric Power Co., 394 F. Supp.2d 81, 88 (D.D.C. 2005). "Whether two cases implicate the same cause of action turns on whether they share the same nucleus of facts." Apotex, Inc., 393 F.3d at 217-18.

In this case, claim preclusion bars Plaintiff from pursuing discrimination claims based on the events that he alleges took place in 2001. That is because those claims were, or could have been, litigated in a prior employment discrimination action Plaintiff filed in this Court. In Brown

v. Snow, Plaintiff sued the Department of Treasury, and alleged violations of Title VII and the

Rehabilitation Act based on theories of retaliation, hostile work environment, and failure to

accommodate a disability.  See Brown v. Snow, 407 F. Supp.2d 61 (D.D.C. 2005).  District

Court Judge Leon awarded summary judgment to Defendant in an April 24, 2005, order, and

final judgment was entered April 27, 2005.  See Exh. 5 hereto (Final Judgment).  Thus the two

suits involved identical parties, and there has been a final judgment on the merits in the prior

action.  It follows that res judicata bars any claim raised in this suit that is based on the same

"cause of action" as Brown.  See Apotex, Inc., 393 F.3d at 217-18.

   All of Plaintiff's current claims based on events that occurred in 2001 arise out of the

same "cause of action" as Brown because they share a common "nucleus of facts."  Id.  Indeed in

many respects, the allegations in this case are identical to the allegations in the prior Brown

matter.  Here, Plaintiff alleges that: (a) he suffered from lower back pain as a result of a work

related injury on or about February 28 or March 1, 2001, Compl. ¶ 6; (b) "[o]n or about August

6, 2001…his supervisors accused him with fraud on his time and attendance sheets," id. ¶ 7; (c)

"on or about March 20, 2001, he was [reprimanded] for being two hours late, id. ¶ 9; (d) in 2001,

he was charged with being AWOL, id. ¶ 9; (e) on April 18, 2001 and July 13, 2001 he was given

a notice of proposed suspension for three and ten calendar days, respectively, id. ¶¶ 10, 14; (f) on

"September 6, 2001 he was again suspended for a period of three days," id. ¶ 14; and (g) on or

about December 10, 2001, he received an Employee Performance Appraisal of fully satisfactory,

id. ¶ 15.  Those allegations are strikingly similar to the claims Plaintiff raised in Brown, which

included the allegation that: (a) on March 20, 2001 he was charged with being AWOL; (b) in

May 2001 and September 2001 he was suspended for three days; (c) he suffered from "lower

back pain and pain in his legs" and Defendant did not accommodate his disability; (d) Defendant

accused him of altering his time and attendance sheets; and (e) Defendant discriminated against him by issuing a negative performance rating in December 2001.  See Brown, 407 F. Supp. 2d at 63-64, 67.

It follows that the final judgment entered in Brown precludes Plaintiff from re-litigating any discrimination claims based on his allegations of being suspended, accused of time and attendance fraud, given a 'fully satisfactory' performance rating, denied an accommodation of his back pain, and charged as being late and/or AWOL in 2001.  Those claims and any other allegations in the complaint concerning actions that took place in 2001 either were, or could have been, litigated in the prior action, and cannot be re-litigated here.  See Velikonja v. Ashcroft, 355 F. Supp. 2d 197, 204 (D.D.C. 2005) (dismissing on claim preclusion grounds all claims based on facts that predated the complaint plaintiff filed in a prior employment discrimination action against defendant).  There are minor differences between the legal theories Plaintiff raised in the two actions, as the prior litigation does not appear to have included claims that the AWOL charge and suspensions were based on Plaintiff's race.  However, the race discrimination claim also could have been raised in that case, and the fact that Plaintiff has raised a new theory here does not prevent res judicata from applying.  See Coleman v. Potomac Elec. Power Co., 310 F. Supp.2d 154, 161 (D.D.C. 2004) (concluding Title VII plaintiff "cannot now rely on the identical facts to present a different theory of law on which recovery might be had").  Accordingly, Rule 12(b)(6) requires dismissal of those claims.[2]

---

[2]  The Court can take judicial notice of publicly filed documents, such as the record of prior court proceedings, when resolving a Rule 12(b)(6) motion.  See Marshall Cty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1228 (D.C. Cir. 1993); Gustave-Schmidt v. Chao, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).  Taking judicial notice of those documents does not convert the 12(b)(6) motion into a motion for summary judgment.  See United States v. Rumsfeld, 350 F. Supp.2d 80, 88 (D.D.C. 2004).

**B.    Collateral Estoppel Also Prevents Plaintiff From Raising Issues That Were Resolved in the Prior Suit Between the Parties.**

The doctrine of issue preclusion (collateral estoppel) bars Plaintiff from relitigating specific legal or factual issues that were resolved in Brown.  Under that doctrine, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Yamaha Corp. of Amer. v. United States, 961 F.2d 245, 254 (D.C. Cir. 1992); see also Nextwave Personal Communications, Inc. v. FCC, 254 F.3d 130, 147 (D.C. Cir. 2001) ("a final judgment on the merits in a prior suit precludes subsequent relitigation of issues actually litigated and determined in the prior suit, regardless of whether the subsequent suit is based on the same cause of action."), aff'd on other grounds, 537 U.S. 293 (2003); IAM Nat'l Pension Fund, 723 F.2d at 947 (same).  There are three elements necessary for issue preclusion:

> (1) the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case; (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case; and (3) preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

Yamaha Corp., 961 F.2d at 254.  The doctrine protects the finality of judgments, and "is intended to free courts and parties from the onerous and unnecessary task of relitigating issues that already have been decided in a full and fair proceeding."  McLaughlin v. Bradlee, 803 F.2d 1197, 1204 (D.C. Cir. 1986).

Plaintiff's complaint repeats several of the issues decided in Brown, and those claims are all barred by collateral estoppel.  In Brown, the Court rejected Plaintiff's allegation that being charged with AWOL and suspended in 2001 constituted retaliation for his prior EEO activity. See Brown, 407 F. Supp.2d at 65-67.  That precludes Plaintiff from litigating the portions of Count I which allege retaliation based on that AWOL charge and the suspensions.  In Brown the

9

Court also entered judgment for Defendant on Plaintiff's claim that Defendants failed to accommodate his disability, and concluded that Plaintiff was not "an individual with a disability." Id. at 67-69. That precludes Plaintiff from litigating any failure to accommodate claim based on events that occurred in or before 2001. See Compl. ¶¶ 33-35 (Count III). The Brown Court also rejected Plaintiff's disability discrimination claim based on a hostile work environment theory. See 407 F. Supp.2d at 68-70. Specifically, the Court held that Plaintiff had not shown that he was an individual with a disability, and that even if he were disabled, the conduct of which he complained was not sufficiently severe to support a hostile work environment claim. See id. at 69-70. That holding precludes Plaintiff from raising hostile work environment claims based on events that transpired in 2001, because the allegedly 'hostile' acts of which he complains are identical to those at issue in the prior case.[3] Compare Compl. ¶¶ 37-40 (alleging plaintiff was subject to "close supervision," suspended, improperly evaluated and charged with time and attendance fraud, and denied accommodation of his disability) with Brown, 407 F. Supp. 2d at 70 n.10 (identifying factual allegations supporting hostile work environment claim as subjecting plaintiff to "close supervision," suspensions, negative evaluations, charging plaintiff with time and attendance fraud, and denying accommodation of disability).

The doctrine of collateral estoppel also will prevent Plaintiff from raising arguments concerning the alleged discriminatory acts in 2002 through 2004 which are dependent upon questions of law and fact actually decided in Brown. It is not clear from the face of the complaint whether Plaintiff intends to rely on questions of law and fact rejected by this Court in

---

[3] The current complaint also includes new hostile work environment claims, based on events that allegedly occurred in 2004. Collateral estoppel does not appear to bar those claims. However, collateral estoppel will prevent Plaintiff from relying on legal arguments which were addressed and rejected in Brown.

<u>Brown</u>.  Accordingly, Defendant will not know the scope of this aspect of its collateral estoppel

defense until Plaintiff has presented his position in a dispositive motion or an opposition to

Defendant's dispositive motion(s).

## II.    PLAINTIFF HAS NOT ALLEGED FACTS SUFFICIENT TO SUPPORT A CLAIM OF AGE DISCRIMINATION AND ANY SUCH CLAIM SHOULD BE DISMISSED.

To the extent Plaintiff seeks to raise a claim of age discrimination, that claim should be

dismissed pursuant to Rule 12(b)(6).  The prayer for relief requests entry of an order "finding

that Plaintiff was discriminated against because of his . . . age."  Compl. at 10.  However, the

Complaint is completely devoid of factual allegations that would support an age discrimination

claim.  Plaintiff does not state his age, and does not reference the Age Discrimination in

Employment Act ("ADEA") in the complaint.  Further, while Plaintiff accuses Defendant of

taking various acts based on his race, and of failing to accommodate his alleged disability, there

are no allegations that Plaintiff's age motivated any of Defendant's actions, or that younger

employees were treated more favorably.

Accordingly, even if one assumes the facts of the complaint to be true and gives Plaintiff

the benefit of all inferences, there simply is no basis on which one could find that Defendant

violated the ADEA.  To survive a Rule 12(b)(6) motion, Plaintiff must plead "enough facts to

state a claim for relief that is plausible on its face."  <u>Bell Atl. Corp. v. Twombly</u>, 127 S.Ct. at

1974.  Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to

provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and

a formulaic recitation of the elements of a cause of action will not do."  <u>Id.</u> at 1964-65.  Here,

Plaintiff has not plead any facts that would support his claim for relief on an age discrimination

theory.   Accordingly, to the extent the prayer for relief indicates that Plaintiff is raising an

ADEA claim, Twombly requires dismissal of that claim.

### III.    PLAINTIFF CANNOT PREVAIL ON HIS CLAIMS ALLEGING FAILURE TO ACCOMMODATE OR DISABILITY DISCRMINATION.

#### A.    Plaintiff Is Not an "Individual With a Disability."

To bring claims of disability discrimination, a federal employee must make a threshold

showing that (s)he is an "individual with a disability" within the meaning of the Rehabilitation

Act.[4]   Evidence that the plaintiff has some medical condition or impairment, such as a medical

diagnosis, is insufficient by itself to establish a disability.   See Toyota Motor Manufacturing,

Kentucky, Inc., v. Williams, 534 U.S. 184, 195 (2002); Sutton v. United Air Lines, Inc., 527 U.S.

471, 483 (1999); Albertson, Inc. v. Kirkingburg, 527 U.S. 555, 565 (1999).   Instead, the plaintiff

must show that (s)he has an impairment that substantially "limits a major life activity."   Toyota,

534 U.S. at 195; see Haynes v. Williams, 392 F.3d 478, 481-82 (D.C. Cir. 2004).   To qualify as

"substantial," the impairment must have a "permanent or long-term" impact.   Toyota, 534 U.S. at

198; compare Paegle v. Dep't of the Interior, 813 F. Supp. 61, 64 (D.D.C. 1993), aff'd, 24 F.3d

1464 (D.C. Cir. 1994) ("The [Rehabilitation] Act identifies a handicap as a severe disability of a

permanent nature").

---

[4] Plaintiff cites the Americans with Disabilities Act ("ADA") in his complaint.   See Compl. ¶ 1.
However, the ADA does not apply to federal employees; those employees' claims arise under the
Rehabilitation Act.   See Jordan v. Evans, 404 F. Supp. 2d 28, 30 (D.D.C. 2005) (citing Rivera v.
Heyman, 157 F.3d 101, 103 (2d Cir. 1998)); Woodruff v. Mineta, 215 F. Supp. 2d 135, 138-39
(D.D.C. 2002).   The text of the ADA makes this clear:   For purposes of obtaining relief under the
statute, "the term 'employer' does not include the United States."   42 U.S.C. § 12111(5)(B)(i)).
However, given that pro se plaintiffs' complaints are read liberally, Defendant will respond to
this claim as if Plaintiff had cited the correct statute.

Accordingly, Plaintiff's disability discrimination claims[5] — which are based on an alleged denial of reasonable accommodation and a hostile work environment theory — must fail unless he establishes that he had a disability that substantially limited a major life activity. Plaintiff will be unable to meet that "demanding standard for qualifying as disabled" Toyota, 122 S.Ct. at 1691. The Supreme Court has articulated a three-step test for ascertaining whether a person has such an impairment.  First, the court must determine whether the individual's condition constituted a physical or mental impairment.  Bragdon v. Abbott, 524 U.S. 624, 631 (1998).  Second, the court must "identify the life activity" that allegedly was limited, and determine whether it constitutes a major life activity.  Id.; see also Haynes, 392 F.3d at 481-82. And third, the court must determine whether the physical or mental impairment "substantially limited" the major life activity in question.  Bragdon, 524 U.S. at 631.  Plaintiff's allegations fall short in all three respects.

First, Plaintiff has not presented evidence of his physical impairments, despite having had several opportunities to do so since consulting an EEO counselor about these claims.  The complaint identifies several alleged impairments, including back pain, joint and leg pain, headaches, high blood pressure, diabetes and blurred vision.  See Compl. ¶ 7.  However, Plaintiff must substantiate those allegations with evidence that he had those conditions when the alleged disability discrimination occurred.  As of July 2003, Plaintiff had not done so, despite Defendant's repeated requests that he provide medical documentation of his alleged impairments.  See Exh. 1 (Myers letters).  In December 2003, when reviewing Plaintiff's request for a change in his work schedule, Defendant again requested that Plaintiff provide medical

---

[5] As discussed supra, to the extent Plaintiff's disability discrimination claims concern events that transpired in or before 2001, they are barred by issue and claim preclusion.  However, he also appears to contend that he was denied a reasonable accommodation and subjected to a hostile work environment because of his disability in 2003 and 2004.

documentation to support his allegation that he needed to adjust the schedule for medical reasons. See Exh. 2 (email thread concerning schedule). Unless Plaintiff comes forward with evidence of those alleged impairments, his disability claims must fail.

Second, Plaintiff has not demonstrated that the alleged impairments affect a major life activity. Plaintiff cannot satisfy that burden by showing that he has an impairment that limits his ability to perform tasks associated with a particular job. See Sutton, 527 U.S. at 492. Instead, he must prove that he had an impairment that limits activities "central to most people's daily lives." Toyota, 534 U.S. at 198. The complaint states that Plaintiff "has trouble bending, stooping, pulling, pushing, standing, and sitting long periods of time without great difficulty." Compl. ¶ 34. However, he must provide medical documentation to support those allegations, and to establish that they were permanent or at least long-term. Thus far, Plaintiff has not done so.

Finally, assuming arguendo that the medical conditions Plaintiff referenced are impairments that affect a major life activity, Plaintiff has not established that they "substantially limit" the relevant life activities. Injuries that restrict a person's ability to stand or sit for prolonged periods of time do not qualify as disabilities under the Rehabilitation Act or ADA. See, e.g., Heasley v. D.C. General Hosp., 180 F. Supp.2d 158, 166 (D.D.C. 2002) (citing cases indicating that being unable to stand for extended periods of time was not a disability). To the extent Plaintiff alleges that his back and joint pain limited the amount of weight he could pull, that also would not support a finding that he is disabled. See Siragy v. Georgetown Univ., 1999 WL 767831, at *3-*4 (D.D.C. Aug. 20, 1999) (concluding restrictions on amount of weight plaintiff could pull did not substantially limit major life activity). Further, mitigating measures, such as medication, must be taken into consideration when determining whether Plaintiff's impairment(s) substantially limited every day activities; an impairment that can be controlled or

corrected with medication or other measures does not substantially limit a life activity.  See

Sutton, 527 U.S. at 482-483; Albertson's Inc. v. Kirkingburg, 527 U.S. 555, 565 (1999).

Moreover, Plaintiff's own physician has testified that he is capable of walking, standing,

and light to moderate lifting.  Specifically, Dr. Laura Welch stated that she had reviewed the job

description for photoengravers, and concluded that "he can perform all the duties listed."  See

Exh. 6 (letter from Dr. Welch).  The job description indicated that the '[j]ob requires prolonged

walking and standing, intermittent light to moderate lifting and ability for rapid mental and

muscular coordination simultaneously; requires good eyesight and ability to perform appropriate

functions in photographic darkrooms."  Exh. 7 (position description).  Dr. Welch's opinion that

Plaintiff could walk, stand, and lift defeats Plaintiff's conclusory allegations that he had trouble

performing those activities.

**B.  Even if Plaintiff Were Disabled, His "Reasonable Accommodation" Claim Would Be Legally and Factually Deficient.**

As explained supra, res judicata and collateral estoppel preclude Plaintiff from raising

claims based on the events that allegedly occurred in 2001.  See Part I-A, supra.  Accordingly,

Plaintiff's allegation that Defendant denied his request to change his work schedule from 7:15

a.m – 3:15 pm to 6:15 am-2:45 pm in December 2003 is the only "reasonable accommodation"

claim that Plaintiff can litigate in this action.  To state a prima facie case for denial of

accommodation under the Rehabilitation Act, Plaintiff must show: (1) that he is a qualified

individual with a disability; (2) that Defendant had notice of that disability; (3) that he "can

perform the essential functions of [his] job with or without reasonable accommodation;" and (4)

that Defendant refused to reasonably accommodate his disability.  Norden v. Samper, __ F.

Supp.2d __, 2007 WL 2219312, at * 8 (D.D.C. Aug. 3, 2007); see Gordon v. District of

Columbia, 480 F. Supp.2d 112, 116 (D.D.C. 2007).  Assuming arguendo that Plaintiff is an

individual with a disability, his failure-to-accommodate claim is deficient in three respects: (1) he cannot show that Defendant had sufficient notice of his disability; (2) the evidence does not support his claim that the scheduling change he requested would have been a reasonable accommodation of his disability; and (3) Defendant proposed an alternative means of accommodating Plaintiff's needs.

Plaintiff's failure to provide medical documentation to support his request for a modified work schedule defeats any reasonable accommodation claim based on Defendant's alleged denial of that request. "An employer is not required to provide an accommodation prior to receiving medical documentation that substantiates the employee's need for accommodation." Bramwell v. Blakey, 2006 WL 1442655, at *6 (D.D.C. May 24, 2006); see also Flemmings v. Howard Univ., 198 F.3d 857, 862 (D.C. Cir. 1999) (remanding for entry of summary judgment for defendant because "no reasonable jury" could find that Plaintiff provided documentation substantiating her need for a reasonable accommodation and that Defendant denied a request substantiated in that manner); Caroll v. England, 321 F. Supp.2d 58, 69-70 (D.D.C. 2004) (concluding plaintiff could not show agency denied a reasonable accommodation when she failed to provide medical documentation requested by agency); see generally Heasley, 180 F. Supp.2d at 167 ("To receive ADA protection a disability must be demonstrated at the time plaintiff requested and was refused a reasonable accommodation."). As noted, Defendant asked Plaintiff to "provide medical documentation that justifies [the proposed] change in schedule and the duration of this change." Exh. 2 (emails concerning schedule). Plaintiff did not submit that information with his request for a revised schedule, or prior to the denial of his request. See Exhs. 3 (Morress Affidavit), 4 (Diaz-Myers Affidavit).

Plaintiff also has failed to establish the requisite connection between his alleged disabilities and the accommodation he requested.  The request simply states that a different schedule would make it more convenient for Plaintiff to schedule doctor's appointments and examinations.  See Exh. 2.  It does not indicate that Plaintiff's back and joint pain, hypertension, headaches, high blood pressure, blurred vision, or diabetes (assuming Plaintiff had any or all of those conditions) required an adjustment of Plaintiff's shift, i.e., by producing symptoms that would require him to report to work an hour earlier.  Thus Plaintiff has not linked the requested accommodation to "a specific disability raised . . . in his . . . request for accommodation." Coleman-Adebayo v. Leavitt, 326 F. Supp.2d 132, 143 (D.D.C. 2004), amended in part on other grounds 400 F. Supp.2d 257, (D.D.C. 2005) (concluding plaintiff had not established that telecommuting would accommodate the specific physical impairments she had).  Without that link, there is no basis for a jury to conclude that Defendant's request sought a "reasonable accommodation" of a disability.  Edwards v. United States Environmental Protection Agency, 456 F. Supp.2d 72, 100-01 (D.D.C. 2006) (concluding plaintiff's failure to show that bringing dog to work would be an "effective means of responding to his disability" precluded finding that his request for accommodation was reasonable).

Finally, even if the schedule modification were sufficiently related to a medical impairment, Defendant's proposal of an alternative solution satisfied any obligation the agency may have had to accommodate Plaintiff.  An employer is not required to provide the precise reasonable accommodation an employee wants, so long as the employer provides a reasonable accommodation that is effective.  See Dage v. Leavitt, 2007 WL 81961, at *7 (D.D.C. Jan. 9, 2007); accord Schmidt v. Methodist Hosp. of Indiana, Inc., 89 F.3d 342, 344 (7th Cir. 1996) (citing Stewart v. County of Brown, 86 F.3d 107 (7th Cir. 1996)); Stewart v. Happy Herman's

17

Cheshire Bridge, Inc., 117 F.3d 1278, 1285-86 (11th Cir. 1997) ("Stated plainly, under the ADA

a qualified individual with a disability is not entitled to the accommodation of her choice, but

only to a reasonable accommodation.").  Instead, [a]n employer "has the ultimate discretion to

choose between effective accommodations, and may choose the less expensive accommodation

or the accommodation that is easier for it to provide."  Smith v. Midland Brake, Inc., 180 F.3d

1154, 1177 (10th Cir. 1999) (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1137 (8th

Cir. 1999)).

Defendant's proposal that Plaintiff use sick leave for his doctor's appointments was an

alternative, effective, accommodation of his alleged medical needs.  Defendant informed

Plaintiff that it would "be more than happy to grant [him] sick leave for [his] doctor

appointments."  Exh. 2 (ROI Tab 12 (emails concerning schedule).  That alternative was

consistent with the Bureau of Engraving and Printing's leave policy and, unlike Plaintiff's

proposed scheduling change, would not have a negative impact on the rest of the work unit.  See

id.[6]

## IV.    PLAINTIFF HAS NO VIABLE RETALIATION OR DISPARATE TREATMENT CLAIM BASED ON THE "ACHIEVED STANDARDS" PERFORMANCE EVALUATION BECAUSE THAT EVALUATION WAS NOT AN ADVERSE EMPLOYMENT ACTION.

### A.    To Articulate a Prima Facie Case of Retaliation or Racial Discrimination, Plaintiff Must Show that He Suffered an Adverse Employment Action.

To establish a prima facie case of retaliation, Plaintiff must demonstrate that (1) he has

engaged in a protected activity, which was known by the alleged retaliator, (2) he was subject to

an adverse action, and (3) there is a causal link between the adverse action and the protected

activity.  See Paquin v. Federal National Mortgage Association, 119 F.3d 23, 31 (D.C. Cir.

---

[6] There is no indication that Plaintiff's doctors visits were so frequent that they required a
wholesale schedule change, rather than approval of leave as they occur.

1997); Passer v. American Chem. Soc'y, 935 F.2d 322, 331 (D.C. Cir. 1991); Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985); Menna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1984). To qualify as adverse, the challenged action must be likely to dissuade a reasonable worker in the plaintiff's position from engaging in protected activity. Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006). Courts ask whether the challenged action would have had that effect on a "reasonable employee." Id.; Gardner v. District of Columbia, 448 F. Supp.2d 70, 75 (D.D.C. 2006).

In the absence of direct evidence, Plaintiff may attempt to establish that he was the victim of intentional discrimination on the basis of his race by relying on circumstantial evidence analyzed using the scheme first set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that scheme, the plaintiff must first, by a preponderance of the evidence, establish a prima facie case of discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). If the employee succeeds, the employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action. See McDonnell Douglas, 411 U.S. at 802. Once it is established that both parties have met their respective burdens of production (i.e., plaintiff by presenting a prima facie case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant. Hicks, 509 U.S. at 510. Then, the plaintiff must establish, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice." Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (citing 42 U.S.C. § 2000e-2(m)).

The Supreme Court has explained that the elements of a prima facie case of discrimination may differ from case to case. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 n.6 (1981). The fundamental requirement, however, is that the prima facie

case, without additional proof to the contrary, give rise to an inference that the defendant's conduct was discriminatory.  See Simens v. Reno, 960 F.Supp 6, 8-9 (D.D.C. 1997).  As a general matter, therefore, to establish a prima facie case of discrimination based on race or sex under Title VII, a plaintiff must demonstrate by a preponderance of the evidence that (1) he was a member of a protected group, (2) an adverse employment action took place, and (3) the unfavorable action gives rise to an inference of discrimination.  See Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002).

### B.    The "Achieved Standards" Performance Evaluation Was Not Adverse.

The performance rating Plaintiff received would not be adverse under either standard. Essentially, Plaintiff alleges that he was discriminated against when he was given an "achieved standards" rating in November 2003.  See Exh. 7 (defining accomplishments necessary for "achieved standards" rating).  He received the same rating the preceding year from the same managers.  See Exh. 8 (performance evaluation).  The only differences between the two ratings were that (1) one of his five job elements had previously been rated as Exceeded Standards, and (2) there was a comment in the narrative of the appraisal concerning an unintentional error that plaintiff made.  See id.  Plaintiff has not explained how the one change in a sub-element of the rating or the comment in the narrative was harmful, or would deter a reasonable person from pursuing protected activity.

As the D.C. Circuit has made clear, "in most circumstances performance evaluations alone at the satisfactory level or above should not be considered adverse employment actions." Russell v. Principi, 257 F.3d 815, 819 (D.C. Cir. 2001) (citing Brown, 199 F.3d at 456-58); see also Lester, 290 F. Supp. 2d at 29 ("plaintiff's claims of inaccurate, unfair or delayed performance appraisals do not constitute actionable adverse employment actions.").  In light of

this "thick body of precedent," <u>Brown</u>, 199 F.3d at 458,  Plaintiff cannot prevail on a claim of

race discrimination unless he shows that his performance review had a tangible impact on the

terms and conditions of his employment.  <u>See</u> <u>Burke v. Gould</u>, 286 F.3d 513, 522 (D.C. Cir.

2002) (noting that is the burden of plaintiff to make the necessary showing of adversity); <u>Mack</u>

<u>v. Strauss</u>, 13 F. Supp.2d 103, 112 (D.D.C. 2001) (same).  He will not be able to do so.  There

were no monetary awards tied to the performance rating that an employee received.  Nor is there

any evidence that Plaintiff applied for any positions and was somehow impeded from being

selected as a result of his achieved standards rating.

Plaintiff also will be unable to show that the "achieved standards" rating was sufficiently

"adverse" to deter a reasonable employee from engaging in protected activity.  Defendant

acknowledges that in some circumstances, a rating that is neutral on its face might have a

materially adverse effect.  <u>See</u> <u>Weber v. Batista</u>, 494 F.3d 179, 184-85 (D.C. Cir. 2007)

(reversing award of summary judgment and remanding for district court to determine whether

evaluations led to lower performance or cash awards).  However, in <u>Weber</u>, the plaintiff alleged

that she had received higher performance evaluations in prior years, and that the reduced

evaluations caused her to lose a cash award.  <u>See</u> <u>id.</u> at 184.  As noted, Plaintiff received a nearly

identical evaluation the prior year, and has not alleged that a higher performance rating would

have triggered monetary awards.

For the foregoing reasons, Defendant should be awarded summary judgment on the

retaliation and race discrimination claims premised on the "achieved standards" evaluation.

Plaintiff simply has not articulated a <u>prima facie</u> case of retaliation or race discrimination.[7]

---

[7] If the Court concludes that Plaintiff has made a prima facie case of discrimination or reprisal, Defendant reserves the right to present a legitimate non-discriminatory reason for its actions. However, this pre-discovery dispositive motion focuses solely on the lack of a <u>prima facie</u> case.

Plaintiff may personally believe that he deserves a higher rating; and his refusal to sign his

performance appraisal suggests that he does.  However, "[a]n employee's opinion that a

performance review was unfair, supported only by her own conclusory statements to that effect,

cannot bootstrap her claims into a Title VII claim of discrimination."  Moorer v. Grumman

Aerospace Corp., 964 F. Supp. 665, 674 (E.D.N.Y.) (citation omitted), aff'd 162 F.3d 1148 (2d

Cir. 1998).

## **CONCLUSION**

For the reasons stated herein, Defendant respectfully requests that Plaintiff's complaint

be dismissed in part with prejudice, and that Defendant be awarded partial summary judgment.

Dated: September 25, 2007                      Respectfully submitted,


             _____/s/ Jeffrey A. Taylor   by MJ_____
             JEFFREY A. TAYLOR, D.C. BAR # 498610
             United States Attorney


             _____/s/ Rudolph Contreras_____
             RUDOLPH CONTRERAS, D.C. BAR #434122
             Assistant United States Attorney


             _ /s/ Robin M. Meriweather_____.
             ROBIN M. MERIWEATHER, D.C. Bar. # 490114
             Assistant United States Attorney
             555 Fourth St., N.W.
             Washington, D.C.  20530
             Phone: (202) 514-7198  Fax: (202) 514-8780
             Robin.Meriweather2@usdoj.gov

**Of Counsel:**

NICHOLE JENKINS WASHINGTON
Office of the Chief Counsel
Department of the Treasury
Bureau Of Engraving and Printing

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of September, 2007, I caused the foregoing

to be filed via the Court's Electronic Case Filing system, and to be served upon plaintiff

by first-class mail, postage prepaid, addressed as follows:

THOMAS D. BROWN, SR.
3162 17th Street, NW
Washington, DC 20010-2748


        /s/   Robin M. Meriweather
        ROBIN M. MERIWEATHER, D.C. Bar # 490114

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
THOMAS D. BROWN, SR.,                     )
3162 17th Street, N.W.                     )
Washington, DC  20010-2748                )    Civil Action 07-0509 (RMU)
              Plaintiff,                   )
                                          )
        vi.                                )
                                          )
HENRY M. PAULSON, JR., Secretary,         )
Department of the Treasury,               )
              Defendant.                   )
_____)

## ORDER

Upon consideration of Defendant's Motion to Dismiss and for Summary Judgment it is, this _____ day of _____, 200__,

ORDERED that Defendant's Motion be and hereby is, GRANTED;

it is further ORDERED that all of Plaintiff's claims that arise out of allegedly discriminatory events in 2001 be and hereby are DISMISSED with prejudice;

it is further ORDERED that Plaintiff's age discrimination claim be and hereby is DISMISSED with prejudice;

it is further ORDERED that SUMMARY JUDGMENT be and hereby is entered for Defendant on Plaintiff's disability discrimination claims, including his allegation that he was denied a reasonable accommodation of his disability;

it is further ORDERED that SUMMARY JUDGMENT be and hereby is entered for Defendant on Plaintiff's race discrimination and retaliation claims based on his receipt of an "achieved standards" performance evaluation in 2003.

SO ORDERED

_____

United States District Judge

# Index of Exhibits

1.    Letters from Judith Diaz Meyers Dated July 1, 2003 and July 17, 2003
2.    Electronic Mail Thread Dated December 4-5, 2003
3.    Affidavit of Ross Morres
4.    Affidavit of Judith Diaz-Myers
5.    Final Judgment in <u>Brown v. Snow</u>, No. 03-1114 (D.D.C.) (RJL)
6.    Letter from Dr. Laura Welch dated December 31, 2002
7.    Position Description and Performance Evaluation Plan
8.    Performance Appraisals Dated November 19, 2002 and November 4, 2003
9.    Letter from Judith Diaz Myers Dated December 11, 2002

# EXHIBIT ONE



# DEPARTMENT OF THE TREASURY

## BUREAU OF ENGRAVING AND PRINTING

### WASHINGTON, D.C.   20228

Karl W. Carter, Esquire
2301 "M" Street, N.W.
Washington, DC  20036

July 17, 2003

Dear Mr. Carter:

I am forwarding a copy of a memorandum that I sent to Thomas D. Brown on July 1, 2003, requesting that his physician specifically address several issues pertaining to his recent District Court claim that he has not been accommodated for disabling conditions that include:  headaches, high blood pressure, diabetes, and blurred vision.  Mr. Brown never made the agency aware that these conditions may be disabling prior to his above-noted complaint.

Based on Mr. Brown's recent claims regarding these conditions, the agency is obligated to inquire about them, and discern whether accommodations are necessary.

To date, Mr. Brown's physician has not provided the requested medical documentation.

I would appreciate any assistance you can provide in this matter.

Sincerely,

Judith Diaz Myers
Chief, Office of Engraving
Bureau of Engraving and Printing

149



# DEPARTMENT OF THE TREASURY
## BUREAU OF ENGRAVING AND PRINTING
### WASHINGTON, D.C. 20228

MEMORANDUM FOR THOMAS D. BROWN, PHOTOENGRAVER
PHOTOENGRAVING SECTION

FROM:              Judith Diaz Myers, Chief *Dllyers)* 7/1/07
                   Office of Engraving

SUBJECT:           Medical Documentation

I have made several attempts to obtain medical documentation in order to determine whether you are disabled under the Rehabilitation Act, 29 U.S.C. § 701 et. seq. To date, you have not submitted medical documentation addressing the specific criteria needed in order for you to qualify for an accommodation under the Act. The Agency was recently informed that you still have lifting restrictions. As the Agency has not received information regarding how long these restrictions need to be in place, or whether you are in fact disabled, the Agency needs more information regarding your condition. I am concerned that your medical condition may interfere with your ability to perform some of the essential functions of your position. This is especially so since all of the Photoengravers are now involved in cross-training in the Office of Engraving and are consequently expected to perform their full range of duties.

Moreover, based on your recent District Court complaint for damages and injunctive relief, the Agency has become aware that you are suffering from the following conditions which may be disabling: headaches, high blood pressure, diabetes, and blurred vision. You have never notified the Agency that these conditions are disabling, and that you are in need of accommodations related to said conditions. However, you state in your recent district court case that the Agency has not been accommodating your medical condition (although no particular accommodation is requested). Based on this information, the Agency needs to know more about these conditions, and what sort of accommodations you may require.

In order to consider further accommodations, I need to determine whether or not you are disabled under the provisions of the Rehabilitation Act. In order to qualify for accommodation, you must establish that you are disabled under the Act, and that you can perform the essential functions of the position with or without an accommodation. Accordingly, in order for a determination to be made

150

upon any further request for accommodation, the information listed below should be provided to the Agency by your treating physician(s).

**Medical Information Required:**

Please ensure that your physician specifically address each of the following issues for each condition you consider a disability:

a. Diagnosis, including a description of the nature, severity, and duration of your impairment(s);

b. A description of the major life activity that is substantially limited by the impairments (if any), and an explanation regarding how that activity is impaired;

c. An estimate of the expected date of full or partial recovery if possible for each impairment (or an explanation if the conditions are permanent).

d. An evaluation of the impact of the medical conditions on your capacity to perform the duties of your position, i.e., an explanation of the extent to which the impairments limit your ability to perform the activities essential to your position (this assessment should be made in conjunction with your physician reviewing your job description.)

e. If an accommodation is necessary to allow you to perform an essential function of your position, describe with specificity the accommodation, and the duration of the accommodation.

f. If applicable, an explanation of why, because of the impairments, the requested reasonable accommodation is needed. This can take the form of a narrative explanation.

g. An explanation of whether you can perform the essential duties of your position (contained in your position description) with or without an accommodation.

I have again enclosed a copy of your position description for use by your physician in responding to these questions.

A response to any requested accommodation will be provided after the above-noted medical documentation is submitted, which Management also has a right to review in conjunction with Dr. James Thiel, Agency Medical Director. Depending on the evaluation of your condition and the recommendation of medical authorities, the Agency may at that time: (a) deny your request for accommodation; (b) grant your request for accommodation, (c) order an

2

151

examination by an Agency appointed physician, if your doctor does not supply adequate information regarding your condition or (d) meet with you to discuss alternate appropriate accommodations for your alleged disability.

Any medical information submitted should be addressed to the following:

> Dr. James Thiel, Medical Director
> Health Unit
> Agency of Engraving and Printing
> 14th & C. Streets S.W.
> Washington, D.C. 20228

Please respond within fourteen days from your receipt of this memorandum. If we do not hear from you, we have no choice but to return you to full duty, or take any other necessary action.

If you have any questions regarding this memorandum please contact me.

3

*152*

# EXHIBIT TWO

## Brown Thomas

| | |
|---|---|
| **From:** | DiazMyers Judith |
| **Sent:** | Friday, December 05, 2003 2:34 PM |
| **To:** | Brown Thomas |
| **Cc:** | DiazMyers Judith; Morres Ross; Bishop Robert; Reidy Patrick; Carpenter Russell |
| **Subject:** | FW: Securing the work area (Pre-Press) tour of duty hours |
| | |
| **Importance:** | High |

Mr. Brown: I cannot accommodate a change in your tour of duty. Changing your duty hours will have a negative impact on the entire work unit due to the section closing security requirements. The Bureau's Leave Policy allows an employee to use Sick Leave for doctor appointments. Please refer to the Leave Policy for further details. We will be more than happy to grant you sick leave for your doctor appointments.

-----Original Message-----
**From:** Brown Thomas
**Sent:** Friday, December 05, 2003 9:32 AM
**To:** DiazMyers Judith
**Cc:** Bishop Robert; Morres Ross; Reidy Patrick; Carpenter Russell
**Subject:** RE: Securing the work area (Pre-Press) tour of duty hours

-----Original Message-----
**From:** DiazMyers Judith
**Sent:** Thursday, December 04, 2003 3:34 PM
**To:** Brown Thomas
**Cc:** Bishop Robert; Morres Ross; Reidy Patrick; Carpenter Russell; DiazMyers Judith
**Subject:** RE: Securing the work area (Pre-Press) tour of duty hours

Please provide medical documentation that justifies this change in schedule and the duration of this change.

-----Original Message-----
**From:** Brown Thomas
**Sent:** Thursday, December 04, 2003 12:39 PM
**To:** Reidy Patrick
**Cc:** Bishop Robert; Morres Ross; DiazMyers Judith
**Subject:** Securing the work area (Pre-Press) tour of duty hours

Due to medical reasons beyond my control, I would appreciate your cooperation in changing my tour of duty hours from 7:15am-3:15pm to: 6:15am-2:45pm Monday through Friday until further notice. During the month of September through December I will be Schedule for a series of doctor's appointments, evuluations, and examinations in the up coming months or for duration until further notice. At the present time i t has been a hardship for me to keep all of my appointments due to various times in scheduling. I have managed to schedule most of the appointments without using my leave so I am arranging my hours tour of duty hour to accommodate my appointments.

Thank You,
Mr. Thomas D. Brown,Sr.

1

145

# EXHIBIT THREE

Management Affidavit Questions:  Ross Morres

**AFFIDAVIT**                                   **WASHINGTON, D.C.**

1.  **State your name, current title, series, grade, race, color, sex, age with date of birth and religion.**

Ross E. Morres, III
Program Manager, Plate Preparation Division
Native American – Caucasian
White
GS-14

2.  **Please identify your present position and the management official to whom you report.**

Program Manager, Plate Preparation Division
Mark Pipkin, Office Chief

3.  **Please describe your professional relationship to the complainant.**

From May 2002 to June 2004, I was the complainant's manager.

4.  **At the time that you reviewed the appraisal in question, were you aware of any prior protected EEO activity by the complainant?  If so, please describe the activity, indicate when the activity occurred, and explain how you were aware of it.  Did the complainant's prior protected EEO activity play a role in your approving the appraisal at issue in this case?**

Yes, I was aware of prior EEO activity, but the activity in question occurred prior to my employment.  His activity did not have any influence regarding his appraisal.

5.  **Were you aware of the complainant having a disability?  If so, how and when did you become aware?**

No.

6.  **The complainant has alleged that he was subjected to harassment based on his race, color, sex, age, religion, disability and prior EEO activity.  Please respond, addressing the allegation as specifically as you can.  If you have documents that relate to the matter, please provide them.**

The complainant was never subjected to harassment based on the above allegations or any other form or characteristic that might constitute harassment.  To the best of my knowledge, the complainant never attempted to communicate to the Office Chief, to the Assistant Office Chief, to me, to the section Foreman, or to his immediate supervisor, either verbally or in writing, that he was allegedly subjected to harassment.

120

**ISSUE # 1:  On November 20, 2003, the complainant received an "Achieved" Standard  Performance Rating for the rating period 2002 to 2003**

   **A.   Please describe in chronological order, the factual events that led up to the rating given.**

For the previous year's activity, the complainant was rated on his job performance which was conducted over that period of time.  During that time, the complainant was issued a number of work assignments.  Most assignments were completed fair or satisfactorily to the best of my knowledge which merited an "Achieved" Standard Performance rating.

   **B.   Please identify what information (e.g., written documents, advice from others, etc.) you relied when reviewing the complainant's performance appraisal?**

The performance review was compiled by input from the two Foremen and the Supervisor and submitted to me for initial review and then again to me after the review was discussed.

   **C.   Was the complainant provided performance expectations with regard to the appraisal in question?  If so, when were the expectations provided?**

Yes.  The performance standards for Photoengravers were distributed to the complainant on or about April 10, 2002.

   **D.   Did the complainant receive a mid-year review on his performance during the rating period?  If so, by whom, when and what was discussed?**

Yes.

   **E.   Prior to reviewing the appraisal, did you consult with any other management official about the rating?  If so, with whom, when, and what was discussed?**

No.

   **F.   Please provide any additional information relevant to this issue.**


**ISSUE # 2:  On December 5, 2003, the complainant was denied a reasonable accommodation when he requested a change in his work hours to 6:15am to 2:45pm for the months of September through December 2003**

   **A.   Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue?  Please explain.**

121

On or about September 10, 2003, the Office Chief issued a memorandum to the shop steward for local 285 informing him of the necessity to establish one work schedule for the Photoengraving section. Those working hours would be 6:30AM to 3:00PM. Copies of this memorandum were circulated to me, the Photoengraving supervisors, the Manager of the Labor-Management Relations department, and to all of the Photoengraving staff.

On December 3, 2003, the complainant e-mailed the Office Chief seeking cooperation in changing his duty hours in order to avoid using sick or annual leave to keep his medical appointments. The Office Chief replied to the complainant's e-mail requesting medical documentation that justifies this change in schedule and the duration of this change. The Office Chief forwarded me another reply to the complainant which clearly explained to him why the Bureau would not be providing him with this request. The complainant did not provide me with any medical documentation to support his request.

## ISSUE #3:  On December 15, 2003, the complainant was charged Absence Without Leave (AWOL)

### A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.

On December 8, 2003, the complainant called in sick. Around 8:15AM, the Supervisor saw him and asked why he was at work. The complainant said he changed his mind. On December 9, the Supervisor asked him to submit a leave slip for the absence on December 8. On review of the leave slip, the Supervisor noticed that the requested time off did not correspond to the complainant's working hours. He put down that he was absent with sick leave from 7:15AM to 8:15AM while his duty hours were to begin at 7:00AM.

On December 11, the Supervisor instructed the complainant to correct the leave slip in order to account for the time off from work. The complainant refused to adjust the leave slip request. The complainant was reminded then that since he would not adjust the leave slip that he'd be charged with AWOL to account for his full duty hours. The complainant did not correct the leave slip and he also did not resubmit it. Consequently, he would now be charged with additional time as AWOL. The Supervisor informed the section Foreman via e-mail, and I received a copy. The section Foreman wrote an e-mail to the complainant reminding him of his duty hours, and he instructed him to request for the proper amount of leave time.

On or about December 15, the complainant resubmitted his original leave slip which still did not fully account for his absence, and as a result, he was charged with AWOL for remaining balance.

## ISSUE # 4:  On January 13, 2004, the complainant was issue a "Letter of Warning" concerning the AWOL

### A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.

On January 13, 2004, the complainant received a letter of warning with regard to ISSUE #3 for failure to follow the supervisor's instructions. The complainant, the Supervisor, and the Foreman discussed the letter. The complainant refused to sign the letter acknowledging receipt of it. I was provided with a copy of the letter.

122

On or about January 21, 2004, I received a copy of a memorandum from the Office Chief to the complainant acknowledging receipt of his letter which advised him that if he was filing a grievance that he should follow the guidelines provided through his bargaining unit. To my knowledge, the complainant did not file a grievance.

## ISSUE # 5:  On January 13, 2004, the complainant was insulted and threatened by a co-worker

### A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement in, if any in this issue?  Please explain.

On January 14, 2004, the complainant came into my office to complain about alleged verbal harassment he received from a female co-worker. This alleged incident occurred when the complainant was in the process of locking up the pre-press section (room 412-A) and by turning the lights out. The complainant claimed that he was unaware that his co-worker was still in the section. The complainant claimed that she cursed him severely. He also said that he felt threatened and that he was no longer going to lock up the section any more. The Assistant Office Chief was in the hallway when this conversation took place, and he later sent me an e-mail requesting that I investigate this further.

On January 15, 2004, I asked the complainant and his supervisor to meet with me to discuss the alleged incident. He told me his side of the story again. He also mentioned a similar incident that occurred some months ago. This issue had been discussed among the complainant, the female co-worker, the Supervisor and the section Foreman. The complainant said that he had brought this up before and that he wanted an apology from the co-worker. She declined. I suggested that this issue first be resolved possibly by taking it to the Alternative Dispute Resolution (ADR). The complainant was not receptive to this. I then told him that if he seriously felt threatened that he write a statement saying so, and that I would then take it to the next level. However, he declined - saying that he did not want anyone to get in trouble. He hoped for an apology from the co-worker, but he was not expecting one. I told him that I would speak to the co-worker. We also agreed that this matter would not be taken any further since he declined to write a statement about the incident on January 14, 2004. He seemed to be satisfied with this approach and I considered this issue closed.

On January 20, 2004, the complainant submitted a letter to the Office Chief stating that he had been insulted and had felt threatened by a female co-worker on January 14, 2004.

I spoke to the complainant's co-worker on January 20, 2004. She said she did not threaten him nor did she curse at him. She also referred to the similar incident from several months before. She did say she raised her voice but she did not curse him nor did she threaten him. I also suggested ADR as a possible way to resolve their difference. She was slightly interested. Her preferences were that he stayed away from her, and that he turn his time sheets in on time like the other Photoengravers. If she needed something from him, she would request it through the Supervisor. I thanked her for her time and told her if necessary, I would get back with her.

## ISSUE # 6:  On February 17, 2004, the complainant's training request was denied

### A. Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.

123

On February 11, 2004, the main FAX machine in the Office of Engraving received a training notice from Computer Consultants Corporation (CCC) that was addressed to the complainant. I dropped the notice off at his work area.

On or about February 17, 2004, the complainant presumably left a training request in my office to attend several training classes sponsored by CCC. First, I notified the section Foreman that the complainant had submitted the training request. We discussed its merit and came to the conclusion that since he had not completed any of the in-house training tutorials on the more applicable programs that it would be best to remind him to complete them first before requesting outside training. Secondly, I referred to the Photoengraving Staff training matrix (see attached) and further concluded that since he had nearly four times the amount of training hours than his co-workers that it was not appropriate at that time to send him to additional training. Thirdly, I wrote a memorandum to the complainant explaining to him why his request was being denied at that time.

**ISSUE # 7:  On February 17, 2004, the complainant was told by his supervisor that he was no longer on light duty**

    **A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.**

The complainant was placed on limited or light duty status beginning April 2003. To the best of my knowledge, he was reminded that this duty status was temporary and that it would last no longer than 12 months. To the best of my knowledge the complainant was periodically asked about his health status and based on his feedback, it was determined that he could be removed from limited or light duty. I was kept informed of this situation through discussions with the Foreman and the Supervisor.

**ISSUE #8:  On March 3, 2004, the complainant was harassed and retaliated against by his supervisor when he was told to respond and complete an assignment by March 9, 2004**

    **A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.**

To the best of my knowledge, the complainant was not harassed or retaliated against by his supervisor. The assignment the complainant referred to was received by the Assistant Supervisor on February 23, 2004. The complainant was given the assignment the same day. The complainant was provided with written instructions to complete the assignment. The next day, specifications to complete this assignment changed, and the complainant was provided with a new set of instructions the following day (Feb. 25). To my knowledge, the complainant could not or did not complete the assignment within an acceptable prescribed time frame, and it was re-assigned to another employee. I was not involved with this issue except that I received a copy of the memorandum from the Assistant Supervisor (see attached) to the complainant informing him that the assignment was not completed and that there was a deadline to meet.

**ISSUE #9:  The agency failed to accommodate his disability**

    **A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.**

124

I am not aware that the complainant had a disability.

I have read the above statement consisting of 5 pages and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Ross Morres

Subscribed and sworn to before me
in Washington, D.C., on October 11, 2005.

Lewis T. Muñoz
EEO Investigator

125

# EXHIBIT FOUR

**Management Affidavit Questions: Judith Diaz-Myers**

**AFFIDAVIT**                                          **WASHINGTON, D.C.**

1.   **State your name, current title, series, grade, race, color, sex, age with date of birth and religion.** Judith Díaz Myers, Associate Director (Technology), ES-1301-00, Hispanic, Female, 46 (DOB March 27, 1959), Non-denomination Christian.

2.   **Please identify your present position and the management official to whom you report.** Associate Director (Technology), Deputy Director

3.   **Please describe your professional relationship to the complainant.**
     I was the complainant's former Office Chief (4th line Supervisor)

4.   **At the time that you reviewed the appraisal in question, were you aware of any prior protected EEO activity by the complainant? If so, please describe the activity, indicate when the activity occurred, and explain how you were aware of it. Did the complainant's prior protected EEO activity play a role in your approving the appraisal at issue in this case?**
     This was handled at the Assistant Supervisor/Supervisor/Manager level.

5.   **Were you aware of the complainant having a disability? If so, how and when did you become aware?**
     I was aware that he alleged that he had a disability only because he told me so himself. However, he never provided supporting documentation. I do not recall exactly when he told me.

6.   **The complainant has alleged that he was subjected to harassment based on his race, color, sex, age, religion, disability and prior EEO activity. Please respond, addressing the allegation as specifically as you can. If you have documents that relate to the matter, please provide them.**
     I am aware that he felt this because he told me this. However, I did not witness such harassment.

**ISSUE # 1: On November 20, 2003, the complainant received an "Achieved" Standard Performance Rating for the rating period 2002 to 2003**

A.   **Please describe in chronological order, the factual events that led up to the rating given. What was your involvement, if any in this issue? Please explain.**
     This was handled at the Assistant Supervisor/Supervisor/Manager level.

126

**ISSUE # 2:  On December 5, 2003, the complainant was denied a reasonable accommodation when he requested a change in his work hours to 6:15am to 2:45pm for the months of September through December 2003.**

    A.   **Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue? Please explain.**

In September 2003, I had issued a memorandum to the Photoengravers Union (of which Complainant was a member) giving them advance notice of the need for the establishment of one work schedule for all Photoengravers. This was due to the nature of the work, the security requirements of the areas, and the interdependence of functions required to meet mission requirements in a timely manner without additional unnecessary costs. Plus, we had lost four employees in this work unit, without a corresponding decrease in workload. A copy of this memorandum is attached. In spite of the mission-driven requirements of his work section, on December 4, 2003, Complainant emailed me and requested a tour of duty hour change so that he could minimize the use of his annual and sick leave for some upcoming doctor appointments. I could not accommodate his request because it would have a negative impact on the entire work unit (all his fellow employees) due to the security requirements for closing the section at the end of the work shift. A copy of this email is attached. My understanding at the time was that the Complainant had sufficient annual and sick leave balances.

**ISSUE #3:  On December 15, 2003, the complainant was charged Absence Without Leave (AWOL)**

    A.   **Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue? Please explain.**

This was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE # 4:  On January 13, 2004, the complainant was issue a "Letter of Warning" concerning the AWOL**

    A.   **Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue? Please explain.**

I became aware of this by receipt a letter from the Complainant dated January 15, 2004. A copy of this letter is attached. I forwarded the letter to his Division Manager, Mr. Ross Morres for handling. To my knowledge, this was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE # 5:  On January 13, 2004, the complainant was insulted and threatened by a co-worker**

    A.   **Please describe in chronological order all the events leading up to this issue. What was your involvement in, if any in this issue? Please explain.**

127

The Complainant sent me a letter dated January 15, 2004 on this issue. A copy of this letter is attached. Since the letter stated that the Complainant "...felt scared, threatening, and defenseless,...", I forwarded the letter to the BEP's Threats and Violence Panel for investigation and adjudication. To my recollection, the Panel determined that the co-worker's words did no constitute a threat and that the Complainant's initial actions in the exchange raised the question of whether he was attempting to antagonize his co-worker.

**ISSUE # 6:  On February 17, 2004, the complainant's training request was denied**

   **A.  Please describe in chronological order all the events leading up to this**
        **issue.  What was your involvement, if any in this issue?  Please explain.**
   This was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE # 7:  On February 17, 2004, the complainant was told by his supervisor that he was no longer on light duty**

   **A.  Please describe in chronological order all the events leading up to this**
        **issue.  What was your involvement, if any in this issue?  Please explain.**
   This was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE #8:  On March 3, 2004, the complainant was harassed and retaliated against by his supervisor when he was told to respond and complete an assignment by March 9, 2004**

   **A.  Please describe in chronological order all the events leading up to this**
        **issue.  What was your involvement, if any in this issue?  Please explain.**
   This was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE #9:  The agency failed to accommodate his disability**

   **A.  Please describe in chronological order all the events leading up to this**
        **issue.  What was your involvement, if any in this issue?  Please explain.**
   I was aware that he alleged that he had a disability only because he told me so himself.  However, he never provided supporting documentation. It was my understanding that his Supervisor's consistently accommodated a recurring health condition, per instructions from his Doctor.

128

I have read the above statement consisting of 3 pages and it is true and complete to the best of my knowledge and belief.  I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Judith Diaz Myers

Subscribed and sworn to before me
in Washington, D.C., on October 4, 2005.

Lewis T. Muñoz
EEO Investigator

129

# EXHIBIT FIVE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THOMAS D. BROWN,                          )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )    Civil Case No. 03-1114 (RJL)
                                          )
                                          )
JOHN W. SNOW, SECRETARY                   )
UNITED STATES DEPARTMENT                  )
OF TREASURY (BEP)                         )
                                          )
                    Defendant.            )


## FINAL JUDGMENT

For the reasons set forth in the Memorandum Opinion and Order entered this 24th

day of April, 2005, it is hereby

**ORDERED** that the defendant's Motion for Summary Judgment [#11] is

**GRANTED**; and it is further

**ORDERED** that judgment is entered in favor of the defendant, and the case is

dismissed with prejudice.

**SO ORDERED.**



RICHARD J. LEON
United States District Judge



# EXHIBIT SIX



Laura Welch, MD
*Section Director*

# Washington
# Hospital Center

Occupational & Environmental
Medicine

December 31, 2002

Dr. Cheryl Opalak, Medical Director
Health Unit
Bureau of Engraving and Printing
14th & C Streets, SW
Washington, DC 20228

Re: Thomas Brown

Dear Dr. Opalak,

Thomas Brown gave me a copy of a memo from Judith Diaz Myers regarding permanent accommodation of his back condition.

I think you have all of the medical information requested in that memo; I'm attaching my most recent letter.

I reviewed the job description of photoengravers (WE-4425). Would you please explain to me which of his duties he cannot perform within the limitations I have requested. As far as I can tell, he can perform all the duties listed. The job description does not provide details on weights lifted or a definition of "prolonged" standing and walking.

My medical restrictions are clear. I believe it is now BEP's responsibility to determine if these restrictions can be accommodated. I would point out Mr. Brown has been doing this job with these specific restrictions for a long time, so to my knowledge these restrictions can be accommodated within his job.

Sincerely,

Laura Welch, M.D.

cc:     Thomas Brown
        J. Myers

*MedStar Health*

100 Irving Street, NW, Suite EB-1114, Washington, DC 20010-2975
*phone:* 202 877 5466 • *fax:* 202 877 4136

# EXHIBIT SEVEN

(Please read instructions on the Back)

| 2. Reason for Submission | 3. Services | 4. Employing Office Location | 5. Duty Station | 1. Agency Position No. 13221 |
|---|---|---|---|---|
| [ ] Redescription  [X] New | [X] Hdqtrs. [ ] Field | Washington, DC | Washington, DC | 6. OPM Certification No. |
| [ ] Reestablishment [ ] Other | | 7. Fair Labor Standards Act | 8. Financial Statements Required | 9. Subject to IA Action |
| F___nation (Show any positions replaced) | | [ ] Exempt [X] Nonexempt | [ ] Executive Personnel Financial Disclosure [ ] Employment and Financial Interests | [ ] Yes [ ] No |

| 10. Position Status | 11. Position is: | 12. Sensitivity | 13. Competitive Level Code 847 |
|---|---|---|---|
| [X] Competitive | [ ] Supervisory | [ ] 1-Non-Sensitive | |
| [ ] Excepted (Specify in Remarks) | [ ] Managerial | [X] 3-Critical Sensitive | 14. Agency Use |
| [ ] SES (Gen.) [ ] SES (CR) | [X] Neither | [ ] 2-Noncritical Sensitive [ ] 4-Special Sensitive | 0260 |

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | Photoengraver (Electronic Pre-press) | WE | 4425 | UNCL | | |
| c. Second Level Review | | | | | | |
| d. First level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

| 16. Organizational Title of Position (If different from official title) | 17. Name of Employee (if vacant, specify) |
|---|---|

| 18. Department, Agency, or Establishment | Department of the Treasury | c. Third Subdivision | Product Design and Engraving Division |
|---|---|---|---|
| a. First Subdivision | Bureau of Engraving and Printing | d. Fourth Subdivision | Photoengraving Section |
| b. Second Subdivision | Office of Engraving | e. Fifth Subdivision | |

19. Employee Review- This is an accurate description of the major duties and responsibilities of my position.

Signature of Employee (optional)

Supervisory Certification. I certify that this an accurate statement of the major duties and responsibilities of this position and its organizational relationship, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statues or their implementing regulations.

| a. Typed Name and Title of Immediate Supervisor | b. Typed Name and Title of Higher-Level Supervisor or Manager (optional) |
|---|---|
| Robert Bishop, Photoengraver Supervisor Photoengraving Section | Judith Diaz-Myers, Chief Office of Engraving |
| Signature  *Robert B. Bishop*  Date 11/28/01 | Signature  *J. Myers*  Date 11/28/01 |

21. Classification/Job Grading Certification. I certify that this position has been classified/graded as a required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.

a. Typed Name and Title of Official Taking Action
Veronica Shirley, Human Resources Specialist
Personnel Services Division

Signature  *Veronica Shirley*  Date 11/28/01

22. Position Classification Standards Used In Classifying/Grading Position

Information for Employees. The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee (optional) | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks:

FULL PERFORMANCE LEVEL

137

| 25. Description of Major Duties and Responsibilities (See Attached) | | |
|---|---|---|
| NSN 7540-00-634-4265 | Previous Edition Usable | 5008-106 |

OF 8 (Rev. 1-85)
U.S. Office of Personnel Management
FPM Chapter 295

# POSITION DESCRIPTION
Photoengraver
(Electronic Pre-press)
WE-4425

**INTRODUCTION:** The position is located in the digital pre-press area of the Photoengraving Section, Office of Engraving. The Photoengraver focuses on digital pre-press production as related to United States currency production, US Postage Stamps, and the BEP's Miscellaneous Products program. The Photoengraver applies and practices techniques and procedures using a variety of electronic publishing software and hardware applications to ensure that the products generated are of the highest quality and are produced in the most efficient manner. The Photoengraver is responsible to perform these duties while ensuring that his/her work area is maintained and meets the BEP's safety requirements.

**MAJOR DUTIES:**

- Applies digital techniques to generate completed pre-press assignments using electronic publishing software and hardware.
- Performs work on production assignments in compliance with existing workflow and production procedures. Assists fellow Photoengravers with projects and training as needed.
- Provides input regarding the status of production assignments by means of the job tracking system.
- Assists with the maintenance of equipment within the digital pre-press area. Keeps the Photoengraver Leader advised of any problems or needs.
- Assists the Photoengraver Leader in determining the needs of the digital pre-press area in terms of machinery, equipment, software, supplies, etc.
- Reports any safety problems immediately to the Photoengraver Leader or Assistant Supervisor.
- Provides input to improve the overall production processes and procedures by promoting quality improvements, efficiency, and cost-savings gains on a continuous basis.
- Utilizing digital technology and/or conventional methods, performs the work in any two or more areas of the following:
  - Digital and Conventional Photography: Operates a wide range of professional photographic equipment (copy cameras, digital cameras, processors, step and repeat machines, printing and contact frames and hand-held cameras) to produce a variety of negatives, positives, black and white prints, color prints and color transparencies. Photographs a variety of material including: dies and plates, drawings, original artwork, and models and designs of

138

securities.  Sets up equipment, mounts copy, determines appropriate techniques, computes settings for enlargements or reductions, arranges lighting and exposes film for best reproduction.

o Scanning: Inputs a variety of original copy, artwork, and archived films into a digital workflow environment. Operates various high-end color and copydot scanners. Ensures images are input in correct file format, correct size and resolution as needed. Utilizes scanner operating software and/or image editing software to ensure images are complete and ready for digital stripping. Responsible for archiving and cataloging scanned images.

o Digital Stripper/Layout:  Employs digital techniques for assembling, processing, imposing and outputting positive or negative plate-ready films and plates. Creates or reassembles materials to form new or improved designs and patterns using digital methods. Ensures proper placement and alignment, conforming to specification reflected in engineering drawings and blueprints. Examines all negatives and positives made on the step and repeat machine, imagesetters and platesetters; corrects all imperfections. Creates detailed digital masters, rule-ups, and imposition layouts.

o Conventional Negative Stripping:  Employs photomechanical and hand compiling techniques to assemble positive or negative films to be used in the production of U.S. Postage Stamps, Currency, and miscellaneous products.  Removes/corrects imperfections from offset films. Creates or reassembles materials to form new or improved designs and patterns using conventional stripping, photomechanical, and hand compiling methods.

o Image Retouching/Color Correction:  Utilizes digital technology to adjust and/or change the density/tonal values of computer graphics and digital images per job requirements and specifications. Compares computer graphics and digital images with the original transparencies, artwork or drawings to determine the amount and percentage of color required to achieve the optimum color reproduction.  Utilizes computer technologies to digitally alter, manipulate, retouch, and compose images, high-resolution lineworks, and vector-based graphics.

o Plate Maker:  Utilizing Computer to Plate (CTP) technology and/or conventional methods (step and repeat machine, vacuum frames, light sensitive coatings), hand developing and automatic plate processing equipment (utilizing film positives and negatives) to produce nyloplate and offset plates for use in various production areas.

o Copper and Zinc Etcher:  Etches photographically imaged zinc or copper plates with acid to prepare them for use in intaglio printing.

Uses asphaltum staging and the brushed powder etching process, electric or gas oven, multiple acid baths until etching is completed.

o Litho-prover: Prints proof impressions from deep etch plates for evaluation and certification. Prepares multicolor printing models of proposed new designs for BEP-produced security items for approval by various Governmental Agencies. Participates in ink testing evaluations. Works closely with internal BEP components in the development of new products and raw materials. Operates both flatbed proving press and rotary press.

- Maintains all safety equipment in the area and enforces all safety regulations. Reports all safety deficiencies.
- Maintains housekeeping for designated work area(s).
- Other duties as assigned.

## SKILLS AND KNOWLEDGE REQUIRED:

- Journeyman Photoengraver with proficiency in electronic pre-press applications.
- Ability to work within a complete digital pre-press workflow system utilizing a cross-platform file server.
- Knowledge and work related experience of digital page layout, graphic and image editing software programs.
- Knowledge and work related experience of page imposition, trapping, electronic imaging (film, proofs, and plates) and processing.
- Knowledge and work related experience of conventional stripping, page imposition, contacting, and film assembling methods.
- Knowledge of electronic pre-press equipment including Macintosh and PC workstations, digital proofing devices, Computer to Film (CTF) devices and Computer to Plate (CTP) devices.
- Knowledge of all occupational safety and health regulations applicable to area of responsibility.

## SUPERVISORY CONTROLS:

Works under the general supervision of the Photoengraver Supervisor, or Assistant Photoengraver Supervisor of the Photoengraving Section, Office of Engraving. Work assignments are received in the form of general oral and written requests and instructions accompanied by digital files, copy, models, and layouts. Work performance is reviewed through reports submitted and in terms of results achieved.

## PHYSICAL EFFORT:

Job requires prolonged walking and standing, intermittent light to moderate lifting

140

and ability for rapid mental and muscular coordination simultaneously; requires good eyesight and ability to perform appropriate functions in photographic darkrooms.


## WORKING CONDITIONS:

Work is performed under conditions of light to dark illumination, in the presence of dust, fumes, sundry solvents, acids and chemicals. The Photoengraver is subject to the usual hazards of the trade: cuts, burns, and other injuries from hand tools and chemicals and working around powered machinery with moving parts. Excessive eyestrain may result from working for extended periods of time with computer monitors.

141



## PERFORMANCE EVALUATION PLAN
### Office of Engraving
**Photoengraver**                                      **April 15, 2002**

## ELEMENT 1:  Quality of Work Performed

**Objective**:  Maintain and improve BEP quality standards by manufacturing the highest quality security products in the industry.

**Exceeds Standard:**          Meets achieved standards <u>and</u> employee demonstrates self-initiative in one of the following areas:
- Consistently produces work of the highest quality with little or no supervision with one or less work errors for the entire rating period;
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in documented, increased quality of work performed.   Employee also actively participates in the implementation of approved suggestions in their work area;
- Consistently and actively participates in ISO implementation and maintenance efforts by the Office of Engraving (beyond what is assigned).

**Achieved Standard:**
- Errors that are traceable to digital files, films, film assemblies, bluelines, chromalins, photographs, models, or offset plates after finished product has left employee's area are not to exceed 3, with no more than one per quarter. Photoengraver will utilize the buddy system (double inspection) for quality certification;
- Employee fails to follow prescribed work procedures on no more than three occasions during the entire rating period, with no more than 1 per quarter.

## ELEMENT 2:  Productivity and Costs

**Objective**:  Maximize Photoengraver productivity.

**Exceeds Standard:**          Meets achieved standards <u>and</u> employee demonstrates self-initiative in one of the following areas:
- Consistently has shown to be a highly productive employee, one that has not failed to deliver error-free, completed assignments before expected time of completion on one or less occasion for the entire rating period;
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in documented, increased productivity of work performed.  Employee also actively participates in the implementation of approved suggestions in their work area.
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in confirmed and documented cost savings.  Employee also actively participates in the implementation of approved suggestions in their work area.

142

**Achieved Standard:**
- Failure to meet predetermined delivery dates established between the Assistant Supervisor/Supervisor and/or Manager do not exceed 3, with no more than one per quarter. In these instances, there is no negative impact (unnecessary costs, job changes, equipment reconfiguration, etc.) to production and production commencement is not delayed.
- Continues to demonstrate increased knowledge base of the Photoengraver's duties and responsibilities.

## ELEMENT 3:    Customer Service

<u>Objective</u>: Exceed internal (BEP) and external customer requirements.

**Exceeds Standard:**    Meets achieved standards <u>and</u> employee demonstrates self-initiative in **one** of the following areas:
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in increased improvement of customer service. Employee also actively participates in the implementation of approved suggestions in their work area;
- No complaints are received (by the Assistant Supervisor/Supervisor) from an internal customer (outside of employee's immediate work unit within the BEP) concerning employee's performance.
- One or more compliments from external customers are received by the Assistant Supervisor/Supervisor on employee's performance.

**Achieved Standard:**
- On no more than 3 occasions, fails to take action to resolve customers' (internal and external) concerns to include: providing fast, accurate, and timely customer service; making improvements in work based on customer feedback;
- Participates in established group efforts to solve problems and/or improve customer satisfaction;
- No complaints are received from external BEP customers concerning employee's performance;
- No more than 2 complaints are received from an internal customer (outside of employee's immediate work unit within the BEP) concerning employee's performance.

## ELEMENT 4:  Security, Accountability and Internal Controls

<u>Objective</u>: To follow all required security, accountability, and internal control policies and procedures.

**Exceeds Standard:**    Meets achieved standards <u>and</u> employee demonstrates self-initiative in **one** of the following areas:
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in greater security, internal controls or accountability of work performed. Employee

143

also actively participates in the implementation of approved suggestions in their work area;

- Consistently has shown to be a highly motivated employee, one that goes above and beyond all BEP policies and procedures involving security, accountability and internal controls with 1 or less instances of failing to comply and no security violations (90-90).

**Achieved Standard:**
- Maintains required security, product accountability, internal controls, and accountability data entry with no more than two instances of failing to comply to established procedures for the entire rating period;
- Data entered into accountability records is complete, accurate, and timely with no more than two instances of failing to comply to established procedures for the entire rating period;
- Informs the Supervisor of any potential security/internal control problems with no more than two instances of failing to comply for the entire rating period.

**ELEMENT 5:**    Safety, Health, Environmental, and Housekeeping

**Objective**:  To follow all required safety, health, environmental, and housekeeping policies and procedures.

**Exceeds Standard:**      Meets achieved standards **and** employee demonstrates self-initiative in the following area:
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in an increase in safe operation of a work section and/or equipment, enhanced cleanliness, or improved environmental condition of the work environment. Employee also actively participates in the implementation of approved suggestions in their work area.

**Achieved Standard:**
- Observes proper safety practices and uses required safety equipment with two or less instances of violation of these guidelines for the entire rating period;
- Notifies Supervisor or safety committee member of any unsafe working condition;
- Maintains appropriate housekeeping for assigned work area(s);
- Follows proper environmental practices and regulations with two or less instances of violation of these guidelines for the entire rating period.

# EXHIBIT EIGHT

**BEP** FORM 2360-1
REV. 4-96

# BUREAU OF ENGRAVING AND PRINTING
# EMPLOYEE PERFORMANCE APPRAISAL

| EMPLOYEE NAME | Thomas D. Brown | RATING PERIOD | 10/1/01 to 9/30/02 |
|---|---|---|---|

SSN _____     OFFICE    Engraving

TITLE   Photoengraver     PAY PLAN/GRADE    WE 4425

## PART 1-PERFORMANCE PLAN DEVELOPED AND APPROVED
(ATTACH A COPY OF THE PERFORMANCE PLAN. TO INCLUDE EACH ELEMENT AND THE STANDARDS TO BE ACHIEVED.)

RATING OFFICIAL *Robert E. Brolf*     DATE  11/19/02

REVIEWING OFFICIAL *Lea E. Merritt*     DATE  11/19/02

EMPLOYEE   EMPLOYEE REFUSES TO SIGN *pro*     DATE  11-19-02

(EMPLOYEE SIGNATURE INDICATES RECEIPT OF THE PLAN AND DOES NOT NECESSARILY CONSTITUTE AGREEMENT.)

## PART II-APPRAISAL OF PERFORMANCE—ELEMENTS
(MOST PERFORMANCE PLANS CONTAIN FEWER ELEMENTS THAN PROVIDE FOR BELOW.  USE THE NUMBER OF LINES NEEDED TO MATCH THE PERFORMANCE PLAN.)

## ELEMENT
## NUMBER        RATING (CHECK ONE BOX FOR EACH ELEMENT)

| Element | | Rating | |
|---|---|---|---|
| 1 | ☐ EXCEEDED STANDARDS | ☒ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE STANDARDS |
| 2 | ☐ EXCEEDED STANDARDS | ☒ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE STANDARDS |
| 3 | ☒ EXCEEDED STANDARDS | ☐ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE STANDARDS |
| 4 | ☐ EXCEEDED STANDARDS | ☒ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE STANDARDS |
| 5 | ☐ EXCEEDED STANDARDS | ☒ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE STANDARDS |

## PART III-APPRAISAL OF PERFORMANCE—NARRATIVE

Mr. Brown has met the criteria for achieved standards in the categories of Quality, Productivity, Customer Service, Security, and Safety & Housekeeping during this rating period.

133

No written complaints from either internal or external customers were received during this period. Mr. Brown received comments from customers of satisfaction and completion of photo shoots he has been assigned to. He also received a complimentary letter from a member of the Alternate Dispute Resolution staff for photos he took at a retirement party.

**PART IV-SUMMARY RATING**

CHECK ONE:

☐  **EXCEEDED STANDARDS**    (ONE-HALF OR MORE OF ELEMENTS RATED EXCEEDED STANDARDS AND NO ELEMENTS RATED UNACCEPTABLE)

☒  **ACHIEVED STANDARDS**    (LESS THAN ONE-HALF OF ELEMENTS RATED EXCEEDED STANDARDS AND NO ELEMENTS RATED UNACCEPTABLE)

☐  **UNACCEPTABLE--DID NOT ACHIEVE STANDARDS**    (ONE OR MORE ELEMENTS RATED UNACCEPTABLE)

RATING OFFICIAL _____    DATE _11/19/02_

REVIEWING OFFICIAL _____    DATE _11/19/02_

EMPLOYEE _EMPLOYEE REFUSED TO SIGN_    DATE _11-19-02_
(EMPLOYEE SIGNATURE ONLY INDICATES THAT THE APPRAISAL DISCUSSION TOOK PLACE AND DOES NOT NECESSARILY CONSTITUTE AGREEMENT WITH THE APPRAISAL.)

FORM 2360-1 *(BACK)*

134

**BEP** FORM 2366-1
REV. 4-96

# BUREAU OF ENGRAVING AND PRINTING
# EMPLOYEE PERFORMANCE APPRAISAL

| | | | |
|---|---|---|---|
| EMPLOYEE NAME | Thomas Brown | RATING PERIOD | 10/1/02 to 9/30/03 |
| SSN | | OFFICE | Engraving |
| TITLE | Photoengraver | PAY PLAN/GRADE | WE 4425 |

## PART 1-PERFORMANCE PLAN DEVELOPED AND APPROVED
(ATTACH A COPY OF THE PERFORMANCE PLAN, TO INCLUDE EACH ELEMENT AND THE STANDARDS TO BE ACHIEVED.)

RATING OFFICIAL _Robert B. Bishop_     DATE _11-4-03_

REVIEWING OFFICIAL _King E. Merritt_     DATE _11/4/03_

EMPLOYEE _Employee refused to sign_     DATE _11-4-03_

(EMPLOYEE SIGNATURE INDICATES RECEIPT OF THE PLAN AND DOES NOT NECESSARILY CONSTITUTE AGREEMENT.)

## PART II-APPRAISAL OF PERFORMANCE--ELEMENTS
(MOST PERFORMANCE PLANS CONTAIN FEWER ELEMENTS THAN PROVIDE FOR BELOW. USE THE NUMBER OF LINES NEEDED TO MATCH THE PERFORMANCE PLAN.)

**ELEMENT NUMBER**

**RATING (CHECK ONE BOX FOR EACH ELEMENT)**

| Element | EXCEEDED STANDARDS | ACHIEVED STANDARDS | UNACCEPTABLE-DID NOT ACHIEVE |
|---|---|---|---|
| 1 | ☐ | ☒ | ☐ |
| 2 | ☐ | ☒ | ☐ |
| 3 | ☐ | ☒ | ☐ |
| 4 | ☐ | ☒ | ☐ |
| 5 | ☐ | ☒ | ☐ |

## PART III-APPRAISAL OF PERFORMANCE--NARRATIVE

During this rating period, Thomas Brown worked in digital photography from Oct. 2002 to May 2003 and since then has participated in the cross-training program for digital pre-press.
In the digital photography area, Mr. Brown met the criteria for achieved standards in the Quality, Productivity, and Customer Service categories.

135
MRH

He has exhibited progress in his digital pre-press training and with further supervision and training he is expected to work more independently with each new assignment. His performance in this area will continue to be monitored.

In the category of Security and Accountability, he has performed as expected. Since his daily quitting time leaves him as one of the last employees in the section, he has the responsibility of securing the section, which he has done without failure. On one occasion during this rating period he promptly notified his manager that the digital pre-press section could not be locked properly, and the issue was resolved.

In the category of Safety, Health, Environmental and Housekeeping he performed as expected, with one minor unintentional instance of unruly housekeeping in the digital pre-press area.

## PART IV-SUMMARY RATING

### CHECK ONE:

☐ **EXCEEDED STANDARDS**    (ONE-HALF OR MORE OF ELEMENTS RATED EXCEEDED STANDARDS AND NO ELEMENTS RATED UNACCEPTABLE)

☒ **ACHIEVED STANDARDS**    (LESS THAN ONE-HALF OF ELEMENTS RATED EXCEEDED STANDARDS AND NO ELEMENTS RATED UNACCEPTABLE)

☐ **UNACCEPTABLE–DID NOT ACHIEVE STANDARDS**    (ONE OR MORE ELEMENTS RATED UNACCEPTABLE)

RATING OFFICIAL  _Robert E Bishop_    DATE  _11-4-03_

REVIEWING OFFICIAL  _Lou E Merritt_    DATE  _11/4/03_

EMPLOYEE  _Employee refused to sign_    DATE  _11-4-03_    136

(EMPLOYEE SIGNATURE ONLY INDICATES THAT THE APPRAISAL DISCUSSION TOOK PLACE AND DOES NOT NECESSARILY CONSTITUTE AGREEMENT WITH THE APPRAISAL.)

# EXHIBIT NINE



# DEPARTMENT OF THE TREASURY
## BUREAU OF ENGRAVING AND PRINTING
### WASHINGTON, D.C. 20228

### December 11, 2002

MEMORANDUM FOR THOMAS D. BROWN, PHOTOENGRAVER
       PHOTOENGRAVING SECTION

FROM:       Judith Diaz Myers, Chief
         Office of Engraving

SUBJECT:      Medical Documentation

Recently you provided the Bureau with a letter from your physician, Dr. Laura Welch, dated October 1, 2002.  In relevant part, Dr. Welch states that she recommends permanent job restrictions.  Her recommendation obliges the agency to inquire into whether you have a disability. You are currently not performing the full range of duties of your position as a Photoengraver.

Unfortunately, Dr. Welch's letter does not provide sufficient information to determine whether you are "disabled" under the provisions of the Rehabilitation Act, 29 U.S.C. § 701 et. seq., and if so, what reasonable accommodations, if any, are necessary.  She also does not explain whether you are capable of performing the core functions of your position with or without an accommodation.

Accordingly, this memorandum is to advise you of your rights under the Rehabilitation Act, and to provide guidance to you and your physician on the medical documentation to be submitted in the event that you request accommodation for a disability under the provisions of the Rehabilitation Act.

### Reasonable Accommodation under the Rehabilitation Act

Under the Rehabilitation Act, employees who are disabled may be entitled under pertinent regulations to a reasonable accommodation of their disability.  An employee is disabled if they have a physical or medical condition which substantially limits a major life activity.  Major life activities are such things as caring for oneself, walking, speaking, breathing and learning.  A reasonable accommodation is a modification to the employee's work environment or the manner in which the job is performed which allows the disabled employee to perform his/her duties; it can include such things as job restructuring, modified work schedules, modified equipment, or reassignment to a vacant position for which an employee is qualified.  In order to qualify for

accommodation, an employee must establish that he is disabled under the Act, and that he can perform the essential functions of the position with or without an accommodation.

According to the Equal Employment Opportunity Commission's Enforcement Guidance on Disability Related Inquiries and Medical Examinations, an employer is entitled to know whether an employee has a covered disability that requires a reasonable accommodation. When the disability or need for the accommodation is not obvious, an agency is entitled to ask for and review reasonable documentation about the alleged disability and its functional limitations that require reasonable accommodation. The burden is upon the employee seeking accommodation to provide the Bureau with sufficient medical information to make the determination of whether an accommodation is required, and, if so, the appropriate accommodation to be provided.   If an employee provides insufficient documentation, an employer does not have to provide reasonable accommodation until sufficient documentation is provided. Medical documentation is sufficient if it: (1) describes the nature, severity, and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and (2) substantiates why the requested reasonable accommodation is needed.

Accordingly, in order for a determination to be made upon any request for accommodation that you are submitting, the information listed below should be provided to the Bureau by your treating physicians.

II:     Medical Information required:

In order to make a complete evaluation of your medical condition and make a determination whether you are entitled to a temporary/permanent accommodation, your physician should provide the following information:

     a.  A brief history of the specific medical condition(s) including references to findings from previous examinations, treatment, and response to treatment;

     b.  Diagnosis, including a description of the nature, severity, and duration of the employee's impairment;

     c.  A description of the major life activity that is substantially limited by the impairment, and an explanation regarding how that activity is impaired.  .

     d.  If applicable, an estimate of the expected date of full or partial recovery;

     e.  An evaluation of the impact of the medical condition on the employee's capacity to perform the duties of his position, i.e., an explanation of the extent to which the impairment limits the employee's ability to perform the activity or activities(this assessment should be made in conjunction with your physician reviewing your job description);

2