UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| THOMAS D. BROWN, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action 07-0509 (RMU) |
| | ) |
| HENRY M. PAULSON, JR., Secretary, | ) |
| Department of the Treasury, | ) |
| | ) |
| Defendant. | ) |

_____ )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On March 19, 2007, Thomas D. Brown, Sr. ("Plaintiff") brought this action pursuant to

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., the Rehabilitation Act, 29

U.S.C. § 701, et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.,

and the Family Medical Leave Act, 29 U.S.C. § 2601, et seq., against his former employer, the

Department of Treasury ("Defendant"), for retaliation, race discrimination, hostile work

environment and disability discrimination. Thereafter, on September 25, 2007, Defendant filed a

motion for partial dispositive relief. On April 1, 2008, this Court issued a Decision and Order in

which it granted that motion. In light of this Court's April 1, 2008 Decision and Order, the only

claims that remain in this litigation are Plaintiff's Title VII claims for retaliation, race

discrimination and hostile work environment, and those claims remain in this litigation only to

the extent that they are based on events that allegedly occurred subsequent to May 22, 2003.

Through the instant motion, Defendant moves pursuant to Federal Rule of Civil

Procedure 56 for summary judgment as to the Title VII claims that remain in this litigation. For

the reasons set forth in the attached Memorandum of Points and Authorities in Support of

Defendant's Motion for Summary Judgment, Defendant is entitled to the relief that it seeks

herein.  Accordingly, this Court should grant the instant motion for summary judgment.

Dated:  August 13, 2008                    Respectfully submitted,


                                           _____/s/_____
                                           JEFFREY A. TAYLOR, D.C. BAR # 498610
                                           United States Attorney


                                           _____/s/_____
                                           RUDOLPH CONTRERAS, D.C. BAR # 434122
                                           Assistant United States Attorney


                                           _____/s/_____
                                           CHRISTOPHER B. HARWOOD
                                           Assistant United States Attorney
                                           555 Fourth St., N.W.
                                           Washington, D.C.  20530
                                           Phone: (202) 307-0372
                                           Fax: (202) 514-8780
                                           Christopher.Harwood@usdoj.gov

Of Counsel:

Nichole Jenkins Washington
Office of the Chief Counsel
Department of the Treasury
Bureau Of Engraving and Printing

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                      )
THOMAS D. BROWN, SR.,                 )
                                      )
        Plaintiff,                    )
                                      )
        v.                            )        Civil Action 07-0509 (RMU)
                                      )
HENRY M. PAULSON, JR., Secretary,     )
Department of the Treasury,           )
                                      )
        Defendant.                    )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On March 19, 2007, Thomas D. Brown, Sr. ("Plaintiff") brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., the Rehabilitation Act, 29 U.S.C. § 701, et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., against his former employer, the Department of Treasury ("Defendant"), for retaliation, race discrimination, hostile work environment and disability discrimination. On September 25, 2007, Defendant moved for partial dismissal of this action pursuant to Federal Rule of Civil Procedure 12(b)(6) and for partial summary judgment pursuant to Rule 56. On April 1, 2008, this Court issued a Decision and Order in which it granted Defendant's motion for partial dispositive relief and held that "plaintiff is procedurally barred from litigating claims based on events that allegedly occurred prior to May 22, 2003, and that defendant is entitled to judgment as a matter of law on the claims [for disability discrimination] brought under the Rehabilitation Act." (Docket No. 31 at 10.) In the April 1, 2008 Decision and Order, this Court also dismissed the claims that Plaintiff had asserted under the ADA and the FMLA. (See id. at 1 n.1.)

In light of this Court's April 1, 2008 Decision and Order, the only claims that remain in

this case are Title VII claims for:

- retaliation based upon (1) Plaintiff's receipt of an "Achieved Standards" performance rating on November 4, 2003, (2) Plaintiff's receipt of an absence without leave ("AWOL") charge notice on December 15, 2003,[1] (3) Plaintiff's receipt of a Letter of Warning on January 13, 2004[2] and (4) Defendant's denial of a training request that Plaintiff had made on February 17, 2004;

- race discrimination based upon (1) Plaintiff's receipt of the November 4, 2003 "Achieved Standards" performance rating, and (2) Defendant's denial of Plaintiff's February 17, 2004 training request; and

- hostile work environment based upon (1) a January 13, 2004 incident in which Plaintiff claims that he was insulted and threatened by a co-worker, and (2) Plaintiff's receipt of a March 5, 2004 memorandum in which his second-line supervisor informed him that he was required to complete a particular assignment by March 9, 2004.

(See id. at 6-7.)[3] Each of those claims fails as a matter of law.

---

[1] In his Complaint, Plaintiff asserts that he was charged with "AWOL on November 20, 2003, December 5, 2003, December 15, 2003, and January 13, 200[4]." (Compl. ¶24.) However, according to agency records, Plaintiff received an AWOL charge notice (and was thereafter charged with 15 minutes of AWOL) on only one occasion between November 20, 2003 and January 13, 2004. (See Ex. A.) Plaintiff received an AWOL charge notice on December 15, 2003 in connection with his late arrival to work on December 8, 2003. (See infra Part I.C; Ex. B.) Plaintiff was thereafter charged with 15 minutes of AWOL in connection with that same late arrival. (See infra Part I.C; Ex. A.)

[2] In his Complaint, Plaintiff asserts a claim for retaliation based upon his alleged receipt of an AWOL charge on "January 13, 200[4]." (Compl. ¶24.) Although Plaintiff was not charged with AWOL on January 13, 2004 (see supra n.1), he did receive a Letter of Warning on that date. Defendant thus assumes that Plaintiff intended to assert a claim for retaliation based upon his receipt of that Letter of Warning.

[3] In its April 1, 2008 Decision and Order, this Court did not identify as "surviving claims" any claims for retaliation or race discrimination based upon Plaintiff's receipt of the November 4, 2003 "Achieved Standards" performance rating. (See Docket No. 31 at 6-7.) However, Defendant believes that such claims were raised in the Complaint and survived its prior dispositive motion. (See, e.g. Compl. ¶¶5, 31.) In addition, in its April 1, 2008 Decision and Order, this Court did not identify as one of the "surviving claims" a claim for race discrimination based upon the denial of Plaintiff's February 17, 2004 training request. (See Docket No. 31 at 6-7.) Yet, during his deposition, Plaintiff stated that he believes that the denial of his training request was due in part to his race. (See Brown Tr. 155:3-5.) Thus, for purposes of the instant motion, Defendant will assume that there is a live claim for race discrimination

Plaintiff's claims for retaliation and race discrimination fail because none of the actions upon which they are based constituted an adverse action sufficient to sustain a claim for retaliation or race discrimination. (See infra Parts III.A.1, III.B.1.) Moreover, even assuming that each of the actions upon which Plaintiff's retaliation and race discrimination claims are based constituted an adverse action, the claims nevertheless fail because Defendant has asserted legitimate, non-retaliatory/non-discriminatory reasons for the actions and there is no evidence in the record that suggests that the asserted reasons are a pretext for retaliation and/or race discrimination. (See infra Parts IIII.A.2-3, III.B.2-3.)

Plaintiff's hostile work environment claim fails because the alleged acts upon which it is based do not establish a pattern of severe or pervasive conduct sufficient to have altered the terms and conditions of his employment. (See infra Part III.C.) Plaintiff's hostile work environment claim also fails because there is no evidence in the record that suggests that the acts upon which it is based were motivated by Plaintiff's protected status (i.e., his race or his prior protected activity). (See id.)

## I.     BACKGROUND

Plaintiff is a black male who was employed within the Department of Treasury's Bureau of Engraving and Printing ("BEP") from 1971 through June 2004. (Compl. ¶3; Brown Tr. 10:1-10.) During the time period relevant to this case (May 2003 through March 2004), Plaintiff's first-line supervisor was Robert E. Bishop, his second-line supervisor was Patrick J. Reidy, his

---

based upon the denial of Plaintiff's February 17, 2004 training request in this case. During his deposition, Plaintiff made it clear that he did not intend to assert a race discrimination claim based upon his receipt of the December 15, 2003 AWOL charge notice or the January 13, 2004 Letter of Warning. (See Brown Tr. 98:18-23, 100:12-16.) Citations in the form "(Brown Tr. __)" refer to the transcript of Plaintiff's July 3, 2008 deposition, excerpts of which are attached hereto.

third-line supervisor was Ross E. Morres and his fourth-line supervisor was Judith Diaz-Myers.

(Bishop Decl. ¶4; Reidy Decl. ¶4; Morres Decl. ¶4; Diaz-Myers Aff. at 126.)[4]

### A.    Plaintiff's EEO Activity

Plaintiff's initial contact with Defendant's EEO office concerning matters relevant to the

instant case occurred on December 15, 2003.  (Ex. C at 1.)  Prior to contacting Defendant's EEO

office on December 15, 2003, Plaintiff had received the November 4, 2003 "Achieved

Standards" performance rating and the December 15, 2003 AWOL charge notice.  (See id. at 3

(indicating that during his initial contact with Defendant's EEO office, Plaintiff wanted "to

discuss" an event that had occurred on December 15, 2003).)  Following his initial contact with

Defendant's EEO office on December 15, 2003, Plaintiff filed a number of formal and informal

written complaints of retaliation and discrimination in which he raised, inter alia, the matters that

comprise the claims that remain in this case.  (See Ex. D.)

Prior to December 15, 2003, Plaintiff had filed a number of EEO complaints alleging

retaliatory and/or discriminatory conduct on the part of certain of his supervisors.  He filed those

complaints on September 25, 1995, January 19, 1996, May 31, 1996, October 9, 1999, June 1,

2001, January 28, 2002 and June 3, 2002.  (See Ex. E (listing Plaintiff's EEO activity from June

2001 through the present).)  See also Brown v. Snow, 407 F. Supp. 2d 61, 64 & n.2 (D.D.C.

---

[4] Citations in the form "(Bishop Decl. ¶__)" refer to the Declaration of Robert Bishop, which is dated August 11, 2008.  Citations in the form "(Reidy Decl. ¶__)" refer to the Declaration of Patrick Reidy.  Citations in the form "(Morres Decl. ¶__)" refer to the Declaration of Ross E. Morres, III, which is dated August 12, 2008.  Citations in the form "(Diaz-Myers Aff. at __)" refer to the Affidavit of Judith Diaz-Myers, which is dated October 4, 2005.  With the exception of the Declaration of Patrick Reidy, each of the above documents is attached hereto. Due to a family emergency, Mr. Reidy was unable to provide the undersigned counsel with a signed copy of his declaration as of the date of this filing.  The undersigned counsel expects to receive a signed copy of Mr. Reidy's declaration within the next several days.  As soon as he does, he will file the declaration with the Court.

2005) (listing Plaintiff's EEO activity from September 1995 through January 2002).[5] Of those

prior EEO complaints, only the June 1, 2001, January 28, 2002 and June 3, 2002 complaints

involved agency officials who are alleged to have retaliated and/or discriminated against Plaintiff

in connection with the claims that are still at issue in the instant case. (See Brown Tr. 14:17-

19:5.) Those complaints were directed at Messrs. Bishop and Reidy. (See id. at 17:18-18:6.)

**B.      The November 4, 2003 "Achieved Standards" Performance Rating**

On November 4, 2003, Plaintiff received a performance appraisal for the rating period

October 1, 2002 through September 30, 2003. (Ex. F.) The appraisal consisted of four parts.

In Part I, the appraisal identified: (1) the Performance Plan pursuant to which Plaintiff

was rated ("Performance Plan"); (2) the official who rated Plaintiff—Mr. Bishop; and (3) the

official who reviewed Mr. Bishop's ratings decisions—Mr. Morres. (Id.) The abovementioned

Performance Plan (which is attached hereto as Exhibit G) contained five job elements:

(1) "Quality of Work Performed"; (2) "Productivity and Costs"; (3) "Customer Service";

(4) "Security, Accountability and Internal Controls"; and (5) "Safety, Health, Environmental,

and Housekeeping." (Ex. G.) For each of those five job elements, Plaintiff was to have been

rated as either: (1) "Exceeded Standards"; (2) "Achieved Standards"; or (3) "Unacceptable—

Did Not Achieve." (See Ex. F.) The Performance Plan identified what Plaintiff would have to

have done during the rating period with respect to each of the five job elements to obtain a rating

of "Exceeded Standards" or "Achieved Standards."[6] (See Ex. G.)

---

[5] It also appears that, in January 2000, Plaintiff participated as a witness in connection
with an EEO complaint that one of his co-workers had filed against Mr. Bishop. (See Ex. D
at 22.)

[6] For example, to obtain a rating of "Exceeded Standards" for "Quality of Work
Performed," Plaintiff would have to have either: (1) "[c]onsistently produce[d] work of the
highest quality with little or no supervision with one or less work errors for the entire rating
period"; (2) [s]ubmit[ted] a minimum of two written suggestions to [his supervisor] that [were]

In <u>Part II</u> of the appraisal, Mr. Bishop rated Plaintiff as having "Achieved Standards" with respect to each of the five job elements listed in the Performance Plan. (Ex. F.) In <u>Part III</u>, Mr. Bishop provided a short narrative with respect to Plaintiff's performance in which he stated, <u>inter alia</u>, that Plaintiff had "met the criteria for achieved standards" or "performed as expected" with respect to each of the five job elements contained in the Performance Plan. (<u>Id.</u>) And, in <u>Part IV</u>, Mr. Bishop gave Plaintiff a "Summary Rating" of "Achieved Standards." (<u>Id.</u>) The available "Summary Ratings" were: "Exceeded Standards"; "Achieved Standards"; and "Unacceptable—Did Not Achieve Standards." (<u>Id.</u>)

Before rating Plaintiff, Mr. Bishop consulted the Performance Plan and reviewed what Plaintiff would have to have done during the rating period with respect to each of the five job elements identified therein to justify a rating of either "Exceeded Standards" or "Achieved Standards." (Bishop Decl. ¶5.) Mr. Bishop also asked other supervisors who had directly observed Plaintiff's job performance during the rating period (including Messrs. Reidy and Morres) for details regarding his performance and their assessments of how he had performed. (<u>Id.</u>) Based upon his own personal observations of Plaintiff's job performance, as well as the input that he had received from the other supervisors whom he had contacted, Mr. Bishop determined that Plaintiff had "Achieved Standards" with respect to each of the five job elements listed in the Performance Plan. (<u>See id.</u> at ¶¶5-6.) Although Plaintiff had "performed adequately during the rating period, he [had] not consistently fulfill[ed] any of his various employment responsibilities at a level that would have warranted an 'Exceed[ed] Standards' rating." (<u>Id.</u> at ¶6.) Nor had he satisfied any of the other criteria listed in the Performance Plan that would have

_____

implemented during the rating period and result[ed] in documented, increased quality of work performed"; or (3) "[c]onsistently and actively participate[d] in ISO implementation and maintenance efforts by the Office of Engraving (beyond what [was] assigned)." (Ex. G.)

made him deserving of an "Exceeded Standards" rating. (Id.) Because Plaintiff had "Achieved Standards" with respect to each of the five job elements in the Performance Plan, Mr. Bishop concluded that he should receive a "Summary Rating" of "Achieved Standards." (Id.)

Before the November 4, 2003 performance appraisal was issued to Plaintiff, Mr. Morres reviewed it; he concurred with Mr. Bishop's assessments. (Morres Decl. ¶9.) According to Mr. Morres, Plaintiff "had not satisfied any of the requirements for receiving an 'Exceeded Standards' rating for any of the job elements listed in [the] Performance Plan." (Id.)

Notably, Plaintiff's receipt of an "Achieved Standards" annual rating was not an aberration. Plaintiff had received the same annual rating for the prior two rating periods. (See Ex. D at 25; Brown Tr. 28:15-20.)

### C.     The December 15, 2003 AWOL Charge Notice and January 13, 2004 Letter of Warning

On December 8, 2003, Plaintiff called Mr. Reidy and told him that he was going to arrive late to work. (Ex. H.)[7] At approximately 8:15 a.m., Mr. Reidy saw that Plaintiff was at work. (Id.) The following day, December 9, 2003, Mr. Reidy asked Plaintiff to submit a leave slip for his late arrival on December 8, 2003. (Id.) Either on December 9, 2003 or December 10, 2003, Plaintiff submitted a leave slip to Mr. Reidy for his approval. (Id.) In the leave slip, Plaintiff requested that he be approved for sick leave from 7:15 a.m. to 8:15 a.m. on December 8, 2008. (Id.) On December 11, 2003, Mr. Reidy met with Plaintiff and: (1) reminded him that his present start time was 7:00 a.m.; (2) returned to him the leave slip that he had previously

---

[7] Exhibit H contains an email from Mr. Reidy to Mr. Bishop dated December 11, 2003. During his deposition, Plaintiff testified that all of the statements in that email are correct with the exception of Mr. Reidy's statement that on December 8, 2003, Plaintiff "called to say he was calling in sick." (Brown Tr. 81:11-82:11.) According to Plaintiff, he called Mr. Reidy on December 8, 2003 and told him that he was going to arrive late to work. (See id.) For purposes of the instant motion, Defendant will assume that when Plaintiff called Mr. Reidy on December 8, 2003, he told Mr. Reidy that he was going to arrive late to work.

submitted; and (3) told him to submit a new leave slip for his late arrival on December 8, 2003 for the period 7:00 a.m. to 8:15 a.m.  (See id.)  About fifteen minutes later, Plaintiff approached Mr. Reidy and told him that he would not submit a new leave slip reflecting a 7:00 a.m. start time.  (See id.)  In response, Mr. Reidy again explained to Plaintiff that his present start time was 7:00 a.m., and he told Plaintiff that he would not sign a leave slip for Plaintiff unless it reflected a 7:00 a.m. start time.  (Id.)  The conversation ended with Plaintiff refusing to submit a new leave slip reflecting a 7:00 a.m. start time.  (Id.)  Later that same day, Mr. Bishop sent Plaintiff an email in which he stated:  "Mr. Brown, your work hours are from 7:00 am to 3:30 pm.  I am requiring you to give Mr. Reidy or myself a request for leave for the 1 ¼ hours that you were late on Monday 12/8/03.  This must be done by [the close of business] today 12/11/03."  (Id.)

On December 15, 2003, employee timecards were due to be submitted to the timekeeper. (Reidy Aff. at 111.)[8]  As of that date, Plaintiff had not submitted a new leave slip for his late arrival on December 8, 2003 that reflected his 7:00 a.m. start time.  (Id.)  Consequently, Mr. Reidy contacted Plaintiff and "told him, if he wished, [that] he could resubmit the leave slip as he had done originally and that he would be charged one hour of leave (7:15 am to 8:15 am) and ¼ hour of AWOL (7:00 am to 7:15 am)."  (Ex. B at 2; see Brown Tr. 83:19-25.)  Thereafter, on December 15, 2003, Plaintiff submitted a leave slip for his late arrival on December 8, 2003 covering the period 7:15 a.m. to 8:15 a.m., which Mr. Reidy signed.  (Ex. I.)  Accordingly, later that day, Mr. Reidy issued Plaintiff an "A.W.O.L. Charge Notice" for the period 7:00 a.m. to 7:15 a.m.  (See Ex. B.)  The AWOL charge notice "requested" that, "within two days from the date of this notice," Plaintiff "furnish . . . any explanation which [he] believe[d] might justify a change in the recording."  (Id.)  Plaintiff did not respond to the AWOL charge notice and, as a

---

[8] Citations in the form "(Reidy Aff. at __)" refer to the Affidavit of Patrick Reidy, which is dated October 4, 2005, and is attached hereto.

result, he was charged with 15 minutes of AWOL in connection with his late arrival on December 8, 2003.  (See Reidy Aff. at 111-12; Ex. A.)

On January 13, 2004, Mr. Bishop issued Plaintiff a "Letter of Warning" for "Failure to Follow Supervisory Instructions."  (Ex. J.)  Specifically, Mr. Bishop issued the Letter of Warning to Plaintiff because he had refused to "follow [the December 11, 2003] supervisory instructions" of Mr. Reidy and Mr. Bishop and submit a leave request for his late arrival on December 8, 2003 that reflected his 7:00 a.m. start time.  (See id.; Bishop Decl. ¶8.)  Notably, the Letter of Warning expressly stated that:  (1) it would not be filed in Plaintiff's Official Personnel Folder; (2) it would be retained within the BEP for a period of only one year; and (3) after the one-year period, it would "be destroyed and not used as a basis for progressive discipline in any subsequent offenses."  (Ex. J.)  Following its issuance, the Letter of Warning was not used against Plaintiff in any way.  (Bishop Decl. ¶8.)  Nor did the Letter of Warning in any way affect the terms or conditions of Plaintiff's employment.  (Id.)

Plaintiff's refusal to submit a leave request for his late arrival on December 8, 2003 reflecting a 7:00 a.m. start time was based on his insistence that his official start time as of that date was 7:15 a.m.  (See Ex. H.)  It was not, and there can be no reasonable dispute on this point. Prior to December 2003, Mr. Reidy had circulated to all employees who worked within Plaintiff's section—including Plaintiff—an excel spreadsheet that listed each employee's official work hours.  (Reidy Decl. ¶7.)  According to the spreadsheet, Plaintiff's "Start" time was "7:00" a.m. and his "Finish" time was "3:30" p.m.  (See id. at ¶7 & Ex. 1.)  Moreover, Plaintiff's official time sheets for December 2003 list his "Tour of Duty" as "7:00 am – 3:30 pm."  (See Ex. A.)

### D.    The Denial of Plaintiff's February 17, 2004 Training Request

On February 17, 2004, Plaintiff submitted a request to Mr. Morres to take eight separate computer training classes offered by Computer Consultants Corporation ("CCC"), a non-governmental entity.  (See Morres Aff. at 124[9]; see Ex. K.)  The eight training classes were: (1) Introduction to Photoshop 7; (2) Advanced Photoshop 7; (3) Illustrator 10; (4) Fireworks MX 2004; (5) Windows XP; (6) QuarkXpress 6.0; (7) Introduction to Excel 2002; and (8) Intermediate Word 2002.  (Ex. K.)  There was a fee associated with taking each class.  (See id.)  The fees for the classes ranged from $225 to $600.  (See id.)

After conferring with Mr. Reidy, Mr. Morres concluded that Plaintiff's February 17, 2004 training request should be denied.  (See Morres Aff. at 124.)  Mr. Morres communicated the reasons for the denial of the training request to Plaintiff in a memorandum dated February 17, 2004.  (Id.; see Morres Decl. ¶10; Ex. L.)  In that memorandum, Mr. Morres explained precisely why Plaintiff was not being permitted to take each of the eight classes that he had identified in his February 17, 2004 training request:

First, Mr. Morres stated that in January 2002, Plaintiff had made "a similar request" for training in Photoshop, Illustrator and QuarkXpress.  (Ex. L.)  At that time, Plaintiff's request was denied, but he was given copies of "self-guided tutorials" for each of those applications.  (Id.)  Plaintiff was advised that "once [he had] completed each tutorial and passed the final quiz, then consideration would be made concerning further training."  (Id.)  As of February 2004, Plaintiff had not completed the tutorials, and as a result, his request to take classes on Photoshop 7, Illustrator 10 and QuarkXpress 6.0 from CCC was denied.  (See id.)

---

[9] Citations in the form "(Morres Aff. at __)" refer to the Affidavit of Ross Morres, which is dated October 4, 2005, and is attached hereto.

Second, Mr. Morres stated that Plaintiff's request to take classes on Fireworks MX 2004 and Windows XP from CCC was denied because "neither of th[o]se applications [was] essential to [his] immediate job function." (Id.)

Finally, Mr. Morres stated that Plaintiff's request to take classes on Excel 2002 and Word 2002 from CCC was denied because: (1) although "useful," neither of those applications was essential to his job function; and (2) training on those applications was available in-house through the BEP's Center for Excellence. (Id.) Plaintiff was "advis[ed] . . . to review the training schedule offered through the BEP's Center for Excellence."[10] (Id.) In the meantime, Mr. Morres stated that he would discuss with Mr. Reidy whether the specific dates that Plaintiff had proposed to take training in Excel and Word were acceptable.[11] (Id.)

### E.    The January 13, 2004 Incident in which Plaintiff was Purportedly Insulted and Threatened by a Co-Worker

On January 13, 2004, Plaintiff turned off the lights in the room in which he worked as he was leaving for the night. (Ex. N at 92.) There were multiple workstations in that room. (See id.) At the time that Plaintiff turned off the lights, one of his co-workers, Marjorie Freeman, was still at her workstation. (Id.) As soon as Plaintiff realized that Ms. Freeman was still in the

---

[10] During his deposition, Plaintiff stated that he could not recall whether, after receiving the February 17, 2004 memorandum, he discussed with his supervisors the possibility of taking training in Excel and/or Word in-house through the BEP's Center for Excellence. (See Brown Tr. 148:15-20.)

[11] During the course of evaluating Plaintiff's February 17, 2004 training request, Mr. Morres reviewed a Training Matrix that listed the total amount of training that Plaintiff and each of his co-workers had received as of January 30, 2004. (See Morres Decl. ¶11; Morres Aff. at 124; Ex. M.) The Training Matrix revealed that, during the course of his employment, Plaintiff had received far more hours of training than any of his co-workers, and more hours of computer training than all but one of his co-workers. (See Ex. M.) Nevertheless, Mr. Morres did not deny Plaintiff's training request based upon the information contained within the Training Matrix. (Morres Decl. ¶11.) He denied the request for the reasons stated in the February 17, 2004 memorandum. (Id.) Mr. Morres did, however, conclude that the information in the Training Matrix provided additional support for the denial. (Id.)

room, he turned the lights back on and apologized to her. (Id.) Ms. Freeman, however, did not

accept Plaintiff's apology and allegedly yelled at him and told him "to kiss her black ass." (Id.)

Plaintiff found the incident "scar[y]" and "threatening."[12] (Id.)

      Plaintiff reported the alleged incident involving Ms. Freeman to Mr. Morres on

January 14, 2004. (Morres Aff. at 123.) The following day, January 15, 2004, Mr. Morres met

with Plaintiff and told Plaintiff, inter alia, that if he felt threatened as a result of his encounter

with Ms. Freeman, he could write up a formal statement of the encounter and Mr. Morres "would

then take it to the next level." (Id.) Plaintiff told Mr. Morres that he did not want to write up a

formal statement because "he did not want anyone to get in trouble." (Id.) Nevertheless, later

that same day, Plaintiff sent his fourth-line supervisor, Ms. Diaz-Myers, a letter in which he

recounted his alleged incident with Ms. Freeman. (See Ex. N; Diaz-Myers Aff. at 126, 128.)

Because Plaintiff's "letter stated that [he] 'felt scared, threaten[ed], and defenseless,'" Ms. Diaz-

Myers "forwarded [it] to the BEP's Threats and Violence Panel for investigation and

adjudication." (Diaz-Myers Aff. at 128.) The Threats and Violence Panel ultimately determined

that Ms. Freeman's alleged actions "did no[t] constitute a threat." (Id.)

---

[12] According to Plaintiff, a similar incident involving himself and Ms. Freeman had occurred approximately two and a half months earlier. (See Ex. N at 91.) On October 27, 2003, Ms. Freeman allegedly approached Plaintiff while he was talking with another co-worker and purportedly yelled at him and "told [him] to kiss her black ass." (Id.) After Plaintiff allegedly told Ms. Freeman to "watch [her] mouth," she purportedly responded by saying, "[F]uck you[.] You make me watch my fucking mouth." (Id.) Plaintiff did not include any allegations regarding this prior alleged incident in his Complaint in the instant case.

F.    **The March 5, 2004 Memorandum in which Plaintiff was Told to Complete a Particular Assignment by March 9, 2004**

On March 5, 2004, Mr. Reidy issued a memorandum to Plaintiff concerning an assignment that he had given to Plaintiff on February 25, 2004.[13]  (See Ex. O; Reidy Decl. ¶5.)[14] As of March 5, 2004, Plaintiff had not yet completed the assignment, despite the fact that he had had "approximately 28 working hours" to do so.  (See Ex. O.)  In the March 5, 2004 memorandum, Mr. Reidy reminded Plaintiff that the assignment "need[ed] to be completed." (Id.)  Mr. Reidy further provided Plaintiff with a firm due date for the assignment—March 9, 2004.  (Id.)  According to Mr. Reidy, the assignment should have taken no more than three or four hours to complete.  (Reidy Decl. ¶5.)

Mr. Reidy issued the March 5, 2004 memorandum to Plaintiff because:  (1) it was important that the assignment referenced therein be completed as quickly as possible, and by no later than March 9, 2004, so that the BEP could fulfill its production obligations to its client; and (2) he wanted to convey to Plaintiff the importance of completing the assignment in an expedited fashion.  (Id. at ¶6.)

---

[13] Mr. Reidy actually gave Plaintiff the assignment on February 23, 2004.  (See Ex. O at 44.)  However, on February 24, 2004, Mr. Reidy informed Plaintiff that certain aspects of the assignment had to be modified.  (See id.)  The following day, February 25, 2004, Mr. Reidy provided Plaintiff with "new written instructions [for the assignment]" and "discussed [with Plaintiff] what [he was] required" to do to complete the assignment in a satisfactory manner. (Id.)

[14] The March 5, 2004 memorandum was initially issued to Plaintiff on March 4, 2004. (See Ex. O.)  However, when it was initially issued to Plaintiff, the memorandum "contained some incorrect dates."  (Id.)  Thus, Mr. Reidy revised the memorandum and re-issued it to Plaintiff on March 5, 2004.  (See id.)

## II.     LEGAL STANDARDS

### A.     Legal Standard for a Motion for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met its burden, the non-movant "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  Anderson, 477 U.S. at 248 (quotation marks omitted).  Here, as demonstrated below (see infra Part III), there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law.

### B.     Legal Standards for Plaintiff's Title VII Retaliation and Race Discrimination Claims

Traditionally, where (as here) the record contains no direct evidence of retaliation or discrimination, courts have examined Title VII claims for retaliation and race discrimination under the three-step burden-shifting framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792, 802-04 (1973).  Under that framework:  (1) the plaintiff has the initial burden of proving a prima facie case of retaliation and/or race discrimination; (2) if the plaintiff succeeds in proving a prima facie case, then the burden then shifts to the employer to articulate some legitimate, non-retaliatory/non-discriminatory reason for its action; and (3) if the employer meets its burden, then the plaintiff must prove that the employer's stated reason is a mere pretext

14

for retaliation and/or race discrimination.[15]  Brantley v. Kempthorne, No. 06-1137, 2008 WL

2073913, at *4 (D.D.C. May 13, 2008); see Short v. Chertoff, No. 05-1034, 2008 WL 2174856,

at *2 (D.D.C. May 27, 2008).

　　　To establish a prima facie case of retaliation, a plaintiff must show that:  (1) he "engaged

in statutorily protected activity"; (2) "the employer took an adverse personnel action"; and (3) "a

causal connection existed between the two."  Pardo-Kronemann v. Jackson, 541 F. Supp. 2d 210,

214 (D.D.C. 2008) (quotation marks omitted); see Brantley, 2008 WL 2073913, at *6.  In the

retaliation context, an adverse action is one "that a reasonable employee would have found . . .

materially adverse" and that "well might have dissuaded a reasonable worker from making or

supporting a charge of discrimination."  Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S.

53, 68 (2006) (quotation marks omitted); Brantley, 2008 WL 2073913, at *6.  Whether an action

is materially adverse "'will often depend upon the particular circumstances'" of a given case.

Jones v. Bernanke, 538 F. Supp. 2d 53, 59 (D.D.C. 2008) (quoting Burlington, 548 U.S. at 69).

To establish a causal connection between protected activity and an adverse action, a plaintiff

may show that the employer had knowledge of the protected activity and that the adverse action

occurred shortly thereafter.  Baker v. Potter, 294 F. Supp. 2d 33, 41 (D.D.C. 2003).  "[T]he

temporal proximity between the employer's knowledge of the protected activity and the adverse

---

　　　[15] It appears that Plaintiff intended to bring his race discrimination claims under the
single-motive theory of discrimination (which requires that a plaintiff establish that
discrimination was the sole reason for the challenged actions), and not the mixed-motive theory
of discrimination (which requires that a plaintiff establish that discrimination played a motivating
part or was a substantial factor in the challenged actions).  (See Compl. ¶¶27-31.)  See also Fogg
v. Gonzales, 492 F.3d 447, 451 (D.C. Cir. 2007) (discussing the single-motive and mixed-motive
theories of discrimination).  Thus, Defendant analyzes Plaintiff's race discrimination claims
under the single-motive theory.  That said, Plaintiff's race discrimination claims fail under either
theory.  The undisputed facts show that Plaintiff cannot establish that race discrimination was a
motivating factor—much less that it was the sole motivating factor—in the actions that he is
challenging.  (See infra Part III.B.)

personnel action must be very close." Id. (quotation marks omitted) (holding that a "two-month gap is not sufficient to establish the temporal proximity necessary to show a causal connection").[16]

To establish a prima facie case of race discrimination, a plaintiff must show that:  "(1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  Short, 2008 WL 2174856, at *3 (quotation marks and alterations omitted); see Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999).  In the race discrimination context, for an action to be adverse, it must result in "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  Accordingly, the D.C. Circuit has defined an adverse action in the discrimination context as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  Taylor v. Small, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quotation marks omitted).

The D.C. Circuit has recently clarified that in considering an employer's motion for summary judgment "[i]n a Title VII disparate-treatment suit where an employee has suffered an adverse employment action and [the] employer has asserted a legitimate, [non-retaliatory/]non-discriminatory reason for the decision, the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas."  Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original); see

---

[16] A plaintiff may also establish a causal connection between protected activity and an adverse action by producing direct evidence that the adverse action would not have occurred but for the protected activity.  See Brantley, 2008 WL 2073913, at *6 n.8.  There is no direct evidence of any such causal connection here.

Pardo-Kronemann, 541 F. Supp. 2d at 215-16 (stating that the Brady principle applies to Title VII retaliation suits). Instead, the district court should resolve only one question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-retaliatory/non-discriminatory reason is a pretext for retaliation/discrimination. See Brady, 520 F.3d at 494; Short, 2008 WL 2174856, at *3; Pardo-Kronemann, 541 F. Supp. 2d at 215-16.

The instant case is a Title VII disparate-treatment suit and Defendant has asserted legitimate, non-retaliatory/non-discriminatory reasons for each of the challenged actions. (See infra Part III.A.2.) Thus, under Brady, this Court must as an initial matter determine whether each claim of retaliation and race discrimination that remains in this case involves an adverse action. See Brady, 520 F.3d at 494 (making clear that the Brady rule applies only "where an employee has suffered an adverse employment action"); Brantley, 2008 WL 2073913, at *4 ("[T]he Court must first determine whether any of the conduct underlying the claims constituted an adverse action."). If a particular claim does not involve an adverse action, then it fails as a matter of law. See Brantley, 2008 WL 2073913, at *4-*5 (finding that certain of the plaintiff's discrimination claims fail because they do not involve adverse actions). If, on the other hand, a particular claim does involve an adverse action, then the Brady rule applies, and this Court must determine whether Plaintiff has produced sufficient evidence for a reasonable jury to find that Defendant's asserted non-retaliatory/non-discriminatory reason for the action is a pretext for retaliation/discrimination. See id. at *5. In making that determination, this Court must consider whether a jury could infer retaliation/discrimination from: (1) Plaintiff's prima facie case; (2) any evidence that Plaintiff may present to attack Defendant's stated non-retaliatory/non-discriminatory reason for the action; and (3) any further evidence of retaliation/discrimination that may be available to Plaintiff. Short, 2008 WL 2174856, at *3 (citing Waterhouse v. District

of Columbia, 298 F.3d 989, 992-93 (D.C. Cir. 2002); Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998)).

### C.    Legal Standard for Plaintiff's Title VII Hostile Work Environment Claim

To establish a claim for a hostile work environment, a plaintiff must demonstrate that:

> (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action.

Smith v. Jackson, 539 F. Supp. 2d 116, 137 (D.D.C. 2008); see Laurent v. Bureau of Rehabilitation, Inc., 544 F. Supp. 2d 17, 24 (D.D.C. 2008).  A hostile work environment exists only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quotation marks and citation omitted); see Brantley, 2008 WL 2073913, at *7 ("[A] hostile work environment claim must be based on incidents comprising one unlawful employment practice of intimidation, insult and ridicule that pervades plaintiff's day-to-day working life." (quotation marks omitted)).  In determining whether a hostile work environment exists, courts must "look at the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Smith, 539 F. Supp. 2d at 137 (quotation marks omitted).

The hostile work environment standard is intended to be demanding "to ensure that Title VII does not become a general civility code," and to "filter out complaints attacking the ordinary tribulations of the workplace."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)

(quotation marks omitted); <u>see</u> <u>Smith</u>, 539 F. Supp. 2d at 137. "Even a few isolated incidents of offensive conduct do not amount to actionable harassment." <u>Stewart v. Evans</u>, 275 F.3d 1126, 1134 (D.C. Cir. 2002). To form the basis of a viable hostile work environment claim, the challenged "conduct must be extreme to amount to a change in the terms and conditions of employment." <u>Faragher</u>, 524 U.S. at 788.

## III.    ARGUMENT

As stated above, Plaintiff has asserted Title VII claims for retaliation, race discrimination and hostile work environment based on a number of acts that allegedly occurred in the latter months of 2003 and the early months of 2004. Those are the only claims that remain in this case, and for the reasons discussed below, each of those claims fails.

### A.    Plaintiff's Retaliation Claims Fail

Plaintiff has asserted claims for retaliation based upon: (1) his receipt of the November 4, 2003 "Achieved Standards" performance rating; (2) his receipt of the December 15, 2003 AWOL charge notice; (3) his receipt of the January 13, 2004 Letter of Warning; and (4) the denial of his February 17, 2004 training request. As an initial matter, each of Plaintiff's retaliation claims fails because none of the actions upon which they are based constituted a materially adverse action that would have dissuaded a reasonable employee from pursuing a charge of discrimination. Moreover, even assuming <u>arguendo</u> that each of the actions upon which Plaintiff's retaliation claims are based constituted a materially adverse action, the claims nevertheless fail because: (1) Defendant has asserted a legitimate, non-retaliatory reason for each of the challenged actions; and (2) given the strength of those reasons, the weakness of Plaintiff's <u>prima facie</u> case, and the entire record herein, no reasonable jury could conclude that Defendant retaliated against Plaintiff when it engaged in the challenged actions.

1.    <u>None of the employment actions upon which Plaintiff's claims for retaliation are based was a materially adverse action, and therefore, none is sufficient to sustain a claim for retaliation</u>

None of the employment actions upon which Plaintiff's retaliation claims are based—(1) the issuance of the November 4, 2003 "Achieved Standards" performance rating, (2) the issuance of the December 15, 2003 AWOL charge notice, (3) the issuance of the January 13, 2004 Letter of Warning and (4) the denial of Plaintiff's February 17, 2004 training request—was a "materially adverse" action that would "have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington</u>, 548 U.S. at 68.  As a result, none is sufficient to sustain a claim of retaliation, and Plaintiff's retaliation claims therefore fail.

<u>First</u>, the issuance of the November 4, 2003 "Achieved Standards" performance rating was not a materially adverse action.  Importantly, the "Achieved Standards" performance rating was not a negative rating; to the contrary, it signaled that Plaintiff "had performed adequately during the rating period."  (<u>See</u> Bishop Decl. ¶7.)  Moreover, there were no tangible negative employment consequences associated with Plaintiff's receipt of the "Achieved Standards" performance rating—the rating in no way affected Plaintiff's salary, bonus, grade or any other term or condition of his employment.  (<u>Id.</u>)  Finally, Plaintiff had received the same "Achieved Standards" performance rating for the prior two rating periods.  (Ex. D at 25; Brown Tr. 28:15-20.)  In light of the above, a reasonable employee in Plaintiff's position would not have been dissuaded from pursuing a charge of discrimination based upon his receipt of the "Achieved Standards" performance rating.  <u>See</u> <u>Powell v. Castaneda</u>, 247 F.R.D. 179, 183 (D.D.C. 2007) (finding that, under the circumstances of the case, the plaintiff's receipt of a "'Fully Satisfactory' performance rating" was not a materially adverse action and characterizing such a rating as "properly setting an employee down the path of prosperity rather than perdition"); <u>see also</u>

20

Halcomb v. Office of the Sergeant-at-Arms, No. 01-1428, 2008 WL 2599836, at *16 (D.D.C. July 2, 2008) ("For a low performance rating to amount to an adverse employment action the plaintiff must present evidence such that a reasonable trier of fact could conclude that she has suffered objectively tangible harm due to the poor rating." (quotation marks and alterations omitted)).[17]

Second, the issuance of the December 15, 2003 AWOL charge notice was not a materially adverse action.  On December 15, 2003, Plaintiff was issued a notice that he would be charged with 15 minutes of AWOL.  (Ex. B at 1-2.)  The notice explained that the charge was based on Plaintiff's failure to submit a leave slip for his late arrival on December 8, 2003 that reflected his 7:00 a.m. start time.  (Id. at 2.)  There is no dispute that Plaintiff refused to submit a leave slip for his late arrival on December 8, 2003 that reflected his 7:00 a.m. start time, and that he instead insisted on submitting a leave slip that reflected a 7:15 a.m. start time.  (See Ex. H.) There also is no dispute that before Plaintiff was issued the AWOL charge notice, he was: (1) reminded (on more than one occasion) that his start time was 7:00 a.m.; and (2) given an opportunity to submit a leave slip that reflected his 7:00 a.m. start time.  (See id.)  Moreover, there can be no reasonable dispute that, as of December 8, 2003, Plaintiff's start time was in fact 7:00 a.m.  (See Reidy Decl. ¶7 & Ex. 1; Ex. A.)  Finally, the AWOL charge notice provided Plaintiff with an opportunity to provide an "explanation [for his conduct] which [he] believe[d]

---

[17] The instant case is distinguishable from Weber v. Battista, 494 F.3d 179, 184-85 (D.C. Cir. 2007), where the plaintiff's claim for retaliation based upon her receipt of a satisfactory performance evaluation survived summary judgment.  In Weber, the plaintiff had presented evidence that:  (1) she had received above-satisfactory performance evaluations for the years prior to when she filed a claim for discrimination, and satisfactory ratings thereafter; (2) performance evaluations served as a basis for performance awards; and (3) she had received performance awards for those years when her performance was evaluated as above-satisfactory, but not for those years when her performance was evaluated as satisfactory.  Id.  Here, there is no comparable evidence in the record.

might justify a change in the recording" (Ex. B); yet, he declined to avail himself of that opportunity (see Reidy Aff. at 111-12). As a result, Plaintiff was charged with 15 minutes of AWOL. (See Ex. A.) Against this backdrop, a reasonable employee would not have been dissuaded from pursuing a charge of discrimination based upon his receipt of the AWOL charge notice, or his being charged with but 15 minutes of AWOL.

Third, the issuance of the January 13, 2004 Letter of Warning was not a materially adverse action. The Letter of Warning—which was issued to Plaintiff because he had repeatedly refused to follow his supervisors' instructions and submit a leave slip for his late arrival on December 8, 2003 that reflected his actual, 7:00 a.m. start time—"did not in any way affect the terms or conditions of [Plaintiff's] employment." (Bishop Decl. ¶8.) The Letter was nothing more than a one-time warning; it neither called for Plaintiff to receive disciplinary action nor resulted in his receiving disciplinary action. (Id.) Notably, the Letter of Warning expressly stated that it would "not be filed in [Plaintiff's] Official Personnel Folder" and that, after one year, it would "be destroyed and not used as a basis for progressive discipline in any subsequent offenses." (Ex. J.) The receipt of such a Letter would not have dissuaded a reasonable employee in Plaintiff's position from making or supporting a charge of discrimination. See Halcomb, 2008 WL 2599836, at *15 ("neither [a counseling] memorandum nor [a written] warning constituted an adverse employment action because they did not [a]ffect the plaintiff's employment"); Jacox v. Gates, No. 06-182, 2008 WL 442400, at *9 (M.D. Ga. Feb. 14, 2008) (holding that the issuance of a letter of warning was not a materially adverse action where the letter "was not filed in Plaintiff's official personnel folder," "did not result in any disciplinary action against Plaintiff" and "had no [other] effect on Plaintiff's employment"); Blake v. Potter, No. 03-7733, 2007 WL 2815637, at *9 (S.D.N.Y. Sept. 25, 2007) ("being given a single letter of warning for

22

failure to [follow an instruction from a supervisor] would not dissuade a reasonable employee . .

. from complaining about discrimination"); Baloch v. Norton, 517 F. Supp. 2d 345, 359 (D.D.C.

2007) (holding that the plaintiff's receipt of a letter of reprimand was not an adverse action); see

also Fratarcangeli v. U.P.S., No. 04-2812, 2008 WL 821946, at *10 (M.D. Fla. Mar. 26, 2008)

(the mere fact that a warning letter places a plaintiff in greater jeopardy of more serious

discipline if a second incident occurs does not render the issuance of such a letter a materially

adverse action).[18]

Finally, the denial of Plaintiff's February 17, 2004 training request was not a materially

adverse action.  On February 17, 2004, Plaintiff asked Defendant to pay for him to attend costly,

non-government-sponsored training classes in eight different software applications.  (See Ex. K.)

Later that same day, Plaintiff was issued a memorandum in which Mr. Morres explained that his

training request had been denied because:  (1) he had not yet completed the self-guided tutorials

that he had been given for four of the applications; (2) two of the remaining applications were

not essential to his job function; and (3) though useful, the remaining two applications were not

essential to his job function and, in any event, were the subject of in-house training that he was

being encouraged to pursue.  (See Ex. L.)  Moreover, Plaintiff did not suffer any tangible adverse

employment consequence as a result of the denial of his training request.  (Morres Decl. ¶10.)  In

light of the above, the denial of the training request would not have dissuaded a reasonable

employee in Plaintiff's position from pursuing a charge of discrimination.  See Powell, 247

F.R.D. at 183-84 (holding that the denial of a training request due to "work priorities" did "not

---

[18] In Powell, 247 F.R.D. at 187, this Court held that the issuance of two letters of reprimand that "describ[ed] the plaintiff's behavior as threatening and verbally abusive and [that] remain[ed] in the plaintiff's personnel file for one year" were materially adverse actions.  In the instant case, however, there was but one Letter of Warning, and it was not filed in Plaintiff's personnel file.  Thus, the instant case is distinguishable from Powell.

qualify" as a material adverse action); <u>Sewell v. Chao</u>, 532 F. Supp. 2d 126, 137 (D.D.C. 2008) (holding that the "denial of training" was "an ordinary tribulation of the workplace, not an actionable adverse action"); <u>Edwards v. E.P.A.</u>, 456 F. Supp. 2d 72, 85 (D.D.C. 2006) (in the discrimination context, the denial of a training opportunity "does not constitute an adverse employment action unless the plaintiff can tie the [denial] . . . to some actual, tangible adverse employment consequence" (quotation marks omitted)).

        2.    <u>Defendant Has Asserted Legitimate, Non-Retaliatory Reasons for Each of the Challenged Actions, and None of those Reasons Is a Pretext for Retaliation</u>

As set forth below, Defendant has asserted legitimate, non-retaliatory reasons for each of the actions upon which Plaintiff's claims for retaliation are based, and there is no evidence in the record that suggests that Defendant's stated reasons are a pretext for retaliation. Thus, even assuming <u>arguendo</u> that the actions upon which Plaintiff's claims for retaliation are based constituted material adverse actions (and they do not), Plaintiff's claims for retaliation nevertheless fail.

        a.    *Defendant has asserted a legitimate, non-retaliatory reason for the November 4, 2003 "Achieved Standards" performance rating*

Plaintiff was issued an "Achieved Standards" rating in his November 4, 2003 performance appraisal because the rating official, Mr. Bishop, determined that he had performed each of the five job elements listed in his Performance Plan in a satisfactory manner. (<u>See</u> Bishop Decl. ¶¶5-6.) Specifically, Mr. Bishop concluded that Plaintiff: (1) had "performed adequately during the rating period, [but had] not consistently fulfill[ed] any of his various employment responsibilities at a level that would have warranted an 'Exceed[ed] Standards' rating"; and (2) had not satisfied any of the other criteria listed in his Performance Plan that

would have made him deserving of an "Exceeded Standards" rating.[19]  (Id. at ¶6.)  Mr. Bishop

based his conclusions on his own personal observations of Plaintiff's job performance and on

information that he had obtained from other supervisors who had directly observed Plaintiff's job

performance.  (Id. at ¶5.)  There is no evidence in the record that indicates that Mr. Bishop's

explanation for Plaintiff's November 4, 2003 performance rating is a pretext for retaliation.[20]

> b.  *Defendant has asserted a legitimate, non-retaliatory reason for the December 15, 2003 AWOL charge notice*

Plaintiff received an AWOL charge notice on December 15, 2003 because he had insisted

on submitting a leave slip for his late arrival on December 8, 2003 that covered only the period

7:15 a.m. to 8:15 a.m., even though his official start time was 7:00 a.m.  (See Exs. A, B, I.)  On

December 11, 2003, Mr. Reidy met with Plaintiff and:  (1) reminded him that his current start

time was 7:00 a.m.; (2) told him that he would not approve a leave slip unless it reflected his

current start time; and (3) instructed him to submit a new leave slip for his late arrival on

December 8, 2003 that reflected his 7:00 a.m. start time (Plaintiff had previously submitted a

---

[19] Plaintiff did not, for example, submit any written suggestions to his supervisors on how to improve (1) the quality of work performed, (2) staff productivity, (3) customer service, (4) BEP security or (5) the safety and cleanliness of the BEP work environment.  (See Bishop Decl. ¶6.)

[20] During his deposition, Plaintiff stated that he believes that he deserved an "Exceeded Standards" rating because, at times, he was asked to complete assignments that had been given to one of his co-workers, Sidney Burch, and Mr. Burch had received an "Exceeded Standards" rating.  (See Brown Tr. 61:23-64:2; see also id. at 51:18-53:12.)  However, even if true, the mere fact that Plaintiff was asked to complete assignments that had been given to Mr. Burch does not establish that Plaintiff met the criteria in his Performance Plan for an "Exceeded Standards" rating.  Moreover, like Plaintiff, Mr. Burch received a summary rating of "Achieved Standards" in his November 4, 2003 performance appraisal.  (See Ex. P; see also id. (rating Mr. Burch as having "Achieved Standards" on four of the five job elements in his performance plan).)  Plaintiff also stated that he believes that he deserved a rating of "Exceeded Standards" in 2003 because:  (1) he had allegedly received a rating of "Exceeded Standards" in 2000; and (2) his performance in 2003 was no different than it was in 2000.  (Id. at 61:23-62:6.)  However, even assuming that Plaintiff had received an "Exceeded Standards" rating in 2000 and had performed in 2003 at the same level as he had performed in 2000, those facts do not establish that he was entitled to an "Exceeded Standards" rating in 2003.

leave slip for the period 7:15 a.m. to 8:15 a.m.). (See Ex. H.) After Plaintiff told Mr. Reidy that he would not submit a new leave slip, Mr. Bishop sent Plaintiff an email in which he stated: "Mr. Brown, your work hours are from 7:00 am to 3:30 pm. I am requiring you to give Mr. Reidy or myself a request for leave for the 1 ¼ hours that you were late on Monday 12/8/03. This must be done by [the close of business] today 12/11/03." (Id.) Plaintiff ignored Mr. Bishop's email. On December 15, 2003, the date that employee timecards were due, Mr. Reidy contacted Plaintiff and "told him, if he wished, [that] he could resubmit the leave slip as he had done originally and that he would be charged one hour of leave (7:15 am to 8:15 am) and ¼ hour of AWOL (7:00 am to 7:15 am)." (Ex. B at 2; see Brown Tr. 83:19-25.) Later that day, Plaintiff submitted a leave slip for his late arrival on December 8, 2003 for the period 7:15 a.m. to 8:15 a.m. (See Ex. I.) Accordingly, Plaintiff was issued an AWOL charge notice for the period 7:00 a.m. to 7:15 a.m. (and was ultimately charged with 15 minutes of AWOL). (See Exs. A, B.)

Plaintiff was not issued the AWOL charge notice (or charged with AWOL) for an unlawful reason. As of December 8, 2003, Plaintiff's official start time was 7:00 a.m. (See Reidy Decl. ¶7 & Ex. 1; Ex. A.) Yet, Plaintiff refused to submit a leave slip for his late arrival on December 8, 2003 that reflected his 7:00 a.m. start time; instead, he submitted a leave slip that reflected a 7:15 a.m. start time. (See Ex. H; Reidy Aff. at 111-12.) It was for that reason, and no other, that Plaintiff was issued an AWOL charge notice on December 15, 2003 (and was ultimately charged with 15 minutes of AWOL). (See Reidy Decl. ¶9.) There is no evidence in the record that suggests that the above, non-retaliatory reason for the issuance of the AWOL charge notice is a pretext for retaliation.

26

  c. *Defendant has asserted a legitimate, non-retaliatory reason for the January 13, 2004 Letter of Warning*

Plaintiff was issued the January 13, 2004 Letter of Warning for "Failure to Follow Supervisory Instructions" because he had repeatedly refused to follow his supervisors' instructions and submit a leave slip for his late arrival on December 8, 2003 that reflected his 7:00 a.m. start time.  (See Ex. J.)  There is no evidence in the record that suggest that Plaintiff was issued the Letter of Warning for any reason other than that he had refused to follow his supervisors' instructions in connection with submitting a leave slip for his late arrival on December 8, 2003.

  d. *Defendant has asserted a legitimate, non-retaliatory reason for the denial of the February 17, 2004 training request*

As stated above, Plaintiff's February 17, 2004 request that Defendant pay for him to attend costly, non-government-sponsored training classes in eight different software applications was denied because:  (1) he had not yet completed the self-guided tutorials that he had been given for four of the applications; (2) two of the remaining applications were not essential to his job function; and (3) though useful, the remaining two applications were not essential to his job function and, in any event, were the subject of in-house training.  (See Ex. L.)  There is no evidence in the record that suggests that the above reason for the denial of the training request is a pretext for retaliation.[21]

---

[21] Notably, during his deposition, Plaintiff could not identify a single co-worker who was permitted to take the training courses that were the subject of his February 17, 2004 request. (Brown Tr. 160:17-21; see id. at 149:23-150:2.)

e.      *Given the legitimate, non-retaliatory reasons that Defendant has asserted for each of the challenged actions, and the entire record herein, Plaintiff's claims for retaliation fail*

Because Defendant's legitimate, non-retaliatory reasons for the challenged actions are compelling (see supra), because Plaintiff's prima facie case is extraordinarily weak,[22] and because there is no evidence in the record of pretext, no reasonable jury could conclude that the challenged actions were retaliatory.  Accordingly, each of Plaintiff's claims for retaliation fails. See Halcomb, 2008 WL 2599836, at *15-*16 (rejecting claims of retaliation based upon, inter alia, "a counseling memorandum," "a written warning" and a "low performance rating" because there was "no evidence . . . that the defendant's legitimate, non-retaliatory explanation for its actions [was] a pretext"); Pardo-Kronemann, 541 F. Supp. 2d at 222-23 (same as to a claim of retaliation based upon an AWOL charge).

**B.      Plaintiff's Race Discrimination Claims Fail**

In addition to claims for retaliation, Plaintiff has asserted claims for race discrimination based upon:  (1) his receipt of the November 4, 2003 "Achieved Standards" performance rating;

---

[22] Plaintiff cannot make out a prima facie case for retaliation because none of the actions upon which his claims for retaliation are based was materially adverse.  (See supra Part III.A.1.)  Plaintiff also cannot make out a prima facie case for retaliation based upon the issuance of either the November 4, 2003 performance rating or the December 15, 2003 AWOL charge notice because he cannot possibly establish a causal connection between his protected activity and those actions.  Plaintiff first contacted Defendant's EEO office in connection with the instant case on December 15, 2003, after he had received the November 4, 2003 performance rating and the December 15, 2003 AWOL charge.  (See supra Part I.A.)  Thus, Plaintiff is necessarily claiming that the November 4, 2003 performance rating and the December 15, 2003 AWOL charge notice were issued in retaliation for protected activity that occurred prior to December 15, 2003.  Prior to that date, Plaintiff had filed an administrative complaint of employment discrimination against Messrs. Bishop and Reidy on June 3, 2002.  (See id.)  Yet, between June 3, 2002 and December 15, 2003, Plaintiff had not engaged in any protected activity.  (See Ex. E.)  The more than one year gap between the June 3, 2002 complaint of discrimination and the actions at issue in this case is too long to support an inference of a causal connection between the two.  See Baker, 294 F. Supp. 2d at 41 (holding that a "two-month gap is not sufficient to establish the temporal proximity necessary to show a causal connection").

and (2) Defendant's denial of his February 17, 2004 training request. Like Plaintiff's retaliation claims, the race discrimination claims fail because the actions upon which they are based do not constitute adverse actions under the governing law. The race discrimination claims also fail because Defendant has asserted legitimate, non-discriminatory reasons for the actions upon which they are based, and given those reasons and the entire record of this case, no reasonable jury could conclude that Defendant discriminated against Plaintiff when it engaged in the challenged actions.

    1.     <u>Neither of the employment actions upon which Plaintiff's claims for race discrimination are based constituted a materially adverse action, and thus, neither is sufficient to sustain a claim for discrimination</u>

Neither of the employment actions upon which Plaintiff's claims for race discrimination are based was a materially adverse action. That is, neither resulted in "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." <u>Taylor</u>, 350 F.3d at 1293. Thus, Plaintiff's race discrimination claims fail.

<u>First</u>, the issuance of the November 4, 2003 "Achieved Standards" performance rating was not an adverse action under the above standard. As stated previously, there were no tangible negative employment consequences associated with Plaintiff's receipt of the "Achieved Standards" performance rating—the rating did not affect Plaintiff's salary, bonus, grade or any other term or condition of his employment. (Bishop Decl. ¶7.) Thus, as a matter of law, Plaintiff's receipt of the "Achieved Standards" rating could not qualify as an adverse action. <u>See Kilby-Robb v. Spellings</u>, 522 F. Supp. 2d 148, 162 (D.D.C. 2007) (holding that a "'successful' performance evaluation [did] not constitute an adverse action" where the plaintiff did "not argue

that [the evaluation affected] her grade or salary")[23]; <u>Powell v. Castaneda</u>, 390 F. Supp. 2d 1, 11

(D.D.C. 2005) (holding that a "'Fully Satisfactory' . . . performance rating . . . do[es] not

constitute a 'change in employment status'"), <u>modified on other grounds by</u> 247 F.R.D. at 179;

<u>Smith v. Snow</u>, No. 02-1092, 2005 WL 975735, at *3 (D.D.C. Apr. 27, 2005) ("In this Circuit,

the law is clear that a performance appraisal of satisfactory, without more, fails to state an

adverse personnel action under Title VII."); <u>Lester v. Natsios</u>, 290 F. Supp. 2d 11, 29 (D.D.C.

2003) (holding that the plaintiff's receipt of evaluations that were "not . . . negative . . . , but

rather only . . . lower than she desired or containing what she believed were inaccurate

observations" did not constitute an adverse action).

     <u>Second</u>, the denial of Plaintiff's February 17, 2004 training request was not an adverse

action.  "[T]he denial of a single training . . . opportunity does not constitute an adverse

employment action unless the plaintiff can tie the alleged discriminatory employment action to

some actual, tangible adverse employment consequence."  <u>Edwards</u>, 456 F. Supp. 2d at 85

(quotation marks omitted); <u>see Lester</u>, 290 F. Supp. 2d at 29 (holding that the denial of a training

opportunity was not an adverse action because the "plaintiff has not explained adequately how

the denial . . . affected some material change in her employment conditions, status or benefits").

Here, Plaintiff "did not suffer any tangible adverse employment consequence as a result of the

denial of his training request."  (Morres Dec. ¶10.)  There is, for example, no raise or other

tangible benefit that Plaintiff did not receive as a result of not having the training that he had

requested.  (<u>Id.</u>)  Thus, the denial of the February 17, 2004 training request cannot constitute an

adverse action.  <u>See Edwards</u>, 456 F. Supp. 2d at 86.

---

    [23] In <u>Kilby-Robb</u>, the employer "used a rating scale of unacceptable, minimally
successful, successful, highly successful, and outstanding."  522 F. Supp. 2d at 152.

      2.     <u>Defendant Has Asserted Legitimate, Non-Discriminatory Reasons for Each of the Challenged Actions, and None of those Reasons Is a Pretext for Discrimination</u>

Defendant has asserted legitimate, non-discriminatory reasons for both of the actions upon which Plaintiff's claims for race discrimination are based.  (<u>See</u> <u>supra</u> Part III.A.2.a, d.) Because Defendant's legitimate, non-discriminatory reasons for the challenged actions are compelling (<u>see</u> <u>id.</u>), because Plaintiff's <u>prima facie</u> case of race discrimination is extraordinarily weak,[24] and because there is no evidence in the record of pretext,[25] no reasonable jury could conclude that the challenged actions were discriminatory.  Thus, even assuming <u>arguendo</u> that the actions upon which Plaintiff's claims for race discrimination are based constituted adverse actions (and they do not), each of those claims nevertheless fails.

**C.**      **Plaintiff's Hostile Work Environment Claim Fails**

Plaintiff has asserted a hostile work environment claim based upon:  (1) the January 13, 2004 incident in which Ms. Freeman allegedly yelled at him and told him "to kiss her black ass"; and (2) his receipt of the March 5, 2004 memorandum in which Mr. Reidy gave him a firm deadline of March 9, 2004 to complete a project that he had been assigned on February 25, 2004. As stated above, a hostile work environment exists only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to

---

[24] Plaintiff cannot make out a <u>prima facie</u> case of race discrimination because neither of the actions upon which his claims for race discrimination are based constituted an adverse action under the governing law.  (<u>See</u> <u>supra</u> Part III.B.1.)

[25] During his deposition, Plaintiff stated that he believes that his receipt of the "Achieved Standards" performance rating in November 2003 was discriminatory because "Caucasian workers" always received higher ratings than African-American workers.  (<u>See</u> Brown Tr. 50:1-7.)  However, Plaintiff could not identify by name any similarly situated Caucasian employee who had received an "Exceeded standards" performance rating in 2003.  (<u>See</u> <u>id.</u> at 50:8-25.) Similarly, during his deposition, Plaintiff could not identify a single co-worker (Caucasian or otherwise) who was permitted to take the training courses that were the subject of his February 17, 2004 request.  (Brown Tr. 160:17-21; <u>see</u> <u>id.</u> at 149:23-150:2.)

alter the conditions of the victim's employment and create an abusive working environment."

Harris, 510 U.S. at 21 (quotation marks and citation omitted); see Brantley, 2008 WL 2073913,

at *7.  Plaintiff here cannot satisfy that demanding standard.  The acts alleged by Plaintiff,

whether considered alone or cumulatively, were not sufficiently "extreme to amount to a change

in the terms and conditions of [his] employment."  Faragher, 524 U.S. at 788.  To the contrary,

they were, at most, "common workplace grievances"; they certainly "do not demonstrate a work

environment that was pervaded by discrimination."  Brantley, 2008 WL 2073913, at *8

(quotation marks omitted).

        A co-worker allegedly yelling at Plaintiff and telling him "to kiss her black ass" and a

supervisor giving Plaintiff a firm deadline to complete an assignment do not a hostile work

environment make.[26]  Even assuming that each of those actions was motivated by unlawful

discrimination or retaliation (an assumption that has no support in the record (see infra)), the

totality of the incidents alleged does not establish a pattern of "severe or pervasive" conduct that

altered the conditions of Plaintiff's working environment.[27]  Harris, 510 U.S. at 21.  Accordingly,

Plaintiff's hostile work environment claim fails as a matter of law.

_____

        [26] The above statement would remain true even if this Court were to consider the second
incident involving Plaintiff and Ms. Freeman that purportedly occurred in October 2003.  (See
supra n.12.)  Of course, Plaintiff did not include any allegations regarding that purported incident
in his Complaint in the instant case.  (See id.)
        [27] Plaintiff cannot rely on the discrete acts on which he bases his claims for retaliation
and discrimination to establish his hostile work environment claim.  See Brantley, 2008 WL
2073913, at *8; Smith, 539 F. Supp. 2d at 138; Keeley v. Small, 391 F. Supp. 2d 30, 51 (D.D.C.
2005).  In any event, even if Plaintiff were permitted to rely on the November 4, 2003 "Achieved
Standards" performance rating, the December 15, 2003 AWOL charge notice, the January 13,
2004 Letter of Warning and the denial of his February 17, 2004 training request to try to
establish a viable hostile work environment claim, he would be unable to do so.  The acts alleged
by Plaintiff in support of his claims of retaliation, race discrimination and hostile work
environment, whether considered alone or cumulatively, were not sufficiently "extreme to
amount to a change in the terms and conditions of [his] employment."  Faragher, 524 U.S. at
788.  Nor is there any evidence in the record that suggests that any of those acts was motivated

32

Plaintiff's hostile work environment claim also fails because there is no evidence in the record from which a reasonable jury could conclude that the acts upon which it is based were motivated by Plaintiff's race and/or his prior EEO activity. See Smith, 539 F. Supp. 2d at 139 (rejecting the plaintiff's hostile work environment claim because there was no evidence "that the treatment he allegedly suffered was based on his [protected status]"); see also Nichols v. Truscott, 424 F. Supp. 2d 124, 140 (D.D.C. 2006) (a hostile work environment claim fails unless the plaintiff can show some "relation between the alleged harassment and plaintiff's membership in a protected class"); Lester, 290 F. Supp. 2d at 32 (because there was no "evidence of any racial element to either [alleged] event," the events could not support a hostile work environment claim). In fact, rather than suggesting that the actions upon which Plaintiff's hostile work environment claim is based were motivated by a discriminatory or retaliatory animus, the record shows that the actions were based on non-discriminatory and non-retaliatory considerations:

- Ms. Freeman allegedly yelled at Plaintiff and told him "to kiss her black ass" because she was angry that he had turned off the lights in her workstation while she was still working (see Ex. N at 92); and

- Mr. Reidy issued Plaintiff the March 5, 2004 memorandum—in which Plaintiff was given a firm deadline of March 9, 2004 to complete a project that he had been assigned on February 25, 2004—because (1) it was important that the project referenced therein be completed as quickly as possible, and by no later than March 9, 2004, so that the BEP could fulfill its production obligations to its client, and (2) Mr. Reidy wanted to convey to [Plaintiff] the importance of completing the assignment in an expedited fashion (Reidy Decl. ¶6).

As Plaintiff cannot establish that the actions upon which his hostile work environment claim is based were motivated by a discriminatory or retaliatory animus, summary judgment should be awarded to Defendant on Plaintiff's hostile work environment claim.

---

by a discriminatory or retaliatory animus. See Smith, 539 F. Supp. 2d at 139 (rejecting a hostile work environment claim because there was no evidence in the record "that the treatment [the plaintiff] allegedly suffered was based on his [protected status]").

## IV.     CONCLUSION

For the reasons set forth above, this Court should GRANT Defendant's motion for

summary judgment.

Dated:  August 13, 2008                         Respectfully submitted,


                                        _____/s/_____
                                        JEFFREY A. TAYLOR, D.C. BAR # 498610
                                        United States Attorney


                                        _____/s/_____
                                        RUDOLPH CONTRERAS, D.C. BAR # 434122
                                        Assistant United States Attorney


                                        _____/s/_____
                                        CHRISTOPHER B. HARWOOD
                                        Assistant United States Attorney
                                        555 Fourth St., N.W.
                                        Washington, D.C.  20530
                                        Phone: (202) 307-0372
                                        Fax: (202) 514-8780
                                        Christopher.Harwood@usdoj.gov

Of Counsel:

Nichole Jenkins Washington
Office of the Chief Counsel
Department of the Treasury
Bureau Of Engraving and Printing

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on August 13, 2008, I caused a copy of the foregoing to be served

upon Plaintiff via the Court's ECF system and via first class mail, postage prepaid, addressed as

follows:

THOMAS D. BROWN, SR.
3162 17th Street, N.W.
Washington, DC  20010-2748


_____/s/_____
Christopher B. Harwood

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                        )
THOMAS D. BROWN, SR.,                          )
                                                        )
          Plaintiff,                                    )
                                                        )
          v.                                            )          Civil Action 07-0509 (RMU)
                                                        )
HENRY M. PAULSON, JR., Secretary,              )
Department of the Treasury,                    )
                                                        )
          Defendant.                                    )
_____        )

## DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Pursuant to Local Civil Rule 7(h), Defendant respectfully submits this Statement of Material Facts Not in Genuine Dispute.

1.       Plaintiff is a black male who was employed within the Department of Treasury's Bureau of Engraving and Printing ("BEP") from 1971 through June 2004.  (Compl. ¶3; Brown Tr. 10:1-10.)[1]

2.       During the time period relevant to this case, Plaintiff's first-line supervisor was Robert E. Bishop, his second-line supervisor was Patrick J. Reidy, his third-line supervisor was Ross E. Morres and his fourth-line supervisor was Judith Diaz-Myers.  (Bishop Decl. ¶4; Reidy Decl. ¶4; Morres Decl. ¶4; Diaz-Myers Aff. at 126.)[2]

---

[1] Citations in the form "(Brown Tr. __)" refer to the transcript of Plaintiff's July 3, 2008 deposition, excerpts of which are attached hereto.

[2] Citations in the form "(Bishop Decl. ¶__)" refer to the Declaration of Robert Bishop, which is dated August 11, 2008.  Citations in the form "(Reidy Decl. ¶__)" refer to the Declaration of Patrick Reidy.  Citations in the form "(Morres Decl. ¶__)" refer to the Declaration of Ross E. Morres, III, which is dated August 12, 2008.  Citations in the form "(Diaz-Myers Aff. at __)" refer to the Affidavit of Judith Diaz-Myers, which is dated October 4, 2005.  With the exception of the Declaration of Patrick Reidy, each of the above documents is attached hereto. Due to a family emergency, Mr. Reidy was unable to provide the undersigned counsel with a

3.      Plaintiff's initial contact with Defendant's EEO office concerning matters relevant to the instant case occurred on December 15, 2003.  (Ex. C at 1.)  Prior to contacting Defendant's EEO office on December 15, 2003, Plaintiff had received his November 4, 2003 "Achieved Standards" performance rating and an absence without leave ("AWOL") charge notice dated December 15, 2003.  (See id. at 3 (indicating that during his initial contact with Defendant's EEO office, Plaintiff wanted "to discuss" an event that had occurred on December 15, 2003).)  Between June 3, 2002 and December 15, 2003, Plaintiff did not file any EEO complaints.  (See Ex. E.)

4.      On November 4, 2003, Plaintiff received a performance appraisal for the rating period October 1, 2002 through September 30, 2003.  (Ex. F.)  In that performance appraisal, Plaintiff was rated by Mr. Bishop pursuant to his Performance Plan dated April 15, 2002 ("Performance Plan").  (See Exs. F, G; Bishop Decl. ¶5.)  Mr. Bishop rated Plaintiff as having "Achieved Standards" with respect to each of the five job elements listed in the Performance Plan.  (Ex. F.)  Consequently, Mr. Bishop gave Plaintiff a "Summary Rating" of "Achieved Standards."  (See id.; Bishop Decl. ¶5.)

5.      Before rating Plaintiff, Mr. Bishop consulted the Performance Plan.  (Bishop Decl. ¶5.)  Mr. Bishop also asked other supervisors who had directly observed Plaintiff's job performance during the rating period for details regarding his performance and their assessments of how he had performed.  (Id.)  Based upon his own personal observations of Plaintiff's job performance, as well as the input that he had received from the other supervisors whom he had contacted, Mr. Bishop determined that Plaintiff had "Achieved Standards" with respect to each

---

signed copy of his declaration as of the date of this filing.  The undersigned counsel expects to receive a signed copy of Mr. Reidy's declaration within the next several days.  As soon as he does, he will file the declaration with the Court.

of the five job elements listed in the Performance Plan.  (See id. at ¶¶5-6.)  Plaintiff had not

satisfied any of the criteria listed in his Performance Plan that would have made him deserving of

an "Exceeded Standards" rating.  (Id. at ¶6.)

6.    Mr. Morres reviewed the November 4, 2003 performance appraisal before it was

issued to Plaintiff, and concurred with Mr. Bishop's assessments.  (Morres Decl. ¶9.)

7.    Plaintiff had received an "Achieved Standards" annual rating for the 2000/2001

and 2001/2002 rating periods.  (See Ex. D at 25; Brown Tr. 28:15-20.)

8.    Plaintiff's November 4, 2003 "Achieved Standards" performance rating was not a

negative rating; it signaled that he "had performed adequately during the rating period."  (Bishop

Decl. ¶7.)  There were no tangible negative employment consequences associated with Plaintiff's

receipt of the "Achieved Standards" performance rating—the rating in no way affected

Plaintiff's salary, bonus, grade or any other term or condition of his employment.  (Id.)

9.    Plaintiff arrived late to work on December 8, 2003; he arrived at approximately

8:15 a.m.  (See Exs. H; I.)  Prior to December 11, 2003, Plaintiff submitted a leave slip to Mr.

Reidy in connection with his late arrival on December 8, 2003.  (See Ex. H.)  In the leave slip,

Plaintiff requested that he be approved for sick leave from 7:15 a.m. to 8:15 a.m. on December 8,

2008.  (See id.)

10.    Plaintiff's official start time as of December 8, 2003 was 7:00 a.m.  (See Reidy

Decl. ¶7 & Ex. 1; Ex. A.)

11.    On December 11, 2003, Mr. Reidy met with Plaintiff and:  (1) reminded him that

his official start time was 7:00 a.m.; and (2) told him to submit a new leave slip for his late

arrival on December 8, 2003 for the period 7:00 a.m. to 8:15 a.m.  (See Ex. H.)  Plaintiff refused

to submit a new leave slip.  (See id.)  On December 11, 2003, Mr. Bishop sent Plaintiff an email

in which he stated:  "Mr. Brown, your work hours are from 7:00 am to 3:30 pm.  I am requiring

you to give Mr. Reidy or myself a request for leave for the 1 ¼ hours that you were late on

Monday 12/8/03.  This must be done by [the close of business] today 12/11/03."  (Id.)

      12.    On December 15, 2003, employee timecards were due to be submitted to the

timekeeper.  (Reidy Aff. at 111.)[3]  As of that date, Plaintiff had not submitted a leave slip for his

late arrival on December 8, 2003 that reflected his 7:00 a.m. start time.  (Id.)  On December 15,

2003, Mr. Reidy contacted Plaintiff and "told him, if he wished, [that] he could resubmit the

leave slip as he had done originally and that he would be charged one hour of leave (7:15 am to

8:15 am) and ¼ hour of AWOL (7:00 am to 7:15 am)."  (Ex. B at 2; see Brown Tr. 83:19-25.)

Thereafter, on December 15, 2003, Plaintiff submitted a leave slip for his late arrival on

December 8, 2003 covering the period 7:15 a.m. to 8:15 a.m., which Mr. Reidy signed.  (Ex. I.)

Later that same day, Mr. Reidy issued Plaintiff an "A.W.O.L. Charge Notice" for the period 7:00

a.m. to 7:15 a.m.  (See Ex. B.)  The AWOL charge notice "requested" that, "within two days

from the date of this notice," Plaintiff "furnish . . . any explanation which [he] believe[d] might

justify a change in the recording."  (Id.)  Plaintiff did not respond to the AWOL charge notice

and, as a result, he was charged with 15 minutes of AWOL in connection with his late arrival on

December 8, 2003.  (See Reidy Aff. at 111-12; Ex. A.)

      13.    On January 13, 2004, Mr. Bishop issued Plaintiff a "Letter of Warning" for

"Failure to Follow Supervisory Instructions."  (Ex. J.)  The Letter of Warning expressly stated

that:  (1) it would not be filed in Plaintiff's Official Personnel Folder; (2) it would be retained

within the BEP for a period of only one year; and (3) after the one-year period, it would "be

destroyed and not used as a basis for progressive discipline in any subsequent offenses."  (Id.)

---

[3] Citations in the form "(Reidy Aff. at __)" refer to the Affidavit of Patrick Reidy, which is dated October 4, 2005, and is attached hereto.

14.    Following its issuance, the Letter of Warning was not used against Plaintiff in any

way.  (Bishop Decl. ¶8.)  The Letter of Warning did not in any way affect the terms or conditions

of Plaintiff's employment.  (Id.)

15.    On February 17, 2004, Plaintiff submitted a request to Mr. Morres to take eight

separate computer training classes offered by Computer Consultants Corporation ("CCC"), a

non-governmental entity.  (See Morres Aff. at 124[4]; see Ex. K.)  After conferring with Mr.

Reidy, Mr. Morres concluded that Plaintiff's February 17, 2004 training request should be

denied.  (See Morres Aff. at 124.)  Mr. Morres communicated the reasons for the denial of the

training request to Plaintiff in a memorandum dated February 17, 2004.  (Id.; see Morres Decl.

¶10; Ex. L.)

16.    Plaintiff did not suffer any tangible adverse employment consequence as a result

of the denial of his February 17, 2004 training request.  (See Morres Decl. ¶10.)

17.    On January 13, 2004, Plaintiff turned off the lights in the room in which he

worked as he was leaving for the night.  (Ex. N at 92.)  There were multiple workstations in that

room.  (See id.)  At the time that Plaintiff turned off the lights, one of his co-workers, Marjorie

Freeman, was still at her workstation.  (Id.)  As soon as Plaintiff realized that Ms. Freeman was

still in the room, he turned the lights back on and apologized to her.  (Id.)  Ms. Freeman,

however, did not accept Plaintiff's apology and yelled at him and told him "to kiss her black

ass."  (Id.)  Plaintiff reported the alleged incident involving Ms. Freeman to Mr. Morres on

January 14, 2004.  (Morres Aff. at 123.)

18.    On March 5, 2004, Mr. Reidy issued a memorandum to Plaintiff concerning an

assignment that he had given to Plaintiff (in final form) on February 25, 2004.  (See Ex. O.)  As

---

[4] Citations in the form "(Morres Aff. at __)" refer to the Affidavit of Ross Morres, which
is dated October 4, 2005, and is attached hereto.

of March 5, 2004, Plaintiff had not yet completed the assignment.  (See id.)  In the March 5, 2004 memorandum, Mr. Reidy provided Plaintiff with a firm due date for the assignment—March 9, 2004.  (Id.)

19.    Mr. Reidy issued the March 5, 2004 memorandum to Plaintiff because:  (1) it was important that the assignment referenced therein be completed as quickly as possible, and by no later than March 9, 2004, so that the BEP could fulfill its production obligations to its client; and (2) he wanted to convey to Plaintiff the importance of completing the assignment in an expedited fashion.  (Reidy Decl. ¶6.)

Dated:  August 13, 2008                    Respectfully submitted,


                                           _____/s/_____
                                           JEFFREY A. TAYLOR, D.C. BAR # 498610
                                           United States Attorney


                                           _____/s/_____
                                           RUDOLPH CONTRERAS, D.C. BAR # 434122
                                           Assistant United States Attorney


                                           _____/s/_____
                                           CHRISTOPHER B. HARWOOD
                                           Assistant United States Attorney
                                           555 Fourth St., N.W.
                                           Washington, D.C.  20530
                                           Phone: (202) 307-0372
                                           Fax: (202) 514-8780
                                           Christopher.Harwood@usdoj.gov

Of Counsel:

Nichole Jenkins Washington
Office of the Chief Counsel
Department of the Treasury
Bureau Of Engraving and Printing

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                              )
THOMAS D. BROWN, SR.,                         )
                                              )
          Plaintiff,                          )
                                              )
               v.                             )          Civil Action 07-0509 (RMU)
                                              )
HENRY M. PAULSON, JR., Secretary,             )
Department of the Treasury,                   )
                                              )
          Defendant.                          )
_____       )

## **ORDER**

Having considered Defendant's Motion for Summary Judgment, and the entire record

herein, it is this _____ day of _____, 2008:

ORDERED that Defendant's Motion for Summary Judgment is GRANTED.

SO ORDERED.


                              _____
                              UNITED STATES DISTRICT JUDGE


Copy to:

ECF Counsel

Thomas D. Brown, Sr.
3162 17th Street, N.W.
Washington, DC 20010-2748

**Management Affidavit Questions: Patrick Reidy**

**AFFIDAVIT**                                        **WASHINGTON, D.C.**

1.  **State your name, current title, series, grade, race, color, sex, age with date of birth and religion.**

Patrick J. Reidy
Photoengraving Supervisor WE4425
White, male, 55 (11/20/1949)

2.  **Please identify your present position and the management official to whom you report.**

Photoengraving Supervisor, reporting to Ross Morres.

3.  **Please describe your professional relationship to the complainant.**

He is a former employee. During the time he was in this department, I was the Assistant Supervisor.

4.  **At the time that you rated the appraisal in question, were you aware of any prior protected EEO activity by the complainant? If so, please describe the activity, indicate when the activity occurred, and explain how you were aware of it. Did the complainant's prior protected EEO activity play a role in your rating the appraisal at issue in this case?**

N/A. Assuming the appraisal in question is the one for the rating period 2002 to 2003, the actual date of the appraisal was 11/4/03. I did not rate this appraisal. Mr. Robert Bishop was the rating official.

5.  **Were you aware of the complainant having a disability? If so, how and when did you become aware?**

No. I was not aware of any disability.

6.  **The complainant has alleged that he was subjected to harassment based on his race, color, sex, age, religion, disability and prior EEO activity. Please respond, addressing the allegation as specifically as you can. If you have documents that relate to the matter, please provide them.**

I have never harassed the complainant. I have never harassed the complainant based on race, color, sex, age, religion, disability or prior EEO activity. The allegation is rather broad. If there were specific incidents identified, possibly they could be addressed.

110

**ISSUE # 1:  On November 20, 2003, the complainant received an "Achieved" Standard  Performance Rating for the rating period 2002 to 2003**
   A. N/A
   B. N/A
   C. Yes. On or around April 15, 2002.
   D. Yes. Complainant received a mid-year review on or around 4/15/2002 by Robert Bishop. A work error that was made earlier in the rating period was discussed.
   E. Yes. In addition to the above, it was pointed out to the employee that he had extensive training in his new work area and he would be expected to complete other training as well.
   F. No.
   G.

**ISSUE # 2:  On December 5, 2003, the complainant was denied a reasonable accommodation when he requested a change in his work hours to 6:15am to 2:45pm for the months of September through December 2003**
   A. Request for change of hours was denied by the Office Chief at the time, Ms. Judith Diaz Myers.
   B. A memo was issued prior to this to establish standard time schedules in the department.
   C. No. My only involvement was to pass his request along to the Division Manager.
   D. It was not within my position to approve or deny any change of hours.
   E. None

**ISSUE #3:  On December 15, 2003, the complainant was charged Absence Without Leave (AWOL)**
   A. On Monday, 12/8/03, the complainant called to say he was calling in sick. Around 8:15 am, I saw he was here and asked why he was in. He said he changed his mind. On Tuesday, I asked him to give me a leave slip for his absence on Monday. Either on Tuesday or Wednesday, he left a slip for my approval. I didn't get around to signing it until after he had left on Wednesday, but I noticed that the time he put on it did not correspond to his working hours. He put down that he was absent with sick leave from 7:15 am to 8:15 am. On Thursday, 12/11, I asked him to correct the times. He stated something about that his original starting time was 7:15 and that's why he put that there. I told him present starting time was 7:00 am and that is what should be on the leave slip. I left it with him. About 15 minutes later, he brought it back to me and said he would not change it. Again, I explained that his present starting time was 7:00 am and that I would not approve his leave slip unless it reflected that. He walked away with it, again without changing it.
   On 12/15/03 timecards were due. I never received a correct leave of absence slip for him. I wrote an e-mail to the Division Manager asking if his timecard should be withheld or if it should be sent without the 1.25 hours accounted for. The manager said to apply 1.25 hrs of AWOL. It was later decided by the manager to offer the complainant that he could turn in the leave slip as he originally did (accounting for 1 hour of leave only), and whatever leave was unaccounted for (.25 hours) would be charged to AWOL. The complainant then resubmitted a leave slip that showed 1 hour of leave. This slip was approved by me. The complainant was instructed to complete

\\\

BEP Form 8017 (AWOL Charge Notice). On Wednesday,12/17/03, I sent the complainant an e-mail reminding him that the Form 8017 was due back to me by the end of the day. I never received the form back from him. The next day I e-mailed the manager stating that the complainant did not return the form. I recommended to the division Manager that the absence be charged to AWOL.

B. See above

C. Incident was also discussed with Robert Bishop.

D. No other employees were Absent Without Leave during that time.

E.

**ISSUE # 4:  On January 13, 2004, the complainant was issue a "Letter of Warning" concerning the AWOL**

A. See Issue #3.

B. Complainant was issued a Letter of Warning for failing to follow supervisors instructions.

C. I did not speak to any Management Official, however the supervisor requested a formal letter from the Labor Relations department.

D. None

E.

**ISSUE # 5:  On January 13, 2004, the complainant was insulted and threatened by a co-worker**

A. I was informed of the issue after the fact. I had no involvement in this issue.

B. It was reported to Ross Morres.

C. Robert Bishop.

D. No other incidents involving Marjorie Freeman that I am aware of.

E. Ms. Freeman's version of this incident was very different from the complainant's. It is my understanding this issue was resolved through discussions with Ross Morres.

**ISSUE # 6:  On February 17, 2004, the complainant's training request was denied**

A. I am not aware of any training request that was denied on 2/27/2004.

B. N/A.

C. The complainant was denied a training request on 9/02/2003. The request was for a two day Photoshop Workshop. This particular workshop covered the same basic material that had been made available to him in previous Photoshop training. Other training (self-guided tutorials) that he had been instructed to complete remained uncompleted when this request was received. Complainant was advised to complete the tutorials first, then other training requests would be reconsidered. The tutorials never were completed.

No other requests for training by other employees were received or denied during this time frame.

D. Complainant has logged more training hours than any other employee in the department.

**ISSUE # 7:  On February 17, 2004, the complainant was told by his supervisor that he was no longer on light duty**

112

A. In April 2003, the complainant was allowed among other things to take a twenty minute walk every hour. He was asked periodically about his condition.
B. See above.
C. This request was not denied. He was allowed to take twenty minutes out of every hour for his walk.
D. The Office Chief, the Division Manager, the Department Supervisor, Health Unit officials, the Bureau's Safety Coordinator and Labor Relations officials.
E. None.
F.

**ISSUE #8: On March 3, 2004, the complainant was harassed and retaliated against by his supervisor when he was told to respond and complete an assignment by March 9, 2004**

A. The complainant was not harassed or retaliated against at any time. Complainant was given an assignment with written instructions and was unable to complete the assignment.
B. Yes.
C. He never did complete the assignment. It was reassigned to a co-worker to fulfill the Bureau's Mission.
D. Yes. Completed with no problems.
E.

**ISSUE #9: The agency failed to accommodate his disability**

A. I am not aware of any disability of the complainants.

**7.   On any of the above issues, did you take the complainant's race, color, sex, age, religion, disability or prior EEO activity into consideration prior to making any decisions?**

No

**I have read the above statement consisting of 4 pages and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.**

*Patrick Reidy*
**Patrick Reidy**

**Subscribed and sworn to before me**
**in Washington, D.C., on October 4, 2005.**

*Lewis T. Muñoz*
**Lewis T. Muñoz**
**EEO Investigator**

113

Management Affidavit Questions: Ross Morres

**AFFIDAVIT**                                        **WASHINGTON, D.C.**

1. **State your name, current title, series, grade, race, color, sex, age with date of birth and religion.**

Ross E. Morres, III
Program Manager, Plate Preparation Division
Native American – Caucasian
White
GS-14

2. **Please identify your present position and the management official to whom you report.**

Program Manager, Plate Preparation Division
Mark Pipkin, Office Chief

3. **Please describe your professional relationship to the complainant.**

From May 2002 to June 2004, I was the complainant's manager.

4. **At the time that you reviewed the appraisal in question, were you aware of any prior protected EEO activity by the complainant? If so, please describe the activity, indicate when the activity occurred, and explain how you were aware of it. Did the complainant's prior protected EEO activity play a role in your approving the appraisal at issue in this case?**

Yes, I was aware of prior EEO activity, but the activity in question occurred prior to my employment. His activity did not have any influence regarding his appraisal.

5. **Were you aware of the complainant having a disability? If so, how and when did you become aware?**

No.

6. **The complainant has alleged that he was subjected to harassment based on his race, color, sex, age, religion, disability and prior EEO activity. Please respond, addressing the allegation as specifically as you can. If you have documents that relate to the matter, please provide them.**

The complainant was never subjected to harassment based on the above allegations or any other form or characteristic that might constitute harassment. To the best of my knowledge, the complainant never attempted to communicate to the Office Chief, to the Assistant Office Chief, to me, to the section Foreman, or to his immediate supervisor, either verbally or in writing, that he was allegedly subjected to harassment.

120

**ISSUE # 1:  On November 20, 2003, the complainant received an "Achieved" Standard  Performance Rating for the rating period 2002 to 2003**

    **A.  Please describe in chronological order, the factual events that led up to the rating given.**

For the previous year's activity, the complainant was rated on his job performance which was conducted over that period of time.  During that time, the complainant was issued a number of work assignments.  Most assignments were completed fair or satisfactorily to the best of my knowledge which merited an "Achieved" Standard Performance rating.

    **B.  Please identify what information (e.g., written documents, advice from others, etc.) you relied when reviewing the complainant's performance appraisal?**

The performance review was compiled by input from the two Foremen and the Supervisor and submitted to me for initial review and then again to me after the review was discussed.

    **C.  Was the complainant provided performance expectations with regard to the appraisal in question?  If so, when were the expectations provided?**

Yes.  The performance standards for Photoengravers were distributed to the complainant on or about April 10, 2002.

    **D.  Did the complainant receive a mid-year review on his performance during the rating period?  If so, by whom, when and what was discussed?**

Yes.

    **E.  Prior to reviewing the appraisal, did you consult with any other management official about the rating?  If so, with whom, when, and what was discussed?**

No.

    **F.  Please provide any additional information relevant to this issue.**

**ISSUE # 2:  On December 5, 2003, the complainant was denied a reasonable accommodation when he requested a change in his work hours to 6:15am to 2:45pm for the months of September through December 2003**

    **A.  Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue?  Please explain.**

121

On or about September 10, 2003, the Office Chief issued a memorandum to the shop steward for local 285 informing him of the necessity to establish one work schedule for the Photoengraving section. Those working hours would be 6:30AM to 3:00PM. Copies of this memorandum were circulated to me, the Photoengraving supervisors, the Manager of the Labor-Management Relations department, and to all of the Photoengraving staff.

On December 3, 2003, the complainant e-mailed the Office Chief seeking cooperation in changing his duty hours in order to avoid using sick or annual leave to keep his medical appointments. The Office Chief replied to the complainant's e-mail requesting medical documentation that justifies this change in schedule and the duration of this change. The Office Chief forwarded me another reply to the complainant which clearly explained to him why the Bureau would not be providing him with this request. The complainant did not provide me with any medical documentation to support his request.

## ISSUE #3:  On December 15, 2003, the complainant was charged Absence Without Leave (AWOL)

### A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.

On December 8, 2003, the complainant called in sick. Around 8:15AM, the Supervisor saw him and asked why he was at work. The complainant said he changed his mind. On December 9, the Supervisor asked him to submit a leave slip for the absence on December 8. On review of the leave slip, the Supervisor noticed that the requested time off did not correspond to the complainant's working hours. He put down that he was absent with sick leave from 7:15AM to 8:15AM while his duty hours were to begin at 7:00AM.

On December 11, the Supervisor instructed the complainant to correct the leave slip in order to account for the time off from work. The complainant refused to adjust the leave slip request. The complainant was reminded then that since he would not adjust the leave slip that he'd be charged with AWOL to account for his full duty hours. The complainant did not correct the leave slip and he also did not resubmit it. Consequently, he would now be charged with additional time as AWOL. The Supervisor informed the section Foreman via e-mail, and I received a copy. The section Foreman wrote an e-mail to the complainant reminding him of his duty hours, and he instructed him to request for the proper amount of leave time.

On or about December 15, the complainant resubmitted his original leave slip which still did not fully account for his absence, and as a result, he was charged with AWOL for remaining balance.

## ISSUE # 4:  On January 13, 2004, the complainant was issue a "Letter of Warning" concerning the AWOL

### A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.

On January 13, 2004, the complainant received a letter of warning with regard to ISSUE #3 for failure to follow the supervisor's instructions. The complainant, the Supervisor, and the Foreman discussed the letter. The complainant refused to sign the letter acknowledging receipt of it. I was provided with a copy of the letter.

122

On or about January 21, 2004, I received a copy of a memorandum from the Office Chief to the complainant acknowledging receipt of his letter which advised him that if he was filing a grievance that he should follow the guidelines provided through his bargaining unit. To my knowledge, the complainant did not file a grievance.

**ISSUE # 5:  On January 13, 2004, the complainant was insulted and threatened by a co-worker**

   **A.  Please describe in chronological order all the events leading up to this issue. What was your involvement in, if any in this issue?  Please explain.**

On January 14, 2004, the complainant came into my office to complain about alleged verbal harassment he received from a female co-worker. This alleged incident occurred when the complainant was in the process of locking up the pre-press section (room 412-A) and by turning the lights out. The complainant claimed that he was unaware that his co-worker was still in the section. The complainant claimed that she cursed him severely. He also said that he felt threatened and that he was no longer going to lock up the section any more. The Assistant Office Chief was in the hallway when this conversation took place, and he later sent me an e-mail requesting that I investigate this further.

On January 15, 2004, I asked the complainant and his supervisor to meet with me to discuss the alleged incident. He told me his side of the story again. He also mentioned a similar incident that occurred some months ago. This issue had been discussed among the complainant, the female co-worker, the Supervisor and the section Foreman. The complainant said that he had brought this up before and that he wanted an apology from the co-worker. She declined. I suggested that this issue first be resolved possibly by taking it to the Alternative Dispute Resolution (ADR). The complainant was not receptive to this. I then told him that if he seriously felt threatened that he write a statement saying so, and that I would then take it to the next level. However, he declined - saying that he did not want anyone to get in trouble. He hoped for an apology from the co-worker, but he was not expecting one. I told him that I would speak to the co-worker. We also agreed that this matter would not be taken any further since he declined to write a statement about the incident on January 14, 2004. He seemed to be satisfied with this approach and I considered this issue closed.

On January 20, 2004, the complainant submitted a letter to the Office Chief stating that he had been insulted and had felt threatened by a female co-worker on January 14, 2004.

I spoke to the complainant's co-worker on January 20, 2004. She said she did not threaten him nor did she curse at him. She also referred to the similar incident between them from several months before. She did say she raised her voice but she did not curse him nor did she threaten him. I also suggested ADR as a possible way to resolve their difference. She was slightly interested. Her preferences were that he stayed away from her, and that he turn his time sheets in on time like the other Photoengravers. If she needed something from him, she would request it through the Supervisor. I thanked her for her time and told her if necessary, I would get back with her.

**ISSUE # 6:  On February 17, 2004, the complainant's training request was denied**

   **A.  Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue?  Please explain.**

123

On February 11, 2004, the main FAX machine in the Office of Engraving received a training notice from Computer Consultants Corporation (CCC) that was addressed to the complainant. I dropped the notice off at his work area.

On or about February 17, 2004, the complainant presumably left a training request in my office to attend several training classes sponsored by CCC. First, I notified the section Foreman that the complainant had submitted the training request. We discussed its merit and came to the conclusion that since he had not completed any of the in-house training tutorials on the more applicable programs that it would be best to remind him to complete them first before requesting outside training. Secondly, I referred to the Photoengraving Staff training matrix (see attached) and further concluded that since he had nearly four times the amount of training hours than his co-workers that it was not appropriate at that time to send him to additional training. Thirdly, I wrote a memorandum to the complainant explaining to him why his request was being denied at that time.

**ISSUE # 7: On February 17, 2004, the complainant was told by his supervisor that he was no longer on light duty**

> **A. Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue? Please explain.**

The complainant was placed on limited or light duty status beginning April 2003. To the best of my knowledge, he was reminded that this duty status was temporary and that it would last no longer than 12 months. To the best of my knowledge the complainant was periodically asked about his health status and based on his feedback, it was determined that he could be removed from limited or light duty. I was kept informed of this situation through discussions with the Foreman and the Supervisor.

**ISSUE #8: On March 3, 2004, the complainant was harassed and retaliated against by his supervisor when he was told to respond and complete an assignment by March 9, 2004**

> **A. Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue? Please explain.**

To the best of my knowledge, the complainant was not harassed or retaliated against by his supervisor. The assignment the complainant referred to was received by the Assistant Supervisor on February 23, 2004. The complainant was given the assignment the same day. The complainant was provided with written instructions to complete the assignment. The next day, specifications to complete this assignment changed, and the complainant was provided with a new set of instructions the following day (Feb. 25). To my knowledge, the complainant could not or did not complete the assignment within an acceptable prescribed time frame, and it was re-assigned to another employee. I was not involved with this issue except that I received a copy of the memorandum from the Assistant Supervisor (see attached) to the complainant informing him that the assignment was not completed and that there was a deadline to meet.

**ISSUE #9: The agency failed to accommodate his disability**

> **A. Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue? Please explain.**

124

I am not aware that the complainant had a disability.

**I have read the above statement consisting of 5 pages and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.**

Ross Morres

Subscribed and sworn to before me
in Washington, D.C., on October 11, 2005.

Lewis T. Muñoz
EEO Investigator

125

**Management Affidavit Questions: Judith Diaz-Myers**

**AFFIDAVIT**                                    **WASHINGTON, D.C.**

1. **State your name, current title, series, grade, race, color, sex, age with date of birth and religion.** Judith Díaz Myers, Associate Director (Technology), ES-1301-00, Hispanic, Female, 46 (DOB March 27, 1959), Non-denomination Christian.

2. **Please identify your present position and the management official to whom you report.** Associate Director (Technology), Deputy Director

3. **Please describe your professional relationship to the complainant.**
   I was the complainant's former Office Chief (4th line Supervisor)

4. **At the time that you reviewed the appraisal in question, were you aware of any prior protected EEO activity by the complainant? If so, please describe the activity, indicate when the activity occurred, and explain how you were aware of it. Did the complainant's prior protected EEO activity play a role in your approving the appraisal at issue in this case?**
   This was handled at the Assistant Supervisor/Supervisor/Manager level.

5. **Were you aware of the complainant having a disability? If so, how and when did you become aware?**
   I was aware that he alleged that he had a disability only because he told me so himself. However, he never provided supporting documentation. I do not recall exactly when he told me.

6. **The complainant has alleged that he was subjected to harassment based on his race, color, sex, age, religion, disability and prior EEO activity. Please respond, addressing the allegation as specifically as you can. If you have documents that relate to the matter, please provide them.**
   I am aware that he felt this because he told me this. However, I did not witness such harassment.

**ISSUE # 1: On November 20, 2003, the complainant received an "Achieved" Standard Performance Rating for the rating period 2002 to 2003**

A. **Please describe in chronological order, the factual events that led up to the rating given. What was your involvement, if any in this issue? Please explain.**
   This was handled at the Assistant Supervisor/Supervisor/Manager level.

126

**ISSUE # 2:  On December 5, 2003, the complainant was denied a reasonable accommodation when he requested a change in his work hours to 6:15am to 2:45pm for the months of September through December 2003.**

    **A.  Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue?  Please explain.**

In September 2003, I had issued a memorandum to the Photoengravers Union (of which Complainant was a member) giving them advance notice of the need for the establishment of one work schedule for all Photoengravers.  This was due to the nature of the work, the security requirements of the areas, and the interdependence of functions required to meet mission requirements in a timely manner without additional unnecessary costs.  Plus, we had lost four employees in this work unit, without a corresponding decrease in workload. A copy of this memorandum is attached.  In spite of the mission-driven requirements of his work section, on December 4, 2003, Complainant emailed me and requested a tour of duty hour change so that he could minimize the use of his annual and sick leave for some upcoming doctor appointments.  I could not accommodate his request  because it would have a negative impact on the entire work unit (all his fellow employees) due to the security requirements for closing the section at the end of the work shift.  A copy of this email is attached.  My understanding at the time was that the Complainant had sufficient annual and sick leave balances.

**ISSUE #3:  On December 15, 2003, the complainant was charged Absence Without Leave (AWOL)**

    **A.  Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue?  Please explain.**

This was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE # 4:  On January 13, 2004, the complainant was issue a "Letter of Warning" concerning the AWOL**

    **A.  Please describe in chronological order all the events leading up to this issue. What was your involvement, if any in this issue?  Please explain.**

I became aware of this by receipt a letter from the Complainant dated January 15, 2004.  A copy of this letter is attached.  I forwarded the letter to his Division Manager, Mr. Ross Morres for handling.  To my knowledge, this was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE # 5:  On January 13, 2004, the complainant was insulted and threatened by a co-worker**

    **A.  Please describe in chronological order all the events leading up to this issue. What was your involvement in, if any in this issue?  Please explain.**

127

The Complainant sent me a letter dated January 15, 2004 on this issue. A copy of this letter is attached. Since the letter stated that the Complainant "...felt scared, threatening, and defenseless,...", I forwarded the letter to the BEP's Threats and Violence Panel for investigation and adjudication. To my recollection, the Panel determined that the co-worker's words did no constitute a threat and that the Complainant's initial actions in the exchange raised the question of whether he was attempting to antagonize his co-worker.

**ISSUE # 6: On February 17, 2004, the complainant's training request was denied**

   **A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.**
   This was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE # 7:  On February 17, 2004, the complainant was told by his supervisor that he was no longer on light duty**

   **A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.**
   This was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE #8:  On March 3, 2004, the complainant was harassed and retaliated against by his supervisor when he was told to respond and complete an assignment by March 9, 2004**

   **A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.**
   This was handled at the Assistant Supervisor/Supervisor/Manager level.

**ISSUE #9:  The agency failed to accommodate his disability**

   **A.  Please describe in chronological order all the events leading up to this issue.  What was your involvement, if any in this issue?  Please explain.**
   I was aware that he alleged that he had a disability only because he told me so himself.  However, he never provided supporting documentation.  It was my understanding that his Supervisor's consistently accommodated a recurring health condition, per instructions from his Doctor.

128

I have read the above statement consisting of $\mathcal{3}$ pages and it is true and complete to the best of my knowledge and belief.  I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

Judith Diaz Myers

Subscribed and sworn to before me
in Washington, D.C., on October 4, 2005.

Lewis T. Muñoz
EEO Investigator

129

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THOMAS D. BROWN, SR., | ) | |
| 3162 17th Street, N.W. | ) | |
| Washington, DC 20010-2748 | ) | Civil Action 07-0509 (RMU) |
| Plaintiff, | ) | |
| | ) | |
| v. | | |
| | ) | |
| HENRY M. PAULSON, JR., Secretary, | ) | |
| Department of the Treasury, | ) | |
| Defendant. | ) | |

DECLARATION OF ROBERT BISHOP

I, Robert Bishop, declare the following to be a true and correct statement of facts based on my personal knowledge:

1. I was employed as the Photoengraver Foreman, Photoengraving/Electronic Prepress Division, Office of Engraving, within the Department of the Treasury's Bureau of Engraving and Printing ("Bureau" or "Agency") for 17 years.

2. I retired from the Bureau on March 31, 2005.

3. As the Photoengraver Foreman, my job responsibilities entailed: establishing and managing long term production schedules; working closely with supervisory and craft personnel to determine program needs, and keep the Office Chief informed of staff and production activity; maintaining and reviewing production cost records, including overtime, materials costs, and equipment expenses; reviewing standards and procedures that are prepared by subordinate supervisors; initiating and reviewing personnel actions pertaining to staff including preparing vacancy announcements, reviewing applications, and determining training for employees; evaluating site conditions and making and/or approving recommendations for improvements in connection with safety, security, and productivity.

4. During the time period from May 2002 to June 2004, and prior to my retirement, I was Thomas D. Brown, Sr.'s first line supervisor.

5.  As Mr. Brown's first line supervisor, I was responsible for rating his performance.  In late 2003, prior to evaluating his performance, I consulted the Office of Engraving's Performance Evaluation Plan and reviewed what Mr. Brown would have to have done during the 2002/2003 rating period with respect to the five job elements discussed therein to justify receiving a rating of either "Exceeds Standards" or "Achieved Standards."  I also asked other supervisors who had directly observed Mr. Brown's job performance during the rating period—including Mr. Reidy and Ross Morres—for details on and their assessments of how he had performed.  This was the process I used in evaluating all employees.  Based upon my own personal observations of Mr. Brown's performance, as well as the input that I had received from the other supervisors whom I had contacted, I determined that Mr. Brown had "Achieved Standards" in each of the critical job elements listed in his Performance Evaluation Plan.  As a result, I concluded that a summary rating of "Achieved Standards" was appropriate.

6.  It should be noted that for all of the individual job elements listed in the Performance Evaluation Plan, an employee may "Exceed Standards" by submitting written suggestions to management on how to improve staff performance in the specified area.  Mr. Brown did not submit written suggestions with respect to any of the areas covered in the Performance Evaluation Plan, and thus could not receive "Exceeds Standards" ratings on that basis.  Alternatively, an employee may receive an "Exceeds Standards" rating by consistently performing at a high level in a specified area.  While Mr. Brown performed adequately during the rating period, he did not consistently fulfill any of his various employment responsibilities at a level that would have warranted an "Exceeds Standards" rating.  Nor did Mr. Brown satisfy any of the other criteria in the Performance Evaluation Plan such that he deserved "Exceeds Standards" ratings.

7.  An "Achieved Standards" performance rating is not a negative rating.  To the contrary, it signals that the recipient—in this case Mr. Brown—had performed adequately during the rating period.  Moreover, there were no tangible negative employment consequences to Mr. Brown associated with his receipt of the "Achieved Standards" performance rating.  The rating in no way affected his salary, bonus, grade or any other term or condition of his employment.

8.  On January 13, 2004, I issued Mr. Brown a Letter of Warning for "Failure to Follow Supervisory Instructions."  The Letter was issued because Mr. Brown had failed to follow my instructions, as well as Mr. Reidy's instructions, to submit a leave slip for his late arrival on December 8, 2003 that reflected his official 7:00 a.m. start time.  The Letter was nothing more than a warning.  It neither called for Mr. Brown to receive disciplinary action nor resulted in Mr. Brown receiving disciplinary action.  Following its issuance, the Letter was not used against Mr. Brown in any way.  The Letter did not in any way affect the terms or conditions of Mr. Brown's employment.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed in the state of North Carolina this  _11_  day of August, 2008.


Robert Bishop                                    Robert Bishop




PAGE


PAGE 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THOMAS D. BROWN, SR., 3162 17th Street, N.W. Washington, DC 20010-2748 Plaintiff, | ) ) ) ) ) | Civil Action 07-0509 (RMU) |
| v. | ) ) ) | |
| HENRY M. PAULSON, JR., Secretary, Department of the Treasury, Defendant. | ) ) ) ) | |

DECLARATION OF ROSS E. MORRES, III

I, Ross E. Morres, III, declare the following to be a true and correct statement of facts based on my personal knowledge:

1. I am a GS-14 Program Manager, Plate Preparation Division, Office of Engraving, with the Department of the Treasury's Bureau of Engraving and Printing ("Bureau" or "Agency").

2. I have been employed with the Bureau since March 2001 in the positions of Production Specialist and Program Manager, Plate Preparation Division, respectively.

3. As the Program Manager, Plate Preparation Division, my job responsibilities entail: establishing and managing long term production schedules; working closely with supervisory and craft personnel to determine program needs, and keep the Office Chief informed of staff and production activity; maintaining and reviewing production cost records, including overtime, materials costs, and equipment expenses; reviewing standards and procedures that are prepared by subordinate supervisors; initiating and reviewing personnel actions pertaining to staff including preparing vacancy announcements, reviewing applications, and determining training for employees; evaluating site conditions and making and/or approving recommendations for improvement in connection with safety, security, and productivity.

4. During the time period from May 2002 to June 2004, I was Thomas D. Brown, Sr.'s third line supervisor.

5. I stand by the affidavit that I submitted on October 4, 2005 to the EEO investigator in connection with the complaint filed by Mr. Brown, and I incorporate by reference the contents of that affidavit.

6. On or about January 14, 2004, Mr. Brown reported that the administrative assistant for the office, Ms. Marjorie Freeman, had insulted and threatened him when he turned the light off in the section, not knowing that she was still there. Mr. Brown informed me that he was not interested in reporting her further, i.e., to the threats and violence panel because he did not want her to get into trouble. He simply wanted her to apologize to him.

7. After speaking to Ms. Freeman separately and obtaining her side of what had transpired between her and Mr. Brown, she advised that she did not believe she should have to apologize to him because he allegedly spoke to her unprofessionally and she reacted to him in like fashion. She told me that she did not curse at or threaten him. I counseled her, and then advised her to have minimal unsupervised contact with him, including that she should obtain Mr. Brown's time sheets from his supervisors rather than directly from him.

8. I subsequently spoke to Mr. Brown concerning Ms. Freeman's version of the incident and advised him that if he didn't want to pursue the matter, including attending alternative dispute resolution with her, then I would consider the matter closed. I also advised both Mr. Brown and Ms. Freeman that I expected them to behave professionally toward each other in the future. Mr. Brown subsequently wrote a letter to the Office Chief, Ms. Judith Diaz-Myers. I did everything that I felt appropriate in handling the incident. I did not take the reported incident lightly, and I addressed it with the same fervor and seriousness that I would have addressed any similar circumstances.

9. I am aware that Mr. Brown received an "Achieved Standards" performance rating on his November 4, 2003 performance appraisal. Prior to its issuance, I reviewed Mr. Brown's performance appraisal and concurred with the rating official's (Robert Bishop) assessments of Mr. Brown's performance. Mr. Brown had not satisfied any of the requirements for receiving an "Exceeded Standards" rating for any of the job elements listed in his Performance Evaluation Plan.

10. On or about February 17, 2004, I issued a memorandum to Mr. Brown in which I explained why he was not being permitted to take the computer training classes that he had requested permission to take on February 17, 2004. Mr. Brown did not suffer any tangible adverse employment consequence as a result of the denial of his training request. There is no raise or other tangible employment benefit that Mr. Brown did not receive as a result of not having the training that he had requested on February 17, 2004.

11. During the course of evaluating Mr. Brown's February 17, 2004 training request, I reviewed a Training Matrix that listed the total amount of training that

Mr. Brown and each of his co-workers had received as of January 30, 2004. The Training Matrix revealed that, during the course of his employment with the Bureau, Mr. Brown had received far more hours of training than any of his co-workers, and more hours of computer training than all but one of his co-workers. That said, I did not deny Mr. Brown's training request based upon the information contained within the Training Matrix. I denied the request for the reasons stated in the February 17, 2004 memorandum that I sent to Mr. Brown. I did, however, conclude that the information in the Training Matrix provided additional support for the denial.

12. I did not consider Mr. Brown's race or prior involvement in the EEO process when I took the actions that are at issue in the above-captioned case.


I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

Executed in the District of Columbia this __13__ day of August, 2008.


Ross Morres

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x
                    :

THOMAS D. BROWN, SR.      :    ORIGINAL

                    :

       Plaintiff,      :

                    :

      v.             :    Civil No.: 07-00509

                    :

HENRY M. PAULSON, JR.,   :

SECRETARY, UNITED STATES  :

TREASURY DEPARTMENT,     :

                    :

       Defendant.      :

                    :

- - - - - - - - - - - - - - x

Washington, D.C.

Thursday, July 3, 2008

Deposition of

THOMAS D. BROWN, SR.

a witness of lawful age, sworn before Jon G. Hundley, a

Notary Public in and for the District of Columbia, in the

offices of the United States Attorney, 501 Third Street,

N.W., Room 4419, commencing at 10:02 a.m.

Diversified Reporting Services, Inc.

(202) 467-9200

Page 10

1    Q    What year did you start working at the Bureau of

2    Engraving and Printing?

3    A    I think at the end of 1970 and '71.

4    Q    And what year did you stop working at the Bureau of

5    Engraving and Printing?

6    A    I was fired June 18, 19, 2004.

7    Q    And did you work continuously for the Bureau of

8    Engraving and Printing for 1971 until 2004?

9    A    Well, you can say 2005, actually, because this was

10   approved in 2005.  Yes, I did.

11   Q    Okay, and you say you were fired in 2005?

12   A    4, yes.

13   Q    You were fired in 2004?

14   A    Right.

15   Q    Why were you working then until 2005?

16   A    Because the preliminary -- the papers for

17   disability I filed for disability -- and from my

18   understanding I had to wait a year for the okay to be cleared

19   for records and everything to be reconciled and to be

20   confirmed.

21   Q    You were issued a notice of termination in 2004?

22   A    Yes.

23   Q    Was that notice of termination ever rescinded?

24   A    What do you mean?

25   Q    Do you have an official personnel record for the

Page 14

1    Q    How about in 2004?  Was taking photographs of

2    events?

3    A    Yes.

4    Q    Also one of your primary job responsibilities?

5    A    Yes, and also in 2003 and '04, I was working in

6    different areas because of my disability.  So, sometime, I

7    would be detailed to another area within the photo engraving

8    area, but another section for detail work.

9    Q    And what type of work would you be doing at that

10   time when you were detailed?  Would you still be taking

11   photographs of events?

12   A    Yes, yes.  It was irregular, but yes.  They would

13   still have me to do photo engraving work, yes.

14   Q    What activities did you perform that you can recall

15   in 2003 and/or 2004, other than taking photographs of events?

16   A    Other than the detailed jobs, I don't remember.

17   Q    You filed EEO complaints alleging employment

18   discrimination with the Department of Treasury's EEO office

19   before.  Was that correct?

20   A    Yes, several times.

21   Q    When did you file your first EEO complaint?

22   A    In the year 1992, if I am not mistaken, yeah,

23   between '90 and '92.

24   Q    Between 1990 and '92?

25   A    Yes.

Page 15

1    Q    And when did you file your next complaint?

2    A    I don't have that information in front of me, so I

3    can't accurately say.

4    Q    Can you recall it?  Let me take a step back.  What

5    was the complaint for that you filed between 1990 and 1992?

6    A    I believe it was the discrimination retaliation of

7    job performance and just discrimination, failure to promote.

8    Q    And who were the alleged discriminating officials

9    that you identified?

10    A    Mike Roark and Jim Schonberg, James Schonberg.

11    Q    Besides that failure to promote and discrimination

12    claim from 1990 that you filed between 1990 and

13    A    Well, I see a performance and variant promote.

14    Q    Okay, let me strike that.  Besides the performance

15    and failure to promote complaint that you filed against Mike

16    Roark between 1990 and 1992, can you recall specifically any

17    other EEO complaints that you filed?

18    A    Yes, I believe I filed another complaint in 1995.

19    Q    And what was that for?

20    A    That was for failure to perform and I believe

21    failure to promote as well.

22    Q    And who was the alleged discriminating official?

23    A    I believe it was James Schaumberg.

24    Q    And he was in your supervisory chain of authority

25    at the time?

1       A    Yes, he was.

2       Q    And between 1990 and 1992, Mike Roark was in your

3  supervisory chain of authority?

4       A    Yes.

5       Q    What level of supervisor was he?

6       A    Which year?

7       Q    When you filed the complaint against him?

8       A    He was my second line supervisor.

9       Q    And what level of supervisor was James Schaumberg?

10      A    He was my first.

11      Q    He was your first level at the time you filed the

12  complaint?

13      A    Yes.

14      Q    Besides the two complaints that you've identified,

15  can you recall any other EEO complaints that you filed?

16      A    I believe I filed one in 1996.

17      Q    And what was that complaint for?

18      A    I don't remember, personally.

19      Q    Do you recall who the alleged discriminating

20  official was in connection with that?

21      A    I believe Jim Thompson, James Schaumberg, and, I

22  believe, Danny Thompson.

23      Q    Is Danny Thompson or Thomas?

24      A    Thompson, I think.  T-h-o-m, is it p-s-o-n?

25  Thompson.

Page 17

1        Q      And was Danny Thompson in your supervisory chain of

2    authority?

3        A      Yeah, he was my first line supervisor.

4        Q      At that time in 1996?

5        A      I believe so.

6        Q      Was he in your supervisory chain of authority in

7    2003 or 2004?

8        A      No.

9        Q      Do you recall any other EEO complaints that you

10   filed?

11       A      Yes, and I believe in 1998.

12       Q      And what was that for?

13       A      That was performance and I believe that's all I can

14   remember at this time.

15       Q      And who was the alleged discriminating official or

16   officials?

17       A      I believe it was Danny Thompson.

18       Q      And did you recall any other EEO complaints that

19   you filed?

20       A      Yes.  I think in 2001 to 2002.

21       Q      And what was that complaint?

22       A      That was performance.

23       Q      When you say performance, performance appraisal?

24       A      Yeah, performance appraisal.

25       Q      When you say you filed a complaint based on

Page 18

1    performance, it was complaining about a performance

2    appraisal?

3        A    That was it exactly.

4        Q    And who was that complaint filed against?  Who was

5    the alleged discriminating official?

6        A    Robert Bishop and Patrick Reidy.

7        Q    Was that complaint based on your 2001 fiscal year

8    performance rating?

9        A    Yes, and our disability as well.

10       Q    Do you recall what you had received as your

11   performance rating that led you to file that complaint?

12       A    I think it was my disability.  I guess it was

13   disability that I found it in reference to.

14       Q    It was only disability, the complaint that you were

15   talking about that you filed against Mr. Bishop and Mr. Reidy

16   in the 2001, 2002, timeframe?

17       A    I believe so, yes.

18       Q    And what was the allegation?  What had they done

19   with respect to your disability that led you to file a

20   complaint?

21       A    Well, I mean, under certain rules I was restricted

22   by doctor's orders and at that time to perform light duty at

23   times and they never honored the doctor's orders in reference

24   to my disability, having to cause my disability to worsen.

25       Q    And did you file any other employment-related

1    complaints with the EEO office after the 2001-2002 complaint

2    against Mr. Bishop and Mr. Reidy?

3        A    I think my last complaint was 2003.

4        Q    And that's in connection with this law suit?

5        A    Yes.

6        Q    In January 2000 did you participate in the EEO

7    process as a witness for Thomas Jefferson?

8        A    What year?

9        Q    Around 2000?

10       A    I'm not sure.  I don't have that before me, but I

11   believe I did.

12       Q    At some point, you participated in the EEO process

13   as a witness for Mr. Jefferson?

14       A    Yes.  Yes.

15       Q    What did Mr. Jefferson allege?

16       A    Age discrimination?

17       Q    And who?

18       A    Performance as well.

19       Q    Based on a performance appraisal that he had

20   received?

21       A    Age discrimination is I think the basis of it, but

22   it had something probably to do with this performance as

23   well.

24       Q    Do you know who the alleged discriminating

25   officials were in connection with that complaint?

Page 28

1          Q     Do you recall what performance rating you received?

2     The fiscal year performance ratings that you received, did

3     you receive them in the fall of each year?

4          A     What do you mean did I see them?

5          Q     What time of year would you receive the performance

6     appraisals?

7          A     The norm of performance rating from October -- from

8     September 30th to October 1st -- that's the whole rating

9     year.

10         Q     And the fall of 2000, I think you testified you

11    received an exceeds standards rating?

12         A     In the year of 2000?

13         Q     Yes.

14         A     Yes, I believe it.

15         Q     And in 2001 do you recall what you received?

16         A     I believe it was satisfactory.

17         Q     Achieves standards?

18         A     Achieves satisfactory, yeah.

19         Q     And the fall of  2002?

20         A     It was satisfactory.

21         Q     Let me show you what I'll have marked as Exhibit 1.

22                         (Defendant's Exhibit 1 was marked

23                          for identification.)

24               Do you recognize this document?

25         A     Yes.

1    Q    You've identified one reason you believe he gave

2    you an achieved standards rating was as retaliation for your

3    prior EEO complaint.  Do you believe it was also based on

4    your race?

5    A    Well, I could see other African-American's ratings

6    were always, you know, lower as reference to fellow Caucasian

7    workers were.

8    Q    Do you believe that there is a Caucasian worker who

9    received an "exceeds standards" performance rating that you

10    did equal or better work then?

11    A    Well, they were working in different areas, so I

12    don't know their ratings.  I inquired for that information,

13    but I wouldn't be able to answer that until I get that

14    information.

15    Q    Can you identify any Caucasian employee who

16    received the higher?  Sorry.  Can you identify any Caucasian

17    employee who received an exceeds standards rating in 2003?

18    A    I probably could, but at this time, I don't know.

19    I'm thinking to think if they did the same job, pretty much

20    the same job.

21    Q    Is there any Caucasian employee you can think of

22    who performed a job comparable to yours who received an

23    "exceeds standards," rating in '03?

24    A    Yeah, several.  In particular, I can't think of

25    their names.

Page 51

1      Q    Are there any other reasons, other than you've

2   already described, that you believe that Mr. Bishop

3   discriminated against you based on your race in connection

4   with this performance appraisal?

5      A    I don't know.

6      Q    If you could turn your attention to part 3 of the

7   appraisal, which is on the bottom of the first page and

8   continues on to the second page, are there any statements in

9   that narrative section, part 3, that you believe are

10  inaccurate?  And, if there are, I'd ask you to point them out

11  to me.

12     A    Yes, so the second part in the digital photography

13  area, "Mr. Brown met the criteria for chief standards and

14  productivity in customer service category."

15     Q    That's wrong?

16     A    Yes.

17     Q    And what's incorrect about that?

18     A    Well, I think that I exceeded in those elements of

19  the job.

20     Q    And what made you exceed standards in each of those

21  elements?

22     A    The same thing that made me exceed in the year

23  2002, the same rating.

24     Q    And what did you do that made you exceed standards

25  in quality, for example?

Page 52

1          A     Well, what do you mean, what did I do?

2          **Q     What leads you to believe that you should have**

3    **received an "exceeds standards," with respect to quality?**

4          A     Well, look at the 2002 rating, you know, because

5    I'm quite sure.

6          **Q     The 2002 rating has been marked.**

7          A     No, I'm sorry, 2000, the year 2000 rating.

8          **Q     I don't have your 2000 rating with me here today,**

9    **so I just want to know based on your belief as you sit here**

10   **testifying today what leads you to believe that in 2003 you**

11   **deserved exceeds standards with respect to quality?**

12         A     Well, as far as quality, I exceeded the quality,

13   productivity and customer service, especially productivity.

14   Because this particular year my counterpart co-worker, Sidney

15   Burch, he had disciplinary problems.  Okay.  And I did a lot

16   of times, so he had to stay at home; and, when I mean stay at

17   home, he was in a section pretty much and there were

18   assignments that he supposedly went out on.

19         Mr. Bishop told me to go out on them.  As a matter

20   of fact, Mr. Bishop told me to go out on every assignment

21   pretty much at the whim, whenever he felt like it, whether it

22   was his assignment or my assignment.  But the case was, you

23   know, I definitely exceeded, you know, in productivity in the

24   customer service.

25         **Q     So Mr. Bishop had you do assignments that were your**

Page 53

1    own assignments and he asked you to cover for other people?

2         A    Exactly.

3         Q    And that leads you to believe that you deserved an

4    exceeds standards rating in quality productivity and customer

5    service?

6         A    Yes.

7         Q    Is there anything else that leads you to believe

8    that you deserved to receive an "exceeds standards" rating in

9    those categories?

10        A    I thought that was enough.

11        Q    Okay.  Is there anything else?

12        A    Oh, no.

13        Q    I'm turning to the second page of Exhibit 3 which

14   has the remainder of the narrative section of the performance

15   appraisal.  So we're looking now at part 3 of the performance

16   appraisal, which is titled "Narrative."

17        A    Okay.

18        Q    And you were just looking at the bottom of the

19   first page of your performance appraisal, and you described

20   to me what you think is incorrect?

21        A    Right.

22        Q    In that area of the document, and now I'd like you

23   to look at the rest of part 3, which is on the second page of

24   the performance appraisal and let me know if there's anything

25   on the second page of the performance appraisal in part 3

Page 61

1          A    I'm not sure.  Okay.  I think there was a

2     particular job description prior to this one that we were

3     rating on.

4          Q    **Well, this is dated April 15, 2002.  Do you see**

5     **that?**

6          A    Sure.  Yes.

7          Q    **So this was dated before the 2003 appraisal.**

8          A    Okay, but at the time this was presented I think

9     the fiscal year had already started.  So there was a prior

10    evaluation plan before this one if I'm not mistaken.

11         Q    **So you believe that this was not the performance**

12    **evaluation plan that you were rated on for the 2003 fiscal**

13    **year?  You were rated based on a prior version of this**

14    **document?**

15         A    I'm not sure.

16         Q    **You're not sure?**

17         A    Yeah, I mean, because it was new.  You know, we had

18    a modification.  I think this is the modification, but it was

19    one prior to this one.

20         Q    **Do you know whether you were rated based on this**

21    **form or based on a prior form?**

22         A    I'm not sure.

23         Q    **Now, in terms of, you know, the elements, the**

24    **quality, productivity, customer service, security and safety,**

25    **I think you've testified already that you believe that based**

Page 62

1   on the fact that you were asked to cover for another employee

2   and do your work, and work that had been assigned to another

3   employee, you believe that you were entitled to receive an

4   "exceeds standards" rating in those categories.

5       A    And also in the year 2000 I exceeded job

6   performance.

7       Q    And is there any other reason as you sit here today

8   why you believe you were entitled to receive an "exceeds

9   standards" rating in 2003 for those elements?

10      A    Yes, because I was doing the work as an exceed

11  performance.  I was on the level with "exceeds standards."

12      Q    And what specifically makes you believe that, that

13  you were doing the work in each of those areas as an exceeds

14  standards?

15      A    Well, I think I have a mid-year rating request.

16  You know, they asked you to rate yourself and I think I have

17  that form.  And I had put down why, you know, what did I do?

18      Q    As you sit here today, the documents not in front

19  of us that's not here today, and I need you to answer the

20  question as best you can as you sit here today why you

21  believe you were entitled.  Why you believe the work you were

22  performing in 2003 entitles you to an exceeds standards

23  rating?

24      A    Because my counterpart -- he was exceeds

25  standards -- and I had to cover a lot of times for him.

Page 63

1       Q   And who was that?

2       A   My counterpart, my working partner.

3       Q   What is his name?

4       A   Sidney Burch.

5       Q   So Sidney Burch received an "exceeds standards"

6  rating in 2003?

7       A   Yes.

8       Q   And you covered work for him when he was not

9  available to perform work?

10      A   Yes.

11      Q   And that leads you to believe that you should

12  receive an "exceeds standards" rating as well.

13      A   Well, no; it leads me to believe that I did my job

14  above the norm and I performed no less than I did in the year

15  2002, received that rating, and it's the same or pretty much,

16  if not more.

17      Q   So you covered for somebody else's work.  You did

18  the same type of work you were doing in 2000?

19      A   Yes.

20      Q   And that leads you to believe that your work

21  exceeded standards?

22      A   And more.  I went above and beyond.

23      Q   Than covering for Sidney Burch?

24      A   Yes.  And he received "exceeded standard."

25      Q   And those are the reasons why you believe you were

Page 64

1    entitled to "exceeds standards."

2    A    Yes.

3    Q    Did you suffer any negative consequences as a

4    result of receiving an "achieves standards" performance

5    rating in 2003 as opposed to an exceeds standards?

6    A    What do you mean?

7    Q    Was there any extra money that you would have

8    received if you had gotten an "exceeded standards?"

9    A    Possibly, promotion-wise; yes, if someone applied

10   for a particular job and another person had a better rating

11   than me because of the rating that I got, yet they will get

12   the job.

13   Q    Did you apply for a different job after 2003?

14   A    Yes, I always applied.

15   Q    What jobs do you recall applying for after November

16   2003?

17   A    After?

18   Q    After November 2003.

19   A    If I'm not mistaken, it might have been before

20   2003, but the only thing that I could think of was the leader

21   job.

22   Q    What was the leader job?

23   A    He was the lead man.

24   Q    The lead man of what?

25   A    Of the section.  You have different categories.

Page 81

1    7:15, and I think we signed off between 2000 or maybe a

2    little later.

3        Q    When you said you signed, are you talking about

4    when you signed off on the 7:15 start time?

5        A    Yes.

6        Q    Do you recall anything else about the meeting that

7    you were just referring to between you and Mr. Bishop and Mr.

8    Reidy where you were discussing this December 11, 2003, e-

9    mail?

10       A    No.

11       Q    Can you please take a look at the second e-mail,

12   the bottom e-mail on Exhibit Number 6?

13       A    Okay.

14       Q    This e-mail, you're not on this e-mail.  This e-

15   mail was from Patrick Reidy to Robert Bishop.  My only

16   question to you is going to be whether there's anything that

17   Mr. Reidy is saying to Mr. Bishop that's inaccurate.  I'd

18   like you to tell me that you see that you think is not

19   accurate.

20       A    Since Monday, 12/8/03, Tom Brown called to say he

21   was called in sick.  I saw he was here and asked why he was

22   in.

23       Q    You just point to things that you think are

24   incorrect.  I don't need you to read the entire thing.

25       A    Okay, he said that he changed his mind.

Page 82

1       Q       That's incorrect?

2       A       Yes.

3       Q       Because you called Mr. Reidy and said you were

4   going to be in late, not that you were going to be sick for

5   the entire day?

6       A       Yes.

7       Q       And so that's why that's incorrect?

8       A       Right.

9       Q       Is there anything else that's incorrect in this e-

10  mail?

11      A       No.

12      Q       I'm going to show you what I'm marking as Exhibit

13  Number 8.

14                              (Defendant's Exhibit 8 was marked

15                                  for identification.)

16              Do you recognize that document?

17      A       Yes.

18      Q       This is a leave slip that you submitted on December

19  15, 2003?

20      A       Okay.

21      Q       Yes or no?

22      A       I believe so.

23      Q       This leave slip relates to the same time period

24  that we've been discussing, the December 8th period where you

25  came in at 8:15.

Page 83

```
1        A    Okay.

2        Q    I'm asking you?

3        A    Yes.

4        Q    This leave slip was submitted in connection with

5   your December 8 late arrival.

6        A    I'm not sure.

7        Q    Do you recall what it related to?  Well, let me

8   strike that.  If you look at the top of the document, the

9   fourth line where you're putting in the leave that you're

10  requesting, it's 7:15 to 8:15, 12/8.  Does that refresh your

11  recollection that this leave request relates to your late

12  arrival on December 8th?

13       A    I'm not sure.

14       Q    Okay.  Between the time that you submitted this

15  leave slip on December 15th and the e-mail that you got from

16  Mr. Bishop on December 8th, did you have any communications

17  with Mr. Bishop or Mr. Reidy?

18       A    Not that I recall.

19       Q    Okay.  Prior to you turning in this leave slip on

20  December 15th, do you recall whether Mr. Reidy said to you

21  that you needed to turn in a leave slip that covered the

22  period 7 to 8:15, and if you turned in a leave slip that

23  covered the period 7:15 to 8:15 that he would have to charge

24  you AWOL for the period from 7 o'clock to 7:15?

25       A    I think, yeah.
```

Page 98

1      A    And performance.

2      Q    **And your work performance?**

3      A    Yes.  The whole time was work performance.

4      Q    **When you say "work performance," do you mean that**

5  **they were dissatisfied with your work?**

6      A    Yes.

7      Q    **They were dissatisfied with your work performance**

8  **so that they issued this letter of warning to you as a result**

9  **of that?**

10     A    Indirectly, yes.  Directly, no.

11     Q    **What do you mean directly no?**

12     A    Well, I mean if you have a discrepancy with an

13 employee, he's not going to come directly with a particular

14 threat or problem.  You want to finesse it.  You want to work

15 around that problem which they did.  You know, but

16 nevertheless it affected me, because it affected my

17 performance and money as far as I was concerned.

18     Q    **Other than this letter of warning being issued to**

19 **you because of retaliation, do you believe that Mr. Reidy and**

20 **Mr. Bishop issued this letter to you as a form of**

21 **discrimination based on your race that they issued this**

22 **letter only to you because you were African-American?**

23     A    No.

24     Q    **Turning now towards the A.W.O.L. charge relating to**

25 **your December 8 late arrival, do you believe that that was**

Page 100

1      A      Yes.

2      Q      Had you filed the EEO complaints naming Morres as a

3    discriminating official?

4      A      I don't recall.  I don't know.

5      Q      Had you filed the EEO complaints naming Meyers as a

6    discriminating official?

7      A      Yes.  Well, if I claim Meyers, I claim Morres as

8    well, yes.

9      Q      Do you recall filing an EEO complaint against

10   Morres and Meyers?

11     A      I don't know.

12     Q      Do you believe that your charge of A.W.O.L. arising

13   from your December 8, 2003, late arrival was the result of

14   discrimination based on your race?  Or was it solely as the

15   result of retaliation?

16     A      Retaliation.

17     Q      I want to make sure.  I'm not sure I asked you this

18   before.  Your performance appraisal in 2003, I know you

19   testified that you believe that was issued to you or that you

20   received a lower rating as a result of retaliation by Ready

21   and Bishop.  Is that correct?

22     A      Yes, and a negative things that they said on the

23   rating.

24     Q      That the rating and its contents were a form of

25   retaliation by Bishop and Reidy?

Page 148

1      Q     And what did you determine?

2      A     But he saying it first.

3      Q     Did you determine that they were offered at some

4   point?  And when I say "they," that Excel and Word were

5   offered?

6      A     At the time they weren't offered, so I then pushed

7   the issue more.  But I know that I made reference to them

8   before, all the time, every chance that I got, you know, to

9   do class work.  The classes were offered a certain date.  I

10  would put in a request.

11     Q     So before you received this February 17 memo you

12  made a request for those courses and you asked to take them

13  wherever they were being offered.  Is that right?

14     A     Yes.

15     Q     And after you received this memo, did you make any

16  request to your supervisors?  Did you discuss with your

17  supervisors taking introduction to Excel '02 or Intermediate

18  Word '02 with the BEP Center for Excellence at some future

19  date?

20     A     I can't recall.

21     Q     Okay.  Did your supervisors ever discuss with you

22  after the date of this memo your taking those courses through

23  the Center for Excellence?

24     A     No.

25     Q     And you don't recall one way or the other whether

Page 149

1      you raised it with them after you received this memo?

2          A    No, because they already answered me.

3          Q    Okay.  Before you left the Agency, did you ever

4      take training on Introduction to Excel 2002 or Intermediate

5      Word 2002?

6          A    Not Excel.

7          Q    Did you take training on Intermediate Word 2002?

8          A    Yes, but I don't recall when.

9          Q    Before you left the Agency, sometime after February

10     17, 2004, you took Intermediate Word 2002.  Before February

11     17, 2004, the training on that?

12         A    I took, yes.  Yes.

13         Q    So this mere request was to take the same training

14     a second time?

15         A    No, it was to take a more extensive training, in

16     other words, the next level of training.

17         Q    After February 17, 2004, did you receive any

18     training in Word?

19         A    No.

20         Q    And after that date, did you receive any training

21     in Excel?

22         A    No.

23         Q    Do you know whether any other employees in or

24     around February 2004 in the Section that you were working on

25     were permitted to take any of the courses listed in Exhibit

Page 150

1    13?

2        A    No.

3        Q    I'm going to mark as Exhibit 14 the document that's

4    titled, "Photo Engravers Training Matrix" and ask you whether

5    you recognize the document.

6                        (Defendant's Exhibit 14 was marked

7                         for identification.)

8        A    No.  I don't recognize the document.

9        Q    Do you see on the top of the document it lists

10   names?

11       A    Hm-hmm.

12       Q    And your name is second.  Do you see that?

13       A    Yes.

14       Q    Second from the left; and then on the left-hand

15   side of the document it lists different types of training.

16   Do you see that?

17       A    Okay.

18       Q    "Workshop conferences," do you see where I'm

19   looking?

20       A    Yes, under my name, right?

21       Q    Yeah, on the left-hand side of the document it

22   lists different types of training, including software

23   applications.  Do you see that?

24       A    Hm-hmm.

25       Q    The training hours that are listed for you in this

Page  155

1    complaints?

2        A    Yeah.

3        Q    Do you believe the denial of your training request

4    was the result of discrimination based on your race?

5        A    No.  In part, yes; part, no.

6        Q    What do you mean by "in part, yes?"  Do you think

7    that you were denied these training requests because you're

8    African-American?

9        A    Well, let's put it this way.  According to this,

10   the training as far as duplication in employees, they

11   received just as much training, if not more, and more

12   classes.

13       Q    And where are you looking that you say that?

14       A    Software applications.

15       Q    Okay, looking specifically at Software

16   Applications, look first at "All trained together."

17   According to this document, if you look at the very bottom

18   line, which is grand total for all training, you have far

19   more hours of training than anybody else.  Do you see that?

20       A    Yeah, well, these are falsified numbers, and they

21   ask you based on that.  I made a statement that the hours of

22   training that I had and what they failed to do was put down

23   all the hours from all the schools and all the training that

24   I had.  And that reflected about 1200 something hours.  This

25   doesn't reflect that at all.

Page 160

1          Q      Well, my question was a little more specific.  My

2      question was what you based your statement that the

3      individuals you identified were afforded greater training

4      opportunities than you?

5          A      Well, it's simply the fact that whenever they put

6      in training requests it was granted.

7          Q      How do you know that?

8          A      Because they took the classes; and, like I said,

9      the latest technology they were always on top of it.

10         Q      What classes did any of those individuals apply to

11     take that you also applied to take and were not permitted and

12     they were?

13         A      The Dinigen Currency.

14         Q      Were they permitted to take any of the training

15     that you listed on Exhibit 12?

16         A      No, but you didn't ask that at first.

17         Q      Well, I'm asking that now.  Was there anybody in

18     your section that applied for the training opportunities that

19     you applied for in February 2004 that was granted permission

20     to take that training?

21         A      I don't know.

22              MR. HARWOOD:   I'll show you what I'm not marking as

23     Exhibit 15.

24                              (Defendant's Exhibit 15 was marked

25                               for identification.)

**BEP** FORM 1235
REV. 8-82

BUREAU OF ENGRAVING & PRINTING
**EMPLOYEE'S BI-WEEKLY TIMESHEET—ORIGINAL**

Batch No. 13

SSN: 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
NAME: BROWN, THOMAS D
HOME COST CENTER #: 323020

PAY PLAN: WE
EMPLOYEE TYPE: FT
COMPRESSED SCHEDULE TYPE: 7
CYPP: 03 23   ENDING: 11/29/03

Lv. Cat. 8

SHIFT WORKED LAST HOUR OF P.P.: ① 2 3
(These employees only)

TOUR OF DUTY: 7:00 am - 3:30 pm

| | | BROUGHT FWD. BALANCE |
|---|---|---|
| ANNUAL | 123.75 | |
| SICK | 13.50 | |
| COMP. TIME | .00 | |
| REST. A/L | .00 | |

CR HRS BAL.: 25

GOVERNMENT
EXHIBIT
A

**HOUR TYPES** — PRE / CODE / SHIFT

| HOUR TYPES | PRE | CODE | SHIFT |
|---|---|---|---|
| REGULAR | | 01 | 1 |
| REGULAR w/SUNDAY DIFF. | | 04 | |
| REGULAR w/NIGHT DIFF. | | 11 | |
| REGULAR w/SUN. & NIGHT DIFF. | | 65 | |
| OVERTIME-REGULAR | | 19/21 | |
| OVERTIME w/NIGHT DIFF. | | 25/26 | |
| HOLIDAY WORKED | | 31 | |
| COMPENSATORY TIME | | 32 | |
| ANNUAL LEAVE USED | | 61 | 1 |
| SICK LEAVE USED | | 62 | |
| COMPENSATORY TIME USED | | 64 | |
| OTHER ABSENCES | Holiday | 66 | 1 |

Certified that the time worked and leave taken

SUPERVISOR'S SIGNATURE & DATE

Maxine Freeman TIMEKEEPER'S SIGNATURE & PHONE NO.

Note: Use supplemental timesheet (Green) to report additional detailed hours

# BEP FORM 1236
(REV. 8/02)

## BUREAU OF ENGRAVING & PRINTING
## EMPLOYEE'S BI-WEEKLY TIMESHEET—ORIGINAL

Batch No. 13

SSN: 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
NAME: BROWN, THOMAS D
PAY PLAN: WE
EMPLOYEE TYPE: FT
COMPRESSED SCHEDULE TYPE: 7

HOME COST CENTER #: 323020
CYPP: 03 24

ENDING: 12/13/03

SHIFT WORKED LAST HOUR OF P. P.:
(Wage employees only)

(1) 2 3

Lv. Cal. 8

TOUR OF DUTY: 7:00pm — 3:30am

| TYPE | BACKUSHT FWD. BALANCE | ACOR | USED | PP ENDING BALANCE |
|---|---|---|---|---|
| ANNUAL | 131.75 | | | 139. |
| SICK | 17.50 | | | 21.- |
| COMP. TIME | .00 | | | |
| REST. A/L | .00 | | | |

Certified that the time worked and leave taken

SUPERVISOR'S SIGNATURE & DATE   12-15-03

TIMEKEEPER'S SIGNATURE & PHONE NO.

CR HRS BAL:                                    .25

Note: Use supplemental timesheet (Green) to report additional detailed hours

BEP FORM 1296
REV 4-97

**BUREAU OF ENGRAVING & PRINTING**
**EMPLOYEE'S BI-WEEKLY TIMESHEET—ORIGINAL**

Batch No. 13

SSN: 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     NAME: BROWN, THOMAS D

PAY PLAN: WE     EMPLOYEE TYPE: FT     COMPRESSED SCHEDULE TYPE: ?

HOME COST CENTER #: 323020     CYPP: 03 25     ENDING: 12/27/03

| | BROUGHT FWD BALANCE | PD ENDING BALANCE |
|---|---|---|
| TYPE | | |
| ANNUAL | 139.00 | 142.00 |
| SICK | 21.50 | 24.00 |
| COMP TIME | .00 | |
| HOL HRS | .00 | |

PR 24    LEAVE BALANCES

FINAL PAY     STATUS CHANGE

TOUR OF DUTY: 7:00 a.m. - 3:30 p.m.

Lv. Cat. 8

CR HRS BAL:     .25

Certified that the time worked and leave taken

SUPERVISOR'S SIGNATURE & DATE

TIMEKEEPER'S SIGNATURE & PHONE NO.

Note: Use supplemental timesheet (Green) to report additional detailed hours

**BEP** FORM 1236
REV. 4-92

## BUREAU OF ENGRAVING & PRINTING
## EMPLOYEE'S BI-WEEKLY TIMESHEET–ORIGINAL

Batch No. 13

SSN: 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  NAME: BROWN, THOMAS D

PAY PLAN: WE  EMPLOYEE TYPE: FT  COMPRESSED SCHEDULE TYPE: 7  HOME COST CENTER #: 323020

CYPP: 0426  ENDING: 01/10/04

Lv. Cat. 8

SHIFT WORKED LAST HOUR OF P.P. ① 2 3

TOUR OF DUTY: 7:00am — 3:30pm

BROUGHT FWD. BALANCE
ANNUAL 126.00
BACK 28.00
COMP. TIME .00
REST. AL. .00

| HOUR TYPES | PRE | CODE | SHIFT | WEEK 1 HOURS | | | | | | | | WEEK 2 HOURS | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | SUN | MON | TUE | WED | THU | FRI | SAT | WEEK TOTAL | SUN | MON | TUE | WED | THU | FRI | SAT | WEEK TOTAL |
| **DUTY HOURS** | | | | | | | | | | | | | | | | | | | |
| REGULAR | | 01 | | | 7½ | 3½ | 3½ | 7½ | 3½ | | 40 | | | | | | | | |
| REGULAR w/SUNDAY DIFF. | | 04 | | | | | | | | | | | | | | | | | |
| REGULAR w/NIGHT DIFF. | | 11 | | | 3½ | 3½ | 3½ | 3½ | 3½ | | | | | | | | | | |
| REGULAR w/SUN. & NIGHT DIFF. | | 05 | | | | | | | | | | | | | | | | | |
| OVERTIME–REGULAR | | 19/21 | | | | | | | | | | | | | | | | | |
| OVERTIME w/NIGHT DIFF. | | 25/28 | | | | | | | | | | | | | | | | | |
| HOLIDAY WORKED | | 31 | | | | | | | | | 32 | | 8 | 8 | 8 | 8 | | | 32 |
| COMPENSATORY TIME | | 32 | | | | | | | | | | | | | | | | | |
| **HOURS OF ABSENCE** | | | | | | | | | | | | | | | | | | | |
| ANNUAL LEAVE USED | | 61 | | | | | | | | 8 | | 8 | | | | | 8 | | 8 |
| SICK LEAVE USED | | 62 | | | | | | | | | | | | | | | | | |
| COMPENSATORY TIME USED | | 64 | | | | | | | | | | | | | | | | | |
| OTHER ABSENCES | | 19/21 | | | | | | | | | | | | | | | | | |
| Holiday | 66 | 31 | 1 | | | | | | | | 40 | 8 | | | | | | | 40 |

**DAILY TOTALS** (grid)

| HOUR TYPES | PRE | CODE | WEEK 1 HRS. | DETAILED COST CENTER | OFM USE | LABOR COST | OFM USE | WEEK 2 HRS. | DETAILED COST CENTER | OFM USE | LABOR COST | OFM USE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REGULAR | | 01 | | | .000 | .000 | .000 | | | .000 | .000 | .000 |
| REGULAR w/SUNDAY DIFF. | | 04 | | | .000 | .000 | .000 | | | .000 | .000 | .000 |
| OVERTIME–REGULAR | | 19/21 | | | .000 | .000 | .000 | | | .000 | .000 | .000 |
| HOLIDAY WORKED | | 31 | | | .000 | .000 | .000 | | | .000 | .000 | .000 |

REMARKS

Certified that the time worked and leave taken

_____ SUPERVISOR'S SIGNATURE & DATE

_____ TIMEKEEPER'S SIGNATURE & PHONE NO.

CR HRS BAL. .25

**Note:** Use supplemental timesheet (Green) to report additional detailed hours

BEP FORM 1236
REV. 1-02

BUREAU OF ENGRAVING & PRINTING
EMPLOYEE'S BI-WEEKLY TIMESHEET—ORIGINAL

Batch No. 13

SSN: 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    NAME: BROWN, THOMAS D
PAY PLAN: WE    EMPLOYEE TYPE: FT    COMPRESSED SCHEDULE TYPE: 7    HOME COST CENTER #: 323020    PP 26

CYPP: 04 01    ENDING: 01/24/04

TOUR OF DUTY: 7:00am – 3:30pm    Lv. Cat. 8

| | | ANNUAL | SICK | COMP-TIME | REST. AV. |
|---|---|---|---|---|---|
| BROUGHT FWD. BALANCE | | 126.00 | 28.00 | .00 | .00 |

CR HRS BAL: .25

Certified that the time worked and leave taken

TIMEKEEPER'S SIGNATURE & PHONE NO.
SUPERVISOR'S SIGNATURE & DATE    1-26-04

Note: Use supplemental timesheet (Green) to report additional detailed hours

BEP FORM 8017
REV. 11-01

# A.W.O.L. CHARGE NOTICE

| NAME OF EMPLOYEE | COMPONENT |
|---|---|
| Thomas D. Brown | Office of Engraving - Photoengraving |

**SUPERVISOR'S STATEMENT**

A charge of "Absent Without Leave" (A.W.O.L.) has been recorded against you for the reason herein stated. You are requested to furnish, in the space provided below, any explanation which you believe might justify a change in the recording. Your reply must be submitted to this office within two days from the date of this notice.

| DATE(S) OF ABSENCE | REASON FOR A.W.O.L. CHARGE |
|---|---|
| 12/08/03 | Un-accounted for time. See attached sheet. |

| SIGNATURE    (Supervisor) | DATE |
|---|---|
| *Patrick J. Ridge* | 12/15/03 |

**EMPLOYEE'S REPLY**    *(If more space is required, use reverse side.)*

EXPLAIN IN DETAIL

| SIGNATURE    (Employee) | DATE |
|---|---|

| SUPERVISOR'S RECOMMENDATION | REMARKS |
|---|---|
| CHARGE ABSENCE TO<br><br>☐ SICK LEAVE    ☐ L.W.O.P<br><br>☐ ANNUAL LEAVE  ☐ A.W.O.L. | |

| SIGNATURE    (Supervisor) | DATE |
|---|---|

RECOMMENDATION AND INITIALS    *(Other officials, if required)*

## A.W.O.L. CHARGE DISPOSITION

| SUPERVISOR'S RECOMMENDATION IS<br><br>☐ APPROVED        ☐ NOT APPROVED | TYPE LEAVE TO BE CHARGED    *(To be completed when supervisor's recommendation is not approved)* |
|---|---|

You are warned that this is your _____ occasion of A.W.O.L. since you were placed on leave restriction.

You are warned that this is your _____ occasion of A.W.O.L. during the current rating period.

Additional occasions of A.W.O.L. will constitute grounds for stringent administrative action including removal.

GOVERNMENT EXHIBIT

B

| SIGNATURE    (Office Chief/Division Manager) | DATE |
|---|---|

Page 1

Addendum to BEP Form 8017 A.W.O.L. Charge Notice

Thomas D. Brown
12/08/03

On Monday, 12/8/03, Tom Brown called to say he was calling in sick. Around 8:15 am, I saw he was here and asked why he was in. He said he changed his mind.  On Tuesday, I asked him to give me a leave slip for his absence. He left a slip for my approval. I didn't get around to signing it until Wednesday, but I noticed that the time he put on it did not correspond to his duty hours. He put down that he was absent with sick leave from 7:15 am to 8:15 am. His duty hours are 7:00 am to 3:30 pm. On Thursday, 12/11, I asked him to correct the times. He stated something about that his original starting time was 7:15 and that's why he put that there. I told him his present starting time was 7:00 am and that is what should be on the leave slip. I left it with him. About 15 minutes later, he brought it back to me and said he would not change it. Again, I explained that his present starting time was 7:00 am and that I would not approve his leave slip unless it reflected that. He walked away with it, again without changing it. On Monday, 12/15, I told him, if he wished, he could resubmit the leave slip as he had done originally and that he would be charged one hour of leave (7:15 am to 8:15 am) and 1/4 hour of AWOL (7:00 am to 7:15 am).

Page 2

# INITIAL CONTACT/INTERVIEW SHEET

| | |
|---|---|
| Date of Contact with EEO Office | December 15, 2003 |
| Date of Intake | December 15, 2003 |
| Name of Aggrieved Party | Thomas D. Brown, Sr. |
| Job Title, Series and Grade | Photoengraver, WE 4425 |
| Aggrieved Person's Home Address | 50 Channing Street N.W. Washington, DC 20001-1030 |
| Home Telephone Number | (202) 332-9527 |
| Work Telephone Number | (202) 927-3805 |
| Work Address | Bureau of Engraving & Printing 14th & C Streets S.W. Washington, D.C 20228 |
| Intake performed by | Renata Robinson |
| Counselor Assigned | Renata Robinson |

**Designation of Representative**: You have the right to retain representation of your choice. If you want someone other than yourself to represent you, you must elect the representative in writing. A form is attached for your convenience. The representative can be anyone of your choosing. You may elect to have a representative at any stage in the process.

**Name of Representative**: Karl Carter

**Representative's Address**:    2000 L Street N.W.
                                 Washington, DC 20036

**Representative's Phone Number**:

**Is your representative an employee of the Agency?**          Yes          No X

Bureau of Engraving and Printing          1          202 874 3460
Washington, DC 20228

GOVERNMENT
EXHIBIT
C

**Anonymity:** You have the right to remain anonymous at the counseling stage of EEO Complaint Processing. Do you wish to remain anonymous?
Yes _____       No    X

**Other Forums:**

Have you filed a union grievance?              Yes _____        No  X  **If so,** what is the status of your grievance?

Have you filed an appeal to the Merit Systems Protection Board (MSPB) on this matter?                    Yes _____         No  X

**If so,** what is the status of the MSPB appeal?

**ALLEGED BASES**

Check and specify the basis(es) on which you believe you were discriminated against. If you are alleging age discrimination, give your date of birth. To file a complaint based on age, you must have been at least 40 years old when the incident occurred. If you're alleging discrimination based on handicap, give the nature of your handicap. If you are alleging discrimination based on retaliation/reprisal, you must have had prior involvement in the EEO complaints process. For example previously entered counseling, filed a formal complaint, or witness in a complaint.

| BASES: | |
|---|---|
| Age: 51<br>Date of Birth:  05/14/52 | Religion: Jehovah Witness |
| Handicap:<br>   Physical:  Back Problems and Muscle Pain<br>   Mental:  Stress | Sex:<br>   Male:  X<br>   Female: |
| Color:  Black | Sexual Harassment: |
| Race:  African American | National Origin: |
| | Other: Reprisal |

**Note:** *If you are alleging mental and/or physical handicap, you MUST submit medical documentation of your handicap(s) at this time or during counseling.*

## PRIOR EEO PARTICIPATION:

**Have you previously participated in the EEO process?  If so, when?  Yes**

TD # 01-1163
TD # 99-1143
TD # 96-1084
TD # 96-1300

**If you have previously participated in the EEO process, what is the current status of that action?**

Appealed to the District Court

## MATTERS AT ISSUE:

**What is the date of the most recent matter you would like to discuss with an EEO Counselor?**

January 13, 2004 (was added during the inquiry)
December 15, 2003,
December 05, 2003
November 20, 2003

**What is the name and position of the person(s) you believed discriminated against you?**

Judith Daiz Meyers, Chief of Office of Engaving
Mark Pipkin, Assistant Chief
Ross Morres, Manager
Robert Bishop, Foreman
Patrick Reidy, Assistant Forman

**Describe the matter you wish to discuss with an EEO Counselor, including when each incident occurred, and explain why you feel the incident was discriminatory.**

As part of an on-going pattern and practice of discrimination due to Age (DOB: 05/14/52, 51), Disability (Physical: Back Problems) (Mental:  Stress), Color (Black), Race (African-American), Religion (Jehovah Witness), Sex (Male) and Reprisal the aggrieved alleges the following:

1) On November 20, 2003 he received an "Achieved Standards" rather than an "Exceeds Standards" on his FY2002/2003 Performance Rating;

2) Denied a reasonable accommodation when he requested a change in his schedule on December 05, 2003;

3) Charged Absence without leave (AWOL) on December 15, 2003;

4) Issued "Letter of Warning" concerning the AWOL on January 13, 2004;

5) Insulted and threaten by a co-worker on January 13, 2004.



**Have you discussed this matter with the person(s) you believed is responsible?  If so, what explanation did he or she give you?**

Some of the issues were discussed with Patrick Reidy, Bob Bishop or Judith Myers but none were resolved to the aggrieved satisfaction.

**Are there any witnesses who have direct knowledge of the matter?  Please give me the name and work telephone number of each witness and what you believe they know about the matters at issue.**

Dave Curtis, Rita Solesell, Phillip Powel and Robert Bailey, Sidney Burch

**What are you seeking in relief?**
1. Change FY2003/2003 Performance Rating to "Exceeds Standards"
2. If the need arises to acquire legal counsel, all legal fees paid up front to include reimbursement for any and all legal fees and court cost to include interest and back payment.
3. Any monetary, compensation, compensatory damages for pain and suffering, and undue stress due to working in a hostile work environment.
4. All Sick, Annual, or Administrative leave taken from the aggrieved pay to be restored back covering 1999 thru 2004).



**Documentation:** **Please attach any documentation you wish to support your allegation(s). Include a copy of any written action(s) which caused you to seek counseling at this time.**

A written narrative addressing some of the questions asked during this inquiry were provided by the aggrieved and are attached.

**NOTE:** Please review this form and make whatever corrections are necessary, then sign and return one copy of this form **immediately** so that the counselor may be able to assist you. The counselor will discuss the Rights and Responsibilities form with you. At that time, please sign and return one copy of it.

_____         _____
Signature                    .                 Date

Enclosures:  Redress/Rights/Responsibilities
             Privacy Act Notice

### NOTICE:  COMPLETE THIS SECTION ONLY IF YOU NO LONGER WISH TO SEEK EEO COUNSELING

I hereby request that you close this file from processing. I stipulate that my decision not to pursue counseling is voluntary and did not result from threat, coercion, intimidation, promise or inducement.

_____         _____
Signature                                   Date

RECEIVED
FEB 0 2 2004

TREASURY COMPLAINT CENTER
DALLAS, TEXAS

| Form No. TDF 62-03.5 (01/03 Edition) | | FOR OFFICE USE ONLY |
|---|---|---|
| | | DEPARTMENT CASE NUMBER  04-2187 |
| **INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION WITH THE DEPARTMENT OF THE TREASURY** | | FILING DATE 01 26 04 |

## Part I Complaint Identification

**1. Name (Last, First, Middle Initial)**
*Brown St. Thomas Darrell*

**2. Telephone/Fax (Include Area Code)**
Home: 202-333-9527   Fax: 1-703-878-06
Work: 202-927-3705   Fax: 202-874-7257

**3. Present Home Address (You must notify the Department of any changes of address while complaint is pending, or your complaint may be dismissed)** 3610 Leighter Law
Cheverly, Landover Hill, Maryland
20785
Street Address
*Cheverly Landover Md. 20785*
City        State        Zip Code

**4. If you are a current or former employee of the Federal government, list your most recent title, series, and grade.**
WE 4425   WE   Part II
Title        Series        Grade

**5. Name and Address of Organization Where You Work (If a Treasury Employee)** Thomas D. Brown
Bureau of Engraving + Printing
Business Unit The Engraving Division
Office and Organizational Component Office of Engraving
Street Address 14th C Street S.W.
City Washington   State D.C.   Zip Code 20228

**6. Employment Status in Relation to this Complaint:**
☐ Applicant   ☐ Probationary   ☐ Career/Career Conditional
☒ Former Employee
☒ Retired n/a   Date Left Treasury Employment 01/14/1998
☒ Other      Date of Retirement 1997
      Specify

**7. I certify that all of the statements made in this complaint are true, complete, and correct to the best of my knowledge and belief.**
Signature of Complainant or Attorney Representative       Date 1/26/2004

## Part II Designation of Representative

**8.** You may represent yourself in this complaint or you may choose someone to represent you. Your representative does not have to be an attorney. You may change your designation of a representative at a later date, but you must notify the Department immediately in writing of any change, and you must include the same information requested in this Part.

" I hereby designate _Attorney Karl Carter_ (Please Print Name) to serve as my representative during the course of this complaint. I understand that my representative is authorized to act on my behalf. "
Karl W. Carter Sr.

**9. Representative's Mailing Address**
2000 K Street N.W.
Firm/Organization
Attorney Karl W. Carter Jr Law
Street Address
2000 St #906 Wash D.C 20036
City        State        Zip Code

**10. Representative's Employer (If Federal Agency)**

**11. Representative's Telephone/Fax (Include Area Code)**
202-416-1669   202-293-3083
Telephone        Fax

12. Complainant's Signature       Date 1/26/04

GOVERNMENT EXHIBIT
D

## Part III Alleged Discriminatory Actions

**13. Name and Address of Treasury Bureau that took the action at issue (if different than item 5.)**

Office of Engraving

Bureau: 14th C Street SW                 Office and Organizational Component

Street Address: Washington D.C. 20228

City     State     Zip Code

**14. If your complaint involves nonselection for a position, please complete the following:**

Position Title _____  Series _____  Grade _____

Vacancy Announcement Number / /  Date Learned of Nonselection

**15. (A)** Describe the action taken against you that you believe was discriminatory; **(B)** Give the date when the action occurred, and the name of each person responsible for the action; **(C)** Describe how you were treated differently than other employees or applicants because of your race, color, religion, sex, national origin, age, disability, or in retaliation for your participation in the EEO process or opposition to alleged discriminatory practices; **(D)** Indicate what harm, if any, came to you in your work situation as a result of this action. *(You may but are not required to attach extra sheets.)* **(E)** If the basis of your complaint is your parental status, sexual orientation, or protected genetic information, use this form, but your complaint is not statutorily based and will follow a separate, parallel process.

See Att #1    Acase Attachment EEO complaint for determination, acts of Reprisal Disabilate, Acts retaliation, OMG discrimation of Coorrnord Attitude, Fraud Working in a Host file working environment, Time and Attendance, Compensation violation Sick Annual

**16. Mark below ONLY the bases you believe were relied on to take the actions described in #15.**

☑ Age (Date of Birth) 5/14/52

☑ Race (State Race) African American

☑ Color (State Color) Black

☑ Religion (State Religion) Fed

☑ Sex (Specify) Male

☑ National Origin (Specify) N/A

☑ Physical or Mental Disability (Describe)

Lower + Chronic Back Pain and Mental Stress

☑ Retaliation/Reprisal (Dates of Prior EEO Activity)

December 16 / 2002

☐ Sexual Orientation
☐ Parental Status
☐ Protected Genetic Information

**17. What remedial or corrective action are you seeking to resolve this matter?**

See Attachment 1 - Pages 3 thru 8 Affidavit

**18. If you wish to amend your complaint (or provide additional evidence), indicate the complaint case number of that complaint.**

TD number - 99-1143 and TD number 01-1163 & 02-1097

## Part IV Contact

EEO Counseling is not required if you are amending an existing open complaint.
Complete items 19, 20, and 25 even if you did not contact a counselor.

**19. When did the most recent discriminatory event occur?**

Nov 1 26 1 2004
Month   Day   Year

**20. When did you first become aware of the alleged discrimination?**

Nov 1 04 1 2004
Month   Day   Year

**21. When did you contact an EEO counselor?**

Dec 1 19 1 2004
Month   Day   Year

**22. Did you discuss all actions raised in item 15 with an EEO counselor?** ☑ YES ☐ NO
*(If no, explain on attached sheet)*

**23. Name and telephone number of EEO counselor.**

Angela Robinson     894-3340
Name                 Telephone No.

**24. When did you receive your "Notice of Right to File"?**

January 16, 1 2004
Month   Day   Year

**25. On this same matter, have you filed a grievance or appeal under:**

Negotiated grievance procedure ☐ YES ☑ No
Agency grievance procedure ☐ YES ☑ No
MSPB appeal procedure ☐ YES ☑ No

If you filed a grievance or appeal, provide date filed, case number, and present status.

N/A

20

Note:   *If you are alleging mental and /or physical handicap, you must submit medical documentation of handicap(s) at this time or during counseling.*

Yes, I am alleging mental and physical handicap.

## PRIOR EEO PARTICIPATION

Have you    previously participate in the EEO process? If so, when?

TD number-01-1163
TD number-99-1143
TD number-96-1084
TD number-96-1300

## MATTER AT ISSUES

**What is the date of the most recent matter you would like to discuss with EEO counselor?**
November 20, 2003/02-03 Employee Performance Appraisal.  Retaliation /harassment/violation of Disability Act, Over abuse of Government Authority, Fraud, Working in a Hostile work environment and Time Attendance. December 10, 2000/ 2001 Employee Performance Appraisal. Retaliated/Harassed and working in Hostile work environment, time and attendance.

**What is the name and the position of the person(s) you believe discriminated against you?**
The people that discriminated against me are as followed Mrs. Judith Diaz Myers, White Female, Chief of the Office of Engraving Mr. Mark Pipkin, White Male, Caucasian, Assistant Chief of the office of Engraving, Mr. Ross Mores, White Male, Caucasian, Manager Office of Engraving, Mr. Robert Bishop, White, Male, Foreman Office of Engraving and Mr. Patrick Reidy, White Male, Caucasian, Assistant Foreman, Office of Engraving and company.

**Describe the matter you wish to discuss with EEO Counselor; including when each incident occurred, and explain why you feel the incident was discriminatory.** As part of an ongoing pattern and practice of discrimination by the agency Based on Color Black Male, African American, Photoengraver Journeyman, Disability, Low back pain, Muscle, Mental stress, Pain and suffering, Age 51, and Religion (Jehovah Witness) have continued to retaliate and Harassed me in various ways on numerous occasions. On or around November 18, 2003 I call Mrs. Judith Diaz Myers for copy of performance rating. On November 20, 2003 I received a copy of my performance rating from Mr. Ross Morres. For the Rating period of FLY 2002/2003 I was not properly rated on the critical elements. The critical elements did not reflect the level of work that I produce while working in the photography area and digital pre-press area. In digital photography Mr. Robert Bishop rated me 3 out of 5 of the critical elements. Also, in digital pre-press I was rated 2 out of 5 of the critical elements.

Bureau of Engraving and Printing                3                    202-874-3340
Washington DC 20228

21

I Received an Achieved Standard Performance Rating For FLY 2003. I have fulfilled the request made by Mr. Robert Bishop but as usual he lied at the final review. Please review the 2002/2003 mid year rating."

Moreover, In Mr. Robert E. Bishop tone and comments, he said, 'I would like to see Mr.. Thomas D. Brown, work more independently. Mr. Robert Bishop Is not my first line supervisor. Mr. Patrick Reidy is my first line supervisor but they continue to harass and play games with each other to conspire against me. Also, Mr. Robert E. Bishop wants me to work alone and faster because he is trying to set me up for failure. Please note that Mr. Robert Bishop has thirty five years in conventional/Pre-press Stripping and I (Thomas D. Brown, Sr. have thirty five days in Conventional/Pre-press Stripping. Mr. Robert Bishop and the office of engraving are discriminating against African Americans employees since 1999 as a Foreman for the Office of Engraving. There is a lot tension, confusion, disorder about equal time and training that needs to be address, and white Caucasian employees are always going to school, and none of the African Americans are aloud to attend a school of their choice. Mr. Robert Bishop have constantly retaliated and harassed me by using the same undermined tactics he use in last year rating because I successfully grieved my performance rating was Exceeded Standards for (1999/2000) By giving me an Achieved standards Performance Evaluation 2001. I have recieved another Achieved Standard in lue of Exceeded Standards rating I did not have a mid-year review for fly 2001 performance evaluation. I have been an employee of BEP for approximately 31 years. For the past eleven years, I have been employed in the capacity of a Photoengraver with the office of Engraving Division. During the period of 1992 thru 2000. I have always received an Outstanding or Exceeded Standard rating from my supervisors Mr. Charles Lunn, white male, and Mr. Danny Thompson Black male

On or around November 1999 Mr. Robert E. Bishop (White Male) Acting Foreman became my supervisor. Prior to November    1999, Mr. Robert E. Bishop was not in my chain of command, he never rated me, nor did he supervise me.

On or around January of 2000, I participated in the EEO process as a witness for Mr. Thomas Jefferson, who had filed a complaint against Mr. R. Bishop, Subsequently on or around February Of 2000, Mr. R. Bishop called me into his office in reference to a statement involving Ms. Rita Sorsdal and Phillip Powell the shop steward. In the mist of the conversation he questioned me about a complaint filed by Mr. Thomas Jefferson. He stated to me that the statement I made on behalf of Mr. Thomas Jefferson during his grievance against Mr. Robert Bishop was lie.

Bureau of Engraving and Printing          4                    202-874-3340
Washington DC 20228

22

I asked Mr. R. Bishop to allow me a get a pad and pencil so that I could take notes of our conversation. Upon my return, Mr. R. Bishop decided to stop speaking about the issue of Mr. Thomas Jefferson and continued to talk about Rita Sorsdal and upon completion of this conversation, he dissolved the meeting.

During the period of February 2001 through September 2001 Mr. R. Bishop never stated to me that he felt that my job performance was deficient in any way shape or form. He never advisee me of any areas he felt I need to make an improvement, nor any areas that would hinder my chances of receiving an outstanding or an exceeded standard rating. In September of 2001 Mr. R. Bishop held his last meeting, Mr. R. Bishop acknowledge in front of the section, (photoengravers), and advise all that we were doing an outstanding job. In his last meeting, Mr. R. Bishop re-assured and acknowledge in front of section by saying that I was doing an outstanding job. Mr. Bishop never conducted a mid-year review with me concerning my job performance, or in any manner or at any time did he present me any warning and or evidence that he viewed my job to be less than Outstanding or Exceed Standards.

It is my belief that this is also in violation of the department regulation as it pertains to section 430 relating to Performance Managerial Procedures section 1-5, and 1-6, as it relates to mid-year review and the appraisal system in itself.

**Have you discuss this matter with person(s) you believe is responsible? If so, what explanation did he or she give you?** Yes, after the final review I talk to my first line "supervisor" Mr. Patrick Reidy about my Performance Appraisal and other issues at hand, such as, the 5 critical elements in my Performance Appraisal. In the Final review Mr. Patrick Reidy did not give any input in my Performance Rating, and did not rate me. (Fly 2002 thru 2003)

Yes, Mr. Robert E. Bishop asked me (Thomas D. Brown) to address the job elements on December 7, 2001. Also, on or around December 10, 2001. R. Bishop stated that Mr. T. Brown's comments about his performance appraisal does not warrant changing his performance evaluation from Achieve standards to Exceed Standards. Once again, Mr. R. Bishop and company have tried to undermined me when he told me to answer the job elements instead of the performance evaluation it self. As I stated in the above paragraph that me and some other employees did not receive a mid-year evaluation. Therefore he was in violation of the above capturing matter pertaining to section 430 as stated in the previous paragraph. After I received the appraisal, I took it to him in my attempt too discuss the issue of my rating. Mr. Robert E. Bishop was only interested in my signing of the document but gave Mr. Sidney Burch an Exceeded Standards evaluation but yet we do the same amount of work side by side. Mr. Robert E. Bishop's final word was to take it to the next level.

Bureau of Engraving and Printing                    5                    202-874-3340
Washington DC 20228

23

**Are there any witnesses who have direct knowledge of the matter? Please give the name and work number of each witness and what you believe they know about the matters at issue.**

Mrs. Rita Sorsdal, was my First line Supervisor. Ms. Sorsdal and I have a good working arrangement and she trusts me to do my job. Also, the lead-man David Curtis-provides the complaint with work assignment during this rating period (202) 874-3798. Mr. Phillip Powell is the Shop delegate for Local 285 GCIU members.

As far as witnesses *the Photoengraving section was present* when Mr. Robert Bishop made comments that the section as a whole was doing an outstanding job.

Rita Sorsdal, was advised by me of the comments made by Mr. Robert Bishop I believe that I was discriminated against because of my race, Black Male, and retaliated for my participation as witness in the EEO Process. My belief is based on Mr. Robert E. Bishop 's dissatisfaction with my participation in the Thomas Jefferson's complaint when he told me that statement about him was a lie. Prior to Mr. Robert E. Bishop becoming my supervisor, all of my Performance evaluations were Outstanding or Exceeded Standards.

**What are you seeking in relief?**

1.) I want my Performance Appraisal increased and show Exceeded Standards or Outstanding Performance rating and a letter of apology from the Chief on down to every one who was responsible for discriminating and harassing me. While working in a Hostile working environment $300.000.00

   2.)  If the need arises to acquire legal counsel I want fees paid up front to attorney; I want reimbursement for any and all fees related to Attorney fees and court cost to include interest and back payment. $13,000.00

   3.)  Any monetary, Compensation, Compensatory Damages for pain and suffering undue stress to the hostile work environment I was subjected to by Mrs. Judith Diaz Myers, Mr. Mark Pipkin Mr. Ross Mores, Mr. Robert E. Bishop, and Mr. Patrick Reidy.

   4.)  All sick, Annual, compensation, Official Business, and administrative leave used or taken from my pay to be restored back to my leave bank in Pursuant of this complaint. (1999 thru May of 2003) $17,000.00 Compensation/sick, Annual leave that was taken out of my pay.

Bureau of Engraving and Printing          6          202-874-3340
Washington DC 20228

*24*

**Documentation: Please attach any documentation you wish to support your allegation(s). Which caused you to seek counseling at this time.**

Performance Appraisal 10/01/1999-9/30/2000 Exceeded Standard

Performance Appraisal 10/01/2000-09/30/2001 Achieved Standard

Performance Appraisal 10/01/2001-009/30/2002 Achieved Standard

Performance Appraisal 10/01/2002-09/30/2003 Achieved Standard

Bureau of Engraving and Printing          7                    202-874-3340
Washington DC 20228

25

Note: **Please review this form and make whatever corrections are necessary, and return one copy of this form _immediately_** So that the counselor may be able to assist you. The counselor will discuss the rights and responsibility form with you. At that time, please sign name and return one copy of it.

_Signature_ _____ Date: _____

Enclosure:    Redress/Responsibilities
              Privacy Act Notice


**NOTICE:    COMPLETE THIS ONLY IF YOU NO LONGER WISH TO SEEK EEO COUNSELING**


I hear by request that you close this file from processing. I stipulated that my decision. Not to pursue counseling is voluntary and did not result from threat, coercion, intimidation, promise or inducement.


_____ Date:_____
Signature


Bureau of Engraving and Printing          8          8743340
Washington, DC 20228

26

RECEIVED

MAR 1 0 2004

TREASURY COMPLAINT CENTER
DALLAS, TEXAS

| Form No. TDF 62-03.5 (01/03 Edition) | | FOR OFFICE USE ONLY |
|---|---|---|
| | | DEPARTMENT CASE NUMBER |

**INDIVIDUAL COMPLAINT OF EMPLOYMENT DISCRIMINATION
WITH THE DEPARTMENT OF THE TREASURY**

FILING DATE  3 / 8 / 4

## Part I Complainant Identification

**1. Name** *(Last, First, Middle Initial)*

Brown, Thomas D., Sr.

**2. Telephone/Fax** *(Include Area Code)*

Home: 202 - 332 9527    Fax: 202

Work: 202 874-5968    Fax

**3. Present Home Address** *(You must notify the Department of any changes of address while complaint is pending, or your complaint may be dismissed)*

3162 17th Street N.W

Street Address

Washington, DC 20011

City          State          Zip Code

**4. If you are a current or former employee of the Federal government, list your most recent title, series, and grade.**

Photoengraver WE-2225 level 2

Title          Series          Grade

**5. Name and Address of Organization Where You Work** *(If a Treasury Employee)*

Bureau

Business Unit    Office of Engraving

Office and Organizational Component    Engraving Art prep

Street Address    14th C Street SW

City Washington    State D.C.    Zip Code 100 28

**6. Employment Status in Relation to this Complaint:**

☐ Applicant  ☐ Probationary  ☒ Career/Career Conditional

☐ Former Employee    Date Left Treasury Employment N/A / /

☐ Retired    Date of Retirement N/A / /

☐ Other    Specify

**7. I certify that all of the statements made in this complaint are true, complete, and correct to the best of my knowledge and belief.**

301-919-4489

Signature of Complainant or Attorney Representative    March 5 2004

Date

## Part II Designation of Representative

**8.** You may represent yourself in this complaint or you may choose someone to represent you. Your representative does not have to be an attorney. You may change your designation of a representative at a later date, but you must notify the Department immediately in writing of any change, and you must include the same information requested in this Part.

" I hereby designate Karl W. Carter Attorney at Law *(Please Print Name)* to serve as my representative during the course of this complaint. I understand that my representative is authorized to act on my behalf. "

**9. Representative's Mailing Address**

KARL W. Carter Sr.

Firm/Organization

2000 L Street N.W. #

Street Address

Washington D.C. 20036

City          State          Zip Code

**10. Representative's Employer** *(If Federal Agency)*

Attorney At Law

**11. Representative's Telephone/Fax** *(Include Area Code)*

2/416-1669

Telephone          Fax

**12. Complainant's Signature**    3/8/04

Date

35

## Part III Alleged Discriminatory Actions

| 13. Name and Address of Treasury Bureau that took the action at issue (if different than Item 5.) | 14. If your complaint involves nonselection for a position, please complete the following: |
|---|---|

**13.** Name and Address of Treasury Bureau that took the action at issue (if different than Item 5.)

Bureau _____ Office and Organizational Component _____

Street Address _____

City _____ State _____ Zip Code _____

**14.** If your complaint involves nonselection for a position, please complete the following:

Position Title _____ Series _____ Grade _____

Vacancy Announcement Number _____ / _____ / _____ Date Learned of Nonselection

**15.** (A) Describe the action taken against you that you believe was discriminatory; (B) Give the date when the action occurred, and the name of each person responsible for the action; (C) Describe how you were treated differently than other employees or applicants because of your race, color, religion, sex, national origin, age, disability, or in retaliation for your participation in the EEO process or opposition to alleged discriminatory practices; (D) Indicate what harm, if any, came to you in your work situation as a result of this action. *(You may but are not required to attach extra sheets.)* (E) If the basis of your complaint is your parental status, sexual orientation, or protected genetic information, use this form, but your complaint is not statutorily based and will follow a separate, parallel process.

SEE THE ATTACHED

**16.** Mark below ONLY the bases you believe were relied on to take the actions described in #15.

- ☑ Age (Date of Birth) _05/14/52_
- ☑ Race (State Race) _African American_
- ☑ Color (State Color) _Black_
- ☑ Religion (State Religion) _Jehovah Witness_
- ☑ Sex (Specify) _Male_
- ☐ National Origin (Specify) _____

- ☐ Physical or Mental Disability (Describe)
- ☑ Retaliation/Reprisal (Dates of Prior EEO Activity) _12 /10/ 02_
- ☐ Sexual Orientation
- ☐ Parental Status
- ☐ Protected Genetic Information

**17.** What remedial or corrective action are you seeking to resolve this matter?

**18.** If you wish to amend your complaint (or provide additional evidence), indicate the complaint case number of that complaint. _04-2187_

## Part IV Contact

EEO Counseling is not required if you are amending an existing open complaint. Complete items 19, 20, and 25 even if you did not contact a counselor.

**19.** When did the most recent discrimination event occur?
_March_ / _05_ / _2004_
Month    Day    Year

**20.** When did you first become aware of the alleged discrimination? _Ongoing_ / _____ / _____
Month    Day    Year

**21.** When did you contact an EEO counselor?
_____ / _____ / _____
Month    Day    Year

**22.** Did you discuss all actions raised in Item 15 with an EEO counselor? ☐ YES ☐ NO *(If no, explain on attached sheet)*

**23.** Name and telephone number of EEO counselor.
Name _____    Telephone No. _____

**24.** When did you receive your "Notice of Right to File"?
_01_ / _14_ / _04_
Month    Day    Year

**25.** On this same matter, have you filed a grievance or appeal under:

Negotiated grievance procedure ☐ YES ☑ No
Agency grievance procedure ☐ YES ☑ No
MSPB appeal procedure ☐ YES ☑ No

If you filed a grievance or appeal, provide date filed, case number, and present status.

36

March 4, 2004

RECEIVED
MAR 1 0 2004
TREASURY COMPLAINT CENTER
DALLAS, TEXAS

Mr. Jerry Armstrong, *Director*
Regional Complaint Center
4050 Alpha Road
Mail Stop 1010 MSRO
Dallas, Texas 75244-4203          Telephone number: (972) 308-1303

Mr. Thomas D. Brown, Sr., *Photoengraver*
3162 17th Street NW
Washington DC, 20011          Telephone number: (202) 265-5629

**Subject:** *Issues were not properly addressed according to my Affidavit, such as, pages 3-7 of my Affidavit and from 1-5 of my November 13th 2003 Letter of Discrimination.*

On going pattern and Practice of Discrimination Base on Prior EEO Activities, Retaliation and Harassment, Race, Color, Black, African American, Disability Low Back Pain, Mental Stress, Pain and Suffering, Performance Reprisal, Over abuse of Government Authority, Time & Attendance and fraud. Also my request for remedies wasn't properly included.

Issues 1,2, 3, 4, and 5were discussed at the counseling stage of the EEO Process. However, 6, 7, 8, 9, and 10 are new issues that I want to amend to my former complaint of discrimination. (In-Court) *Issue #6* On February 17, I was told by my Manager (Mr. Ross Mores) that my training request were denied (and also denied in January of 2002) I was told by my Supervisor that I am no longer on Light duty. Therefore, he is violating my rights, and creating Safety act against me by disobeying the prescribe orders and Form BEP 8519 (part 2of 2) Rev. 7-78 of the Disability Reform Act. *Issue #7* On March 3, of 2004 again I was Harassed and Retaliated against by my supervisor Mr. Patrick Reidy to respond and complete an assignment by March 9, 2004. The health Unit is aware of my disabilities and has proper documentation of these old and new health issues at hand. My eye vision has been impaired because of high blood sugar level of (307) noted by the health unit nurse on Friday February 27, 2004. Also, the constant harassment and Retaliation that created a hostile working environment since 1999.

Page 1 of 3                    TD. Number #04-2187

37

I have submitted the proper documentation to the Heath Unit. I am currently a Diabetic because of the constant Retaliation and harassment from my supervisors. (Mental and physical stress, Injury date: aggravated & assaulted on February 27, 2004, March 1,2,and 3 of'2004) and have difficulties in focusing and seeing the screen monitor at times when my blood Pressure (159 over 94) and blood sugar level is elevated because of Management. **Issue #8** The agency is aware of my current disabilities in reference to my Low Back Pain and have medical documentation from 1996 to the present but fail to **accommodate** and **obey** the Doctor's prescribe **restriction orders** by violating the Disability Reform Act of 1964. My remedies are stated in my affidavit on page 7 of 7 in the counselors report date December 15,2004 and March 4, 2004. **Issue#9** Abuse of Government Authority that include from paragraph 1 thru 3 but limited to issues #1 thru 6 in the above captured matter. **Issue #10**New Time and Attendance, Fraud from 1996 to present, for back pay and time with interest for money plus monetary awards that's already due to me.

I seek the following remedies:

1. $300,000.00 for Retaliation and Harassment, Performance Reprisal Compentsory Damages for **desperate treatment desperate impact due** to a **Hostile working environment** that caused my Mental and Physical Disabilities to suffer pain and suffering from low back pain, and my new injury on March 2, 2004, Diabetes.
2. On May 16, 2003, 246 hours (approximated 17,000.00 of from my pay of earning statement (Sick and Annual leave) taken from me.
3. 13,000.00 for Attorney fees that I incurred in procuring and processing these complaints. Plus, Attorney fees paid up front.
4. For all kinds paid leave and any leave that I was force to use in pursuant processing these complaints, such as, Sick, Annual, Administrative, Official time, Compensation time.

I will submit proper documentation with Exhibits at the proper time and place.

Truly Submitted,

Mr. Thomas Darnell Brown, Sr., *Photoengraver*    Date: March 8, 2004
3162 17th Street N.W.
Washington, DC, 20011
202-874-5968 or 301-919-4499

    CC.    Mr. Karl W. Carter, *Attorney at Law*
                Mrs. Renata Robinson, *EEO Specialist*

Page 3 of 3                                   TD. Number #04-2187

39

## Case Details for BEP-01-0541-F

### I. General Information

| Complaint Type | Formal/Mixed/Class Filed Date |
|---|---|
| Formal | 06/01/2001 |

| Subject |
|---|
| webCTS 01-1163 and BROWN, THOMAS D. SR. {A2} and CLOSED |

| Case Manager | Assignment Date |
|---|---|
| Angela Williams | 05/10/2008 |

| Counselor/Specialist/Investigator | Assignment Date |
|---|---|
| Mariam Harvey | 09/30/2006 |

**Office Information**

| BEP |
|---|

**Complaint Against Information**

| TBD2: | BEP |
|---|---|

### II. Complainants

**Restricted Information**

| Name | UID | EIN | Email | Series/Grade |
|---|---|---|---|---|
| THOMAS D. SR. {A2} BROWN | ***-**-3000 | | | / - |

**Home Address**
5606 LINWOOD COURT
SEABROOK XX
**Phone:** LANHAM, MD 20706-2308   **FAX:** n/a   **Cell:** n/a

**Privacy Act Statement:**29 CFR 1614.601 authorizes collection of this information. The data you are about to access is on pre-complaint and formal EEO complaints filed against the Department. The information is protected by the Privacy Act and access is limited to individuals who need the information to perform their official duties. This computer system is the property of the United States Government. The Government may monitor any activity on the system and retrieve any information stored within the system. By accessing and using this system, you are consenting to such monitoring and information retrieval for law enforcement and other purposes. Users should have no expectation of privacy as to communication on or stored within the system, including the information stored locally on the hard drive or other media use within the unit (e.g., floppy disks, tapes, CD-ROMs, etc.).

GOVERNMENT EXHIBIT
E

## III. Complaint Contacts

### Complaint Contacts

| Complaint Type | Contact Type | Name | Email | Address | Deleted |
|---|---|---|---|---|---|
| Formal | Complainant Representative | KAR CARTER | | **Work Address** ATTORNEY AT LAW 2000 L STREET, NW WASHINGTON DC, 20036 | |
| Formal | Technical Advisor | GILCHRIST, CLIFTON | | | |

## IV. Pre-remand Claims

There are no pre-remand claims for this case.

## V. Claims

### Accepted

| Claim | Incident Date | Comments | |
|---|---|---|---|
| Bases | Discrimination Found By AJ | Discrimination Found By Agency | Discrimination Found By OFO |
| **Harassment Non-Sexual** | 06/01/2001 | Migration Case - incident date is Formal Filed Date | |
| Race: Black | Not Specified | Not Specified | Not Specified |
| Reprisal: Reprisal | Not Specified | Not Specified | Not Specified |
| Disability: Mental | Not Specified | Not Specified | Not Specified |
| Disability: Physical | Not Specified | Not Specified | Not Specified |
| **Time and Attendance** | 06/01/2001 | Migration Case - incident date is Formal Filed Date | |
| Race: Black | Not Specified | Not Specified | Not Specified |
| Reprisal: Reprisal | Not Specified | Not Specified | Not Specified |
| Disability: Mental | Not Specified | Not Specified | Not Specified |
| Disability: Physical | Not Specified | Not Specified | Not Specified |

## VI. Statutes

Rehabilitation Act
Title VII

## VII. Events

Sort Events by Date

| Start | Activity | Created By | Claim | Comment | 462/Class/Mixed Mapping |
|---|---|---|---|---|---|
| **Event Type: 3. Formal Processing** | | | | | |
| 06/01/2001 | 3.1. ACCEPT – Formal Complaint Filed | Thomas Dixon | | Issue: HARASSMENT - NON SEXUAL TIME/ATTENDANCE | Formal Start |

| Start | Activity | Created By | Claim | Comment | 462/Class/Mixed Mapping |
|---|---|---|---|---|---|
| | | | | and Remedy: | |
| 06/01/2001 | 3.14. ACCEPT - File Rcvd by TCMC | Thomas Dixon | | | N/A |
| 06/04/2001 | 3.5.1. ACCEPT - Issue Acknowledgment Letter | Thomas Dixon | | | Written Notification Received |
| 06/04/2001 | 3.3. ACCEPT - Counselors Report Requested | Thomas Dixon | | | N/A |
| 06/04/2001 | 3.5. ACCEPT - Assign Complaint to Specialist | Thomas Dixon | | | N/A |
| 06/08/2001 | 3.4. ACCEPT - Counselors Report Received | Thomas Dixon | | | N/A |
| **Event Type: 5. Investigation** | | | | | |
| 08/23/2001 | 5.2. INV - Investigator Assigned | Thomas Dixon | | LAZARO, BENJAMIN | Investigation Start |
| 10/01/2001 | 5.6. INV - Investigation On-Site Start | Thomas Dixon | | | N/A |
| 10/01/2001 | 5.6.1. INV - Investigation Desk Start | Thomas Dixon | | | N/A |
| 11/07/2001 | 5.7. INV - Request Extension to Complete Inv. | Thomas Dixon | | | N/A |
| 05/01/2002 | 5.9. INV - ROI and Summary Completed | Thomas Dixon | | | N/A |
| 08/28/2002 | 5.14. IF TRANSMITTED - ROI Sent to Agency | Thomas Dixon | | | N/A |
| 09/13/2002 | 5.26. REQUEST DUE - Issued Election Notice | Thomas Dixon | | | Investigation End |
| **Event Type: 7. Final Agency Decision/Orders** | | | | | |
| 11/05/2002 | 7.7. DECISION - Assign to Specialist | Thomas Dixon | | | N/A |
| 06/02/2003 | 7.17. DECISION - FAD Issued - Merits | Mariam Harvey | | | N/A |
| **Event Type: Formal Closure** | | | | | |

| Start | Activity | Created By | Claim | Comment | 462/Class/Mixed Mapping |
|-------|----------|------------|-------|---------|-------------------------|
| 06/02/2003 | Final Agency Decision - Merit | Mariam Harvey | | | FAD - Merit |
| **Event Type: 10. Post Closure** | | | | | |
| 07/26/2005 | 10.1. Date Sent to Federal Records Center | Mariam Harvey | | Accession #: 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. Carton #: 82. Location: SUITLAND FEDERAL RECORDS CENTER. | N/A |

## Case Details for BEP-02-0201-F

### I. General Information

| Complaint Type | Formal/Mixed/Class Filed Date |
|---|---|
| Formal | 06/03/2002 |

| Subject |
|---|
| webCTS 02-1232 and BROWN, THOMAS D. SR. and CLOSED |

| Case Manager | Assignment Date |
|---|---|
| Shanda (D) Adams | 05/10/2008 |

| Counselor/Specialist/Investigator | Assignment Date |
|---|---|
| Thomas Dixon | 09/30/2006 |

**Office Information**

| BEP |
|---|

**Complaint Against Information**

| TBD2: | BEP |
|---|---|

### II. Complainants

**Restricted Information**

| Name | UID | EIN | Email | Series/Grade |
|---|---|---|---|---|
| THOMAS D. SR. BROWN | ***-**-2000 | | | / - |

**Home Address**
5606 LINWOOD COURT,
SEABROOK XX
Phone: LANHAM, MD 20706-2308   FAX: n/a   Cell: n/a

**Privacy Act Statement:**29 CFR 1614.601 authorizes collection of this information. The data you are about to access is on pre-complaint and formal EEO complaints filed against the Department. The information is protected by the Privacy Act and access is limited to individuals who need the information to perform their official duties. This computer system is the property of the United States Government. The Government may monitor any activity on the system and retrieve any information stored within the system. By accessing and using this system, you are consenting to such monitoring and information retrieval for law enforcement and other purposes. Users should have no expectation of privacy as to communication on or stored within the system, including the

information stored locally on the hard drive or other media use within the unit (e.g., floppy disks, tapes, CD-ROMs, etc.).

## III. Complaint Contacts

### Complaint Contacts

| Complaint Type | Contact Type | Name | Email | Address | Deleted |
|---|---|---|---|---|---|
| Formal | Complainant Representative | KARL CARTER, JR. | | **Work Address** 2000 L STREET, NW WASHINGTON, DC 20036 XX, | |
| Formal | Technical Advisor | GILCHRIST, CLIFTON | | | |

## IV. Pre-remand Claims

There are no pre-remand claims for this case.

## V. Claims

### Accepted

| Claim | Incident Date | Comments | | |
|---|---|---|---|---|
| Bases | Discrimination Found By AJ | Discrimination Found By Agency | Discrimination Found By OFO | |
| **Harassment Non-Sexual** | 06/03/2002 | Migration Case - incident date is Formal Filed Date | | |
| Race: Black | Not Specified | Not Specified | Not Specified | |
| Religion: null | Not Specified | Not Specified | Not Specified | |
| Reprisal: Reprisal | Not Specified | Not Specified | Not Specified | |
| Age (Age: Not Specified) | Not Specified | Not Specified | Not Specified | |
| Disability: Mental | Not Specified | Not Specified | Not Specified | |
| Disability: Physical | Not Specified | Not Specified | Not Specified | |
| **Terms/Conditions of Employment** | 06/03/2002 | Migration Case - incident date is Formal Filed Date | | |
| Race: Black | Not Specified | Not Specified | Not Specified | |
| Religion: null | Not Specified | Not Specified | Not Specified | |
| Reprisal: Reprisal | Not Specified | Not Specified | Not Specified | |
| Age (Age: Not Specified) | Not Specified | Not Specified | Not Specified | |
| Disability: Mental | Not Specified | Not Specified | Not Specified | |
| Disability: Physical | Not Specified | Not Specified | Not Specified | |

## VI. Statutes

Age Discrimination in Employment Act (ADEA)
Rehabilitation Act
Title VII

## VII. Events

Sort Events by Date

| Start | Activity | Created By | Claim | Comment | 462/Class/Mixed Mapping |
|---|---|---|---|---|---|
| **Event Type: 3. Formal Processing** | | | | | |
| 06/03/2002 | 3.1. ACCEPT - Formal Complaint Filed | Thomas Dixon | | Issue: HARASSMENT - NON SEXUAL TERMS/CONDITIONS OF EMPLOYMENT and Remedy: FIVE DAYS PAY RESTORED; SUSPENSION AND AWOL TO BE REMOVED FROM PERSONNEL FILE; BACK PAY WITH INTEREST; ATTORNEY FEES; APOLOGY | Formal Start |
| 06/03/2002 | 3.14. ACCEPT - File Rcvd by TCMC | Thomas Dixon | | | N/A |
| 06/03/2002 | 3.5. ACCEPT - Assign Complaint to Specialist | Thomas Dixon | | | N/A |
| 07/22/2002 | 3.5.1. ACCEPT - Issue Acknowledgment Letter | Thomas Dixon | | | Written Notification Received |
| 07/22/2002 | 3.3. ACCEPT - Counselors Report Requested | Thomas Dixon | | | N/A |
| 07/23/2002 | 3.4. ACCEPT - Counselors Report Received | Thomas Dixon | | | N/A |
| **Event Type: Formal Closure** | | | | | |
| 08/08/2002 | Final Agency Decision- Dismissal (Procedural) | Thomas Dixon | | | Final Agency Decision |
| **Event Type: 10. Post Closure** | | | | | |
| 07/10/2003 | 10.1. Date Sent to Federal Records Center | Thomas Dixon | | Carton #: Box 6 of 26. Location: SUITLAND FRC; ACCESSION NO. 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. | N/A |

**VIIIa. Monetary Corrective Actions**

## Case Details for BEP-02-0669-F

### I. General Information

| Complaint Type | Formal/Mixed/Class Filed Date |
|---|---|
| Formal | 01/28/2002 |

| Subject |
|---|
| webCTS 02-1097 and BROWN, THOMAS D. SR. and CLOSED |

| Case Manager | Assignment Date |
|---|---|
| Angela Williams | 05/10/2008 |

| Counselor/Specialist/Investigator | Assignment Date |
|---|---|
| Mariam Harvey | 09/30/2006 |

**Office Information**

| BEP |
|---|

**Complaint Against Information**

| TBD2: | BEP |
|---|---|

### II. Complainants

#### Restricted Information

| Name | UID | EIN | Email | Series/Grade |
|---|---|---|---|---|
| THOMAS D. SR. BROWN | ***-**-7000 | | | / - |

**Home Address**
5606 LINWOOD COURT
SEABROOK XX
**Phone:** LANHAM, MD 20706-2308   **FAX:** n/a   **Cell:** n/a

**Privacy Act Statement:** 29 CFR 1614.601 authorizes collection of this information. The data you are about to access is on pre-complaint and formal EEO complaints filed against the Department. The information is protected by the Privacy Act and access is limited to individuals who need the information to perform their official duties. This computer system is the property of the United States Government. The Government may monitor any activity on the system and retrieve any information stored within the system. By accessing and using this system, you are consenting to such monitoring and information retrieval for law enforcement and other purposes. Users should have no expectation of privacy as to communication on or stored within the system, including the

information stored locally on the hard drive or other media use within the unit (e.g., floppy disks, tapes, CD-ROMs, etc.).

## III. Complaint Contacts

**Complaint Contacts**

| Complaint Type | Contact Type | Name | Email | Address | Deleted |
|---|---|---|---|---|---|
| Formal | Complainant Representative | KARL CARTER, SR. | | **Work Address** ATTORNEY AT LAW 2000 L STREET, NW WASHINGTON DC, 20036 | |
| Formal | Technical Advisor | GILCHRIST, CLIFTON | | | |

## IV. Pre-remand Claims

There are no pre-remand claims for this case.

## V. Claims

**Accepted**

| Claim | Incident Date | Comments | |
|---|---|---|---|
| **Bases** | **Discrimination Found By AJ** | **Discrimination Found By Agency** | **Discrimination Found By OFO** |
| **Evaluation/Appraisal** | 01/28/2002 | Migration Case - incident date is Formal Filed Date | |
| Race: Black | Not Specified | Not Specified | Not Specified |
| Reprisal: Reprisal | Not Specified | Not Specified | Not Specified |
| Disability: Mental | Not Specified | Not Specified | Not Specified |
| Disability: Physical | Not Specified | Not Specified | Not Specified |

## VI. Statutes

Rehabilitation Act
Title VII

## VII. Events

Sort Events by Date

| Start | Activity | Created By | Claim | Comment | 462/Class/Mixed Mapping |
|---|---|---|---|---|---|
| **Event Type: 3. Formal Processing** | | | | | |
| 01/28/2002 | 3.1. ACCEPT - Formal Complaint Filed | Thomas Dixon | | Issue: EVALUATION/APPRAISAL and Remedy: | Formal Start |
| 01/28/2002 | 3.14. ACCEPT - File Rcvd by TCMC | Thomas Dixon | | | N/A |
| 01/30/2002 | 3.5. ACCEPT - | Thomas Dixon | | | N/A |

| Start | Activity | Created By | Claim | Comment | 462/Class/Mixed Mapping |
|---|---|---|---|---|---|
| | Assign Complaint to Specialist | | | | |
| 01/31/2002 | 3.5.1. ACCEPT - Issue Acknowledgment Letter | Thomas Dixon | | | Written Notification Received |
| 01/31/2002 | 3.3. ACCEPT - Counselors Report Requested | Thomas Dixon | | | N/A |
| 02/15/2002 | 3.4. ACCEPT - Counselors Report Received | Thomas Dixon | | | N/A |
| **Event Type:** 5. Investigation | | | | | |
| 03/20/2002 | 5.2. INV - Investigator Assigned | Thomas Dixon | | LAZARO, BENJAMIN | Investigation Start |
| 04/22/2002 | 5.6. INV - Investigation On-Site Start | Thomas Dixon | | | N/A |
| 04/22/2002 | 5.6.1. INV - Investigation Desk Start | Thomas Dixon | | | N/A |
| 07/09/2002 | 5.9. INV - ROI and Summary Completed | Thomas Dixon | | | N/A |
| 08/28/2002 | 5.14. IF TRANSMITTED - ROI Sent to Agency | Thomas Dixon | | | N/A |
| 09/13/2002 | 5.26. REQUEST DUE - Issued Election Notice | Thomas Dixon | | | Investigation End |
| **Event Type:** 7. Final Agency Decision/Orders | | | | | |
| 11/05/2002 | 7.7. DECISION - Assign to Specialist | Thomas Dixon | | | N/A |
| 06/02/2003 | 7.17. DECISION - FAD Issued - Merits | Mariam Harvey | | | N/A |
| **Event Type:** Formal Closure | | | | | |
| 06/02/2003 | Final Agency Decision - Merit | Mariam Harvey | | | FAD - Merit |
| **Event Type:** 10. Post Closure | | | | | |
| 07/26/2005 | 10.1. Date Sent to Federal Records Center | Mariam Harvey | | Accession #: 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. Carton #: 82. Location: SUITLAND FEDERAL RECORDS CENTER. | N/A |

## VIIIa. Monetary Corrective Actions

## Case Details for BEP-04-0649-F

### I. General Information

| Complaint Type | Formal/Mixed/Class Filed Date |
|---|---|
| Formal | 01/26/2004 |

| Subject |
|---|
| webCTS 04-2187 and BROWN, THOMAS D SR. and REQUEST DUE |

| Case Manager | Assignment Date |
|---|---|
| Shanda (D) Adams | 05/10/2008 |

| Counselor/Specialist/Investigator | Assignment Date |
|---|---|
| Sherry Maples | 09/30/2006 |

**Office Information**

| BEP |
|---|

**Complaint Against Information**

| TBD2: | BEP |
|---|---|

### II. Complainants

**Restricted Information**

| Name | UID | EIN | Email | Series/Grade |
|---|---|---|---|---|
| THOMAS D SR. BROWN | ***-**-7000 | | | 4425/WE-02 |

**Home Address**
3610 NEIGHBOR LANE CHEVER
LY LA DOVER- HILL, MD
**Phone:** 20785, 202 332-9527H   **FAX:** n/a   **Cell:** n/a

**Privacy Act Statement:**29 CFR 1614.601 authorizes collection of this information. The data you are about to access is on pre-complaint and formal EEO complaints filed against the Department. The information is protected by the Privacy Act and access is limited to individuals who need the information to perform their official duties. This computer system is the property of the United States Government. The Government may monitor any activity on the system and retrieve any information stored within the system. By accessing and using this system, you are consenting to such monitoring and information retrieval for law enforcement and other purposes. Users should have no expectation of privacy as to communication on or stored within the system, including the

information stored locally on the hard drive or other media use within the unit (e.g., floppy disks, tapes, CD-ROMs, etc.).

## III. Complaint Contacts

### Complaint Contacts

| Complaint Type | Contact Type | Name | Email | Address | Deleted |
|---|---|---|---|---|---|
| Formal | Complainant Representative | KARL W CARTER | | **Work Address** 2000 K STREET NW #716 WASHIGNTOIN DC 20036 202 416-1664 XX, | |
| Formal | Technical Advisor | MAPLES, SHERRY | | | |
| Formal | Investigator: Internal | Mr. John Doe | | | |
| Formal | Investigator: Internal | LEWIS MUNOZ | | | |

## IV. Pre-remand Claims

There are no pre-remand claims for this case.

## V. Claims

### Accepted

| Claim | Incident Date | Comments | |
|---|---|---|---|
| Bases | Discrimination Found By AJ | Discrimination Found By Agency | Discrimination Found By OFO |
| Evaluation/Appraisal | 01/26/2004 | Migration Case - incident date is Formal Filed Date | |
| Race: Black | Not Specified | No | Not Specified |
| Religion: null | Not Specified | No | Not Specified |
| Reprisal: Reprisal | Not Specified | No | Not Specified |
| Sex: Male | Not Specified | No | Not Specified |
| Age (Age: Not Specified) | Not Specified | No | Not Specified |

## VI. Statutes

Age Discrimination in Employment Act (ADEA)
Title VII

## VII. Events

Sort Events by Date

| Start | Activity | Created By | Claim | Comment | 462/Class/Mixed Mapping |
|---|---|---|---|---|---|
| **Event Type: 3. Formal Processing** | | | | | |
| 01/26/2004 | 3.1. ACCEPT - | Sherry | | Issue: | Formal Start |

| Start | Activity | Created By | Claim | Comment | 462/Class/Mixed Mapping |
|-------|----------|-----------|-------|---------|------------------------|
| | Formal Complaint Filed | Maples | | EVALUATION/APPRAISAL and Remedy: $300,000, INCREASE PERF APPRAISAL, ATTY FEES, RESTORE ALL LEAVES, | |
| 02/02/2004 | 3.14. ACCEPT - File Rcvd by TCMC | Sherry Maples | | | N/A |
| 02/04/2004 | 3.3. ACCEPT - Counselors Report Requested | Sherry Maples | | | N/A |
| 02/05/2004 | 3.5.1. ACCEPT - Issue Acknowledgment Letter | Sherry Maples | | | Written Notification Received |
| 03/01/2004 | 3.4. ACCEPT - Counselors Report Received | Sherry Maples | | | N/A |
| 08/03/2006 | 3.5. ACCEPT - Assign Complaint to Specialist | Sherry Maples | | | N/A |
| **Event Type: 5. Investigation** | | | | | |
| 09/01/2005 | 5.2. INV - Investigator Assigned | Sherry Maples | | MUNOZ, LEWIS | Investigation Start |
| 10/04/2005 | 5.6. INV - Investigation On-Site Start | Sherry Maples | | | N/A |
| 10/04/2005 | 5.6.1. INV - Investigation Desk Start | Sherry Maples | | | N/A |
| 10/04/2005 | 5.9. INV - ROI and Summary Completed | Sherry Maples | | | N/A |
| 03/24/2006 | 5.14. IF TRANSMITTED - ROI Sent to Agency | Sherry Maples | | | N/A |
| 04/24/2006 | 5.26. REQUEST DUE - Issued Election Notice | Sherry Maples | | | Investigation End |
| **Event Type: 7. Final Agency Decision/Orders** | | | | | |
| 11/21/2006 | 7.1. DECISION - Req for FAD by TCMC - No Election | Angela Williams | | | Request for FAD |
| 11/21/2006 | 7.7. DECISION - Assign to Specialist | Angela Williams | | case assign to Bob Storck | N/A |
| 12/12/2006 | 7.17. DECISION - FAD Issued - Merits | Angela Williams | | | N/A |
| 12/12/2006 | 7.19. DECISION - Send FAD/FO to Agency/Complainant | Angela Williams | | | N/A |
| **Event Type: Formal Closure** | | | | | |

| Start | Activity | Created By | Claim | Comment | 462/Class/Mixed Mapping |
|-------|----------|------------|-------|---------|-------------------------|
| 12/12/2006 | Final Agency Decision - Merit | Angela Williams | | | FAD - Merit |

## VIIIa. Monetary Corrective Actions

There are no monetary corrective actions for this case.

## VIIIb. Non-monetary Corrective Actions

There are no non-monetary corrective actions for this case.

## IX. Letters

There are no Letters for this case.

## X. Fees

There are no fees for this case.

## XI. Documents

There are no documents for this case.

## XII. Narrative

**BEP** FORM 2360-1
REV. 4-90

# BUREAU OF ENGRAVING AND PRINTING
# EMPLOYEE PERFORMANCE APPRAISAL

| | | | |
|---|---|---|---|
| EMPLOYEE NAME | Thomas Brown | RATING PERIOD | 10/1/02 to 9/30/03 |
| SSN | | OFFICE | Engraving |
| TITLE | Photoengraver | PAY PLAN/GRADE | WE 4425 |

## PART 1-PERFORMANCE PLAN DEVELOPED AND APPROVED
(ATTACH A COPY OF THE PERFORMANCE PLAN, TO INCLUDE EACH ELEMENT AND THE STANDARDS TO BE ACHIEVED.)

RATING OFFICIAL _Robert E. Bishop_   DATE _11-4-03_
REVIEWING OFFICIAL _Tony E. Merrick_   DATE _11/4/03_
EMPLOYEE _Employee refused to sign_   DATE _11-4-03_

(EMPLOYEE SIGNATURE INDICATES RECEIPT OF THE PLAN AND DOES NOT NECESSARILY CONSTITUTE AGREEMENT.)

## PART II-APPRAISAL OF PERFORMANCE—ELEMENTS
(MOST PERFORMANCE PLANS CONTAIN FEWER ELEMENTS THAN PROVIDE FOR BELOW. USE THE NUMBER OF LINES NEEDED TO MATCH THE PERFORMANCE PLAN.)

## ELEMENT NUMBER

### RATING (CHECK ONE BOX FOR EACH ELEMENT)

| Element | | | |
|---|---|---|---|
| 1 | ☐ EXCEEDED STANDARDS | ☒ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE |
| 2 | ☐ EXCEEDED STANDARDS | ☒ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE |
| 3 | ☐ EXCEEDED STANDARDS | ☒ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE |
| 4 | ☐ EXCEEDED STANDARDS | ☒ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE |
| 5 | ☐ EXCEEDED STANDARDS | ☒ ACHIEVED STANDARDS | ☐ UNACCEPTABLE-DID NOT ACHIEVE |

GOVERNMENT EXHIBIT F

## PART III-APPRAISAL OF PERFORMANCE—NARRATIVE

During this rating period, Thomas Brown worked in digital photography from Oct. 2002 to May 2003 and since then has participated in the cross-training program for digital pre-press.
In the digital photography area, Mr. Brown met the criteria for achieved standards in the Quality, Productivity, and Customer Service categories.

135
MRH

He has exhibited progress in his digital pre-press training and with further supervision and training he is expected to work more independently with each new assignment. His performance in this area will continue to be monitored.

In the category of Security and Accountability, he has performed as expected. Since his daily quitting time leaves him as one of the last employees in the section, he has the responsibility of securing the section, which he has done without failure. On one occasion during this rating period he promptly notified his manager that the digital pre-press section could not be locked properly, and the issue was resolved.

In the category of Safety, Health, Environmental and Housekeeping he performed as expected, with one minor unintentional instance of unruly housekeeping in the digital pre-press area.

## PART IV-SUMMARY RATING

CHECK ONE:

☐ **EXCEEDED STANDARDS**          (ONE-HALF OR MORE OF ELEMENTS RATED EXCEEDED
                                  STANDARDS AND NO ELEMENTS RATED UNACCEPTABLE)

☒ **ACHIEVED STANDARDS**          (LESS THAN ONE-HALF OF ELEMENTS RATED EXCEEDED
                                  STANDARDS AND NO ELEMENTS RATED UNACCEPTABLE)

☐ **UNACCEPTABLE--DID NOT          (ONE OR MORE ELEMENTS RATED UNACCEPTABLE)
   ACHIEVE STANDARDS**

RATING OFFICIAL _Robert E. Bishop_          DATE _11-4-03_

REVIEWING OFFICIAL _Jay E. Merritt_          DATE _11/4/03_

EMPLOYEE _Employee refused to sign_          DATE _11-4-03_          136
(EMPLOYEE SIGNATURE ONLY INDICATES THAT THE APPRAISAL DISCUSSION TOOK PLACE AND DOES NOT NECESSARILY CONSTITUTE
AGREEMENT WITH THE APPRAISAL.)



# PERFORMANCE EVALUATION PLAN
## Office of Engraving
### Photoengraver

April 15, 2002

## ELEMENT 1:   Quality of Work Performed

**Objective**:  Maintain and improve BEP quality standards by manufacturing the highest quality security products in the industry.

**Exceeds Standard:**        Meets achieved standards _and_ employee demonstrates self-initiative in one of the following areas:
- Consistently produces work of the highest quality with little or no supervision with one or less work errors for the entire rating period;
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in documented, increased quality of work performed.   Employee also actively participates in the implementation of approved suggestions in their work area;
- Consistently and actively participates in ISO implementation and maintenance efforts by the Office of Engraving (beyond what is assigned).

**Achieved Standard:**
- Errors that are traceable to digital files, films, film assemblies, bluelines, chromalins, photographs, models, or offset plates after finished product has left employee's area are not to exceed 3, with no more than one per quarter. Photoengraver will utilize the buddy system (double inspection) for quality certification;
- Employee fails to follow prescribed work procedures on no more than three occasions during the entire rating period, with no more than 1 per quarter.

## ELEMENT 2:  Productivity and Costs

**Objective**: Maximize Photoengraver productivity.

**Exceeds Standard:**        Meets achieved standards _and_ employee demonstrates self-initiative in one of the following areas:
- Consistently has shown to be a highly productive employee, one that has not failed to deliver error-free, completed assignments before expected time of completion on one or less occasion for the entire rating period;
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in documented, increased productivity of work performed.  Employee also actively participates in the implementation of approved suggestions in their work area.
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in confirmed and documented cost savings.  Employee also actively participates in the implementation of approved suggestions in their work area.

GOVERNMENT EXHIBIT

_G_

142

**Achieved Standard:**
- Failure to meet predetermined delivery dates established between the Assistant Supervisor/Supervisor and/or Manager do not exceed 3, with no more than one per quarter. In these instances, there is no negative impact (unnecessary costs, job changes, equipment reconfiguration, etc.) to production and production commencement is not delayed.
- Continues to demonstrate increased knowledge base of the Photoengraver's duties and responsibilities.

## ELEMENT 3:      Customer Service

<u>Objective</u>: Exceed internal (BEP) and external customer requirements.

**Exceeds Standard:**      Meets achieved standards <u>and</u> employee demonstrates self-initiative in **one** of the following areas:
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in increased improvement of customer service. Employee also actively participates in the implementation of approved suggestions in their work area;
- No complaints are received (by the Assistant Supervisor/Supervisor) from an internal customer (outside of employee's immediate work unit within the BEP) concerning employee's performance.
- One or more compliments from external customers are received by the Assistant Supervisor/Supervisor on employee's performance.

**Achieved Standard:**
- On no more than 3 occasions, fails to take action to resolve customers' (internal and external) concerns to include: providing fast, accurate, and timely customer service; making improvements in work based on customer feedback;
- Participates in established group efforts to solve problems and/or improve customer satisfaction;
- No complaints are received from external BEP customers concerning employee's performance;
- No more than 2 complaints are received from an internal customer (outside of employee's immediate work unit within the BEP) concerning employee's performance.

## ELEMENT 4:  Security, Accountability and Internal Controls

<u>Objective</u>: To follow all required security, accountability, and internal control policies and procedures.

**Exceeds Standard:**      Meets achieved standards <u>and</u> employee demonstrates self-initiative in **one** of the following areas:
- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in greater security, internal controls or accountability of work performed. Employee

143

also actively participates in the implementation of approved suggestions in their work area;

- Consistently has shown to be a highly motivated employee, one that goes above and beyond all BEP policies and procedures involving security, accountability and internal controls with 1 or less instances of failing to comply and no security violations (90-90).

## Achieved Standard:

- Maintains required security, product accountability, internal controls, and accountability data entry with no more than two instances of failing to comply to established procedures for the entire rating period;
- Data entered into accountability records is complete, accurate, and timely with no more than two instances of failing to comply to established procedures for the entire rating period;
- Informs the Supervisor of any potential security/internal control problems with no more than two instances of failing to comply for the entire rating period.

## ELEMENT 5:    Safety, Health, Environmental, and Housekeeping

<u>Objective</u>: To follow all required safety, health, environmental, and housekeeping policies and procedures.

## Exceeds Standard:    Meets achieved standards <u>and</u> employee demonstrates self-initiative in the following area:

- Submits a minimum of two written suggestions to the Photoengraving Assistant Supervisor/Supervisor that are implemented during the rating period and result in an increase in safe operation of a work section and/or equipment, enhanced cleanliness, or improved environmental condition of the work environment. Employee also actively participates in the implementation of approved suggestions in their work area.

## Achieved Standard:

- Observes proper safety practices and uses required safety equipment with two or less instances of violation of these guidelines for the entire rating period;
- Notifies Supervisor or safety committee member of any unsafe working condition;
- Maintains appropriate housekeeping for assigned work area(s);
- Follows proper environmental practices and regulations with two or less instances of violation of these guidelines for the entire rating period.

144

## Bishop Robert

| | |
|---|---|
| **From:** | Bishop Robert |
| **Sent:** | Thursday, December 11, 2003 10:33 AM |
| **To:** | Brown Thomas |
| **Cc:** | DiazMyers Judith; Pipkin Mark; Morres Ross; Reidy Patrick |
| **Subject:** | RE: Re: Thomas Brown |

Mr. Brown, your work hours are from 7:00 am to 3:30 pm. I am requiring you to give Mr. Reidy or myself a request for leave for the 1 1/4 hours that you were late on Monday 12/8/03. This must be done by COB today 12/11/03.

Bob Bishop
Photoengraving Supervisor

———Original Message———

| | |
|---|---|
| **From:** | Reidy Patrick |
| **Sent:** | Thursday, December 11, 2003 9:56 AM |
| **To:** | Bishop Robert |
| **Subject:** | Re: Thomas Brown |

Bob,
On Monday, 12/8/03, Tom Brown called to say he was calling in sick. Around 8:15 am, I saw he was here and asked why he was in. He said he changed his mind.
On Tuesday, I asked him to give me a leave slip for absence on Monday. Either on Tuesday or Wednesday, he left a slip for my approval. I didn't get around to signing it until after he had left on Wednesday, but I noticed that the time he put on it did not correspond to his working hours. He put down that he was absent with sick leave from 7:15 am to 8:15 am.
On Thursday, 12/11, I asked him to correct the times. He stated something about that his original starting time was 7:15 and that's why he put that there. I told him present starting time was 7:00 am and that is what should be on the leave slip. I left it with him. About 15 minutes later, he brought it back to me and said he would not change it. Again, I explained that his present starting time was 7:00 am and that I would not approve his leave slip unless it reflected that. He walked away with it, again without changing it. That is where it now stands - his 1 1/4 hours of absence has not been approved by me.

Just thought you should be aware of this.

Pat



GOVERNMENT EXHIBIT

H

1

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| *Brown Thomas Darnell* | *13929* |

**3. ORGANIZATION**

*Office of Engraving*

| 4. TYPE OF LEAVE/ABSENCE | DATE | | TIME | | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| *(Check appropriate box(es) below.)* | From: | To: | From: | To: | | |
| ☑ Accrued Annual Leave | *7/3/5* | *8:15* | *12-8* | *12-8* | *1* | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | ☐ I hereby invoke my entitlement to Family and Medical Leave for: |
| ☐ Accrued Sick Leave | | | | | | ☐ Birth/Adoption/Foster Care |
| ☐ Advance Sick Leave | | | | | | ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent |
| **Purpose:** ☐ Medical/dental/optical examination of requesting employee  ☐ Other | | | | | | ☐ Serious Health Condition of Self |
| ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | |
| ☐ Leave Without Pay | | | | | | |

**6. REMARKS**

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE *Thomas H. Brown*    DATE *12-15-2003*

**8. OFFICIAL ACTION ON REQUEST:** ☑ APPROVED  ☐ DISAPPROVED

*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

SIGNATURE *Patil Reidy*    DATE *12-15-03*

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or General Accounting Office when the information is required for evaluation of leave administration; and to the General Services Administration in connection with its responsibilities for records management.

When the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency used the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| U.S. OFFICE OF PERSONNEL MANAGEMENT AUTHORIZED FOR LOCAL REPRODUCTION | STANDARD FORM 71 (Rev. 12-97) PREVIOUS EDITION MAY BE USED |
|---|---|

GOVERNMENT EXHIBIT I



# DEPARTMENT OF THE TREASURY
## BUREAU OF ENGRAVING AND PRINTING
### WASHINGTON, D.C. 20228

### JAN 1 3 2004

MEMORANDUM FOR THOMAS BROWN, PHOTOENGRAVER
PHOTOENGRAVING DIVISION

FROM:  Robert Bishop, Foreman
Photoengraving/Electronic Pre-Press Section

SUBJECT:  Letter of Warning

1. You are hereby officially warned for "Failure to Follow Supervisory Instructions". To support and explain the warning, the following information is provided.

On Monday, December 8, 2003, you called Mr. Patrick Reidy, Supervisor, Photoengraving/Electronic Pre-Press Section to say that you would not be in because you were sick. At approximately 8:15 a.m. that day, Mr. Reidy saw that you were at work and asked why you were in. You replied that you changed your mind.

On Tuesday, December 9, 2003, Mr. Reidy requested that you give him a leave slip for your tardiness on the previous day. You left a leave slip for Mr. Reidy's approval; however, the time that you submitted on your leave slip did not correspond to your working hours. You submitted a leave slip requesting sick leave from 7:15 a.m. to 8:15 a.m. Your working hours are from 7:00 a.m. to 3:30 p.m.

On Thursday, December 11, 2003, Mr. Reidy asked you to correct the time to 7:00 a.m. which is the start of your tour of duty. You refused to change the time. Again, Mr. Reidy explained that your present starting time is 7:00 a.m. and that he would not approve your leave request unless it reflected the correct time. You walked away without changing the time.

Mr. Reidy informed me of the circumstances, and I sent you an e-mail message on December 11, 2003 reminding you that your work hours are from 7:00 a.m. to 3:30 p.m. I also instructed you to give Mr. Reidy or myself a request for leave for the 1 ¼ hours that you were late on December 8, 2003 by close of business, December 11, 2003. You did not submit the leave request as instructed.



GOVERNMENT EXHIBIT
J

146

Your failure to follow supervisory instructions demonstrates a blatant disregard for authority and will not be tolerated.

2.  This Letter of Warning will not be filed in your Official Personnel Folder, but will be retained within the Division for a period of one (1) year from the date of your receipt of this letter.  After that time, the letter will be destroyed and not used as a basis for progressive discipline in any subsequent offenses.

3.  You have the right to file a grievance regarding this action in accordance with Article 18, of the Labor-Management Agreement between the Bureau of Engraving and Printing and Graphics Arts International Union, Local 285, AFL-CIO.  The grievance must identify: (a) the nature of the grievance; (b) the date of the act or occurrence, or the date you became aware of the act or occurrence; (c) the personal relief sought; and (d) a designated representative, if any.

4.  It is requested that you acknowledge receipt of this notice by signing and dating it below:


_____          _1 - 13 - 04_
Signature                                              Date

*Employee refused to sign*
*Robert E. Bishop*
*Patrick J Kiely*

147



**Computer Consultants Corporation**

818 18th Street, NW 10th Floor
Washington, DC 20006
(202) 785-8000
Fax: (202) 785-8006

To: Thomas D. Brown
DOT/BEP

Date: 2/17/2004

Fax Number: (202) 874-1290

Pages (including cover sheet): 3

From: Celina Cuadro

Subject: REGISTRATION FORMS FOR GRAPHICS AND MS OFFICE CLASSES

COMMENTS:

Thomas,

Please make sure you have received 2 registration forms listing different classes, and make certain you sign and send back the same 2 forms together with your government form.

Thanks!

**IF YOU HAVE ANY PROBLEMS RECEIVING, PLEASE CALL PERSON SENDING IMMEDIATELY**



GOVERNMENT
EXHIBIT
K

48



**Computer Consultants Corporation**

| To: | Thomas D. Brown |
| --- | --- |
| | Bureau of Engraving & Printing |
| | 202-874-1290 (fax) |
| | 202-874-5968 (phone) |
| From: | Jon Rutenberg |

818 18th Street, NW Suite 1000      (202) 785-8000 (phone)
Washington DC 20006                 (202) 785-8006 (fax)

## Open Class Registration

Dear Thomas,                                                    2/17/2004

Thank you for choosing Computer Consultants Corporation! This form contains registration information for your class(es), and CCC's Terms of Service. Please review this information to ensure its accuracy, then sign and return this form to CCC to confirm your registration.

| Student | Date | Time | Class | Location | Class Fee |
| --- | --- | --- | --- | --- | --- |
| Thomas D. Brown | 2/26/2004 | 9-4 | Introduction to Photoshop 7 | CCC | $300.00 |
| Thomas D. Brown | 3/1/2004 | 9-4 | Advanced Phostoshop 7 | CCC | $300.00 |
| Thomas D. Brown | 3/3/2004 | 9-4 | Illustrator 10 | CCC | $300.00 |
| Thomas D. Brown | 3/8/2004 | 9-4 | Fireworks MX 2004 | CCC | $300.00 |
| Thomas D. Brown | 3/15/2004 | 9-4 | Windows XP | CCC | $250.00 |

| Credit card: | ☐ Visa | Cardholder's Name: _____ |
| --- | --- | --- |
| (if applicable) | ☐ Mastercard | Card Number: _____ |
| | ☐ Amex | Expiration Date: _____ |

### Guarantee of Service

- CCC provides each student with a computer during class (*only applies to classes at CCC's site*).
- CCC provides students free and unlimited phone support for each class he or she takes.
- Classes begin promptly at the scheduled starting time.

### Business Terms

- Full payment of all fees must be made five (5) business days prior to the scheduled class date.
- For government clients, a bona fide Purchase Order is required at least five (5) days prior to the scheduled class date.
- No refunds will be provided on credit card payments.
- Client agrees not to recruit or employ CCC's personnel without CCC's prior written consent.
- Client shall pay any collection or attorney fees borne by CCC in enforcing this agreement.

### Cancellation Policy

- Clients may cancel or reschedule with no financial obligation until five (5) business days prior to the scheduled date.
- Clients must pay a rescheduling fee equal to 50% of the class fee for any class rescheduled fewer than five (5) business days from its scheduled date.
- Clients agree to pay the full fee for any class canceled fewer than five (5) business days from its scheduled date.
- Clients may send alternate students to any class, without additional charge, if they give CCC one (1) day's notice.

I have reviewed all of the information in this document and verified that it is correct. I have also reviewed the terms of service and agree to be bound by them.

Approver's Signature: _Mr. Thomas D. Brown_  Date: _February 23, 20__

Approver's Name: _Mr. Thomas D. Brown_

49



**Computer Consultants Corporation**

| To: | Thomas D. Brown |
| --- | --- |
| | Bureau of Engraving & Printing |
| | 202-874-1290 (fax) |
| | 202-874-5968 (phone) |
| From: | Jon Rutenberg |

818 18th Street, NW Suite 1000    (202) 785-8000 (phone)
Washington DC 20006    (202) 785-8006 (fax)

Dear Thomas,

### Open Class Registration

2/17/2004

Thank you for choosing Computer Consultants Corporation! This form contains registration information for your class(es), and CCC's Terms of Service. Please review this information to ensure its accuracy, then sign and return this form to CCC to confirm your registration.

| Student | Date | Time | Class | Location | Class Fee |
| --- | --- | --- | --- | --- | --- |
| Thomas D. Brown | 3/24-25/2004 | 9-4 | QuarkXpress 6.0 | CCC | 600.00 |
| Thomas D. Brown | 4/15/2004 | 9-4 | Introduction to Excel 2002 | CCC | 225.00 |
| Thomas D. Brown | 4/21/2004 | 9-4 | Intermediate Word 2002 | CCC | 225.00 |

| Credit card: (if applicable) | ☐ Visa ☐ Mastercard ☐ Amex | Cardholder's Name: Card Number: Expiration Date: |
| --- | --- | --- |

### Guarantee of Service

- CCC provides each student with a computer during class (*only applies to classes at CCC's site*).
- CCC provides students free and unlimited phone support for each class he or she takes.
- Classes begin promptly at the scheduled starting time.

### Business Terms

- Full payment of all fees must be made five (5) business days prior to the scheduled class date.
- For government clients, a bona fide Purchase Order is required at least five (5) days prior to the scheduled class date.
- No refunds will be provided on credit card payments.
- Client agrees not to recruit or employ CCC's personnel without CCC's prior written consent.
- Client shall pay any collection or attorney fees borne by CCC in enforcing this agreement.

### Cancellation Policy

- Clients may cancel or reschedule with no financial obligation until five (5) business days prior to the scheduled date.
- Clients must pay a rescheduling fee equal to 50% of the class fee for any class rescheduled fewer than five (5) business days from its scheduled date.
- Clients agree to pay the full fee for any class canceled fewer than five (5) business days from its scheduled date.
- Clients may send alternate students to any class, without additional charge, if they give CCC one (1) day's notice.

I have reviewed all of the information in this document and verified that it is correct. I have also reviewed the terms of service and agree to be bound by them.

Approver's Signature: _Mr. Thomas D. Brown_    Date: _February 20, 2004_
Approver's Name: _Mr. Thomas D. Brown_

**50**



# DEPARTMENT OF THE TREASURY
## BUREAU OF ENGRAVING AND PRINTING
### WASHINGTON, DC 20228

Date:                    February 17, 2004

MEMORANDUM FOR:          THOMAS D. BROWN
                         PHOTOENGRAVING SECTION

FROM:                    Ross Morres
                         OFFICE OF ENGRAVING, EXT. 7-4801

SUBJECT:                 <u>TRAINING REQUESTS</u>

I'll presume you left the packet in my office chair referring to the training courses offered by Computer Consultants Corporation (CCC).

You requested training in the following areas:
- Introduction to Photoshop 7
- Advanced Photoshop 7
- Illustrator 10
- Fireworks MX 2004
- Windows XP
- Quark Xpress 6.0
- Introduction to Excel 2002
- Intermediate Word 2002

You will remember in January 2002 that you made a similar request to attend similar training. At that time, your request was denied. You were advised to complete the self-guided tutorials for Photoshop, Illustrator, and Quark Xpress. Copies were distributed. Then, once you completed and passed the final quiz, then consideration would be made concerning further training. This aspect has not changed; your request to attend these training sessions is denied. Again, you are encouraged to complete the self-guided tutorials and consideration will be made whether further training is necessary. If you do not have these tutorials, please see Bob Bishop. He'll provide you with copies.

Regarding training for Fireworks MX 2004, and Windows XP, neither of these applications are essential to your immediate job function. Therefore, your request to attend these training sessions is denied at this time.

Regarding the training for Introduction to Excel 2002 and Intermediate Word 2002, these are applications not essential to your job function. However, they are useful. The BEP offers these training sessions periodically; therefore, I advise you to review the training schedule offered through the BEP's Center for Excellence. In the meantime, I will discuss this with Mr. Reidy accordingly to determine if the April 15, and 21 dates are acceptable.



47

# PHOTOENGRAVERS TRAINING MATRIX
revised: January 30, 2004

| Category | Armstrong, Robert QTY | HRS | Brown, Tom QTY | HRS | Burch, Syndey QTY | HRS | Jefferson, Tom QTY | HRS | Keller, Marion QTY | HRS | Krajecki, Phil QTY | HRS | Makios, Glenn QTY | HRS | Pappadakis, George QTY | HRS | Powell, Phil QTY | HRS | Sorsdal, Retta QTY | HRS | Spriggs, Linda QTY | HRS | Stubbs, Richard QTY | HRS | Wiedenhoeft, Dick QTY | HRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Work Shops / Conferences** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Pre-press Seminars | 2 | 43 | 2 | 16 | | | | | | | | | | | | | 3 | 56 | | | | | | | | |
| Trade Shows / Conferences | | | | | | | | | | | 1 | 3 | | | | | 2 | 48 | | | | | 1 | 3 | | |
| General Prepress | 3 | 200 | 1 | 8 | | | | | | | 1 | 8 | 1 | 8 | 1 | 8 | 1 | 32 | | | | | | | | |
| Professional Photography | 3 | 142 | 2 | 49 | | | | | | | | | | | | | 1 | 16 | | | 1 | 24 | | | | |
| Color Science & Theory | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sub Total | 8 | 385 | 5 | | | 72 | 0 | 0 | 0 | 0 | 3 | | 0 | | 0 | | 7 | 192 | 0 | | 1 | 24 | 1 | 3 | 0 | |
| **Station Training** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Macintosh | 2 | 66 | 2 | | 1 | 71 | 1 | 51 | 1 | | 1 | 15 | 1 | 15 | | 51 | 1 | | 1 | 15 | 1 | 15 | 1 | 51 | 1 | 51 |
| Personal Computer | | | | | | | | | 1 | 32 | | | | | | | | | | | | | | | | |
| Unix workstation | | | | | | | | | | | | | | | | | | | | | | | | | | |
| VMS Server | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Network Analysis | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sub Total | 2 | 51 | 2 | 66 | 4 | | 2 | 51 | 1 | 32 | 1 | 15 | 2 | 15 | 51 | | 0 | | 1 | 15 | 1 | 15 | 2 | 51 | 2 | 51 |
| **Software Applications** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Quark / Xpress | 1 | 15 | 2 | 33 | 3 | 35 | 1 | 15 | 1 | 8 | 1 | 15 | 1 | 15 | 1 | 15 | 2 | 25 | 4 | 63 | 1 | 15 | 1 | 15 | 1 | 15 |
| Illustrator | 1 | 15 | 1 | 15 | 1 | 15 | | | 1 | 8 | 1 | 15 | 1 | 15 | 1 | 15 | | | 2 | 23 | 1 | 15 | 1 | 15 | 1 | 15 |
| FreeHand | | | | | | | | | 1 | | | | | | | | | | | | | | | | | |
| Photoshop | 1 | 15 | 4 | 105 | 1 | 15 | 2 | 51 | 2 | 32 | 1 | 15 | 1 | 15 | 1 | 15 | 2 | 25 | 3 | 25 | 1 | 15 | 1 | 15 | 1 | 15 |
| Esko-Graphics | | | | | | | | | 2 | 64 | | | | | | | 2 | 64 | | | | | | | | |
| AutoCAD | | | | | | | | | 2 | 56 | | | | | | | | | | | | | | | | |
| Microstation | | | | | | | | | 4 | 65 | | | | | | | 1 | 21 | | | | | | | | |
| Microsoft Office | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Sub Total | 3 | 45 | 3 | 153 | 5 | 85 | 4 | 81 | 12 | 233 | 3 | 45 | 3 | 45 | 45 | | 7 | 135 | 9 | 111 | 3 | 45 | 3 | 45 | 3 | 45 |
| **Imaging / Scanning Equip.** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Linotype-Hell | | | | | | | | | | | | | | | | | 1 | 40 | | | | | | | | |
| Barco ImageSetter | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Scanning | | | 1 | 51 | | | | | | | | | 1 | 32 | | | | | 1 | 40 | | | | | | |
| Creo Renaissance Scanning | | | 1 | | | | | | | | | | | | | | 1 | 25 | 1 | 40 | | | | | 1 | 16 |
| Sub Total | | | 1 | 51 | 1 | 16 | | | | | | | 1 | 32 | 16 | | | | 1 | 40 | | | 1 | 15 | 1 | 16 |
| **Photoengraving and Plating** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Chemical Etching | 1 | 40 | | | | | | | | | 1 | 40 | | | | | | | | | | | | | | |
| Sub Total | 1 | 40 | | | | | | | | | 1 | 40 | | | | | | | | | | | | | | |
| **Printing and Misc. Training** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Gravure / Litho / Printing | | | 9 | 426 | | | | | | | | | | | | | | | | | | | | | | |
| Information Processing | | | 1 | 41 | | | | | | | | | | | | | | | | | | | | | | |
| Shorthand / Intro to Algebra | | | 2 | 83 | | | | | | | | | | | | | | | | | | | | | | |
| Sub Total | | | 12 | 552 | | | | | | | | | | | | | | | | | | | | | | |
| **Grand TOTAL** | 6 | 135 | 30 | /207 | 14 | 208 | 6 | 132 | 13 | 265 | 6 | 103 | 6 | 100 | 5 | 96 | 15 | 327 | 11 | 166 | 3 | 84 | 5 | 99 | 5 | 96 |

GOVERNMENT EXHIBIT  M

January 15, 2004

Mrs. Judith Diaz Myers, *Chief*
Office of Engraving Division
Bureau of Engraving and Printing
Washington, D.C. 20228

Mr. Thomas D. Brown, Sr., *Photoengraver*
3610 Neighbor Lane Cheverly,
Landover Hills, Maryland

Reference:    *Insulted and felt threaten by Ms. Marjorie Freeman*

On or around October 27, 2003 I approached Ms. Linda Gunter about some
security issues that resulted in the Pre-Preparation area not being properly
locked up and secured on 10/27/03. I was explaining the issue to Ms Linda
Gunter. All of a sudden Ms. Marjorie Freeman rudely interrupted us. She
began to holler, screamed, curse, and through fits of anger by loud talking,
and inviting me to her backside. "She told me to *kiss her black ass*." I said
Marj watch your mouth and she responded by saying, *"fuck you." You
make me watch my fucking mouth.* I responded by saying I can't make you
watch your mouth I am not interested in any sexual desires with you. I
warned her about threatening me but Ms. Marjorie E. Freeman takes my
kindness for weakness just like everyone else does in the Photo litho section
in the Office of Engraving. . On or around January 13th of 2004 Mr. Robert
Bishop approached me and said," "Meet me in my office for a 10:00am
meeting. At that meeting neither Patrick Reidy nor Robert Bishop counseled
nor reprimand Ms. Marjorie Freeman for her conduct, as a matter of fact,
Ms. Marjorie Freeman told me that she wasn't going to apologize to me.
Then she laughed in my face and dismissed the meeting. Mr. Patrick Reidy,
Mr. Robert Bishop, or Mr. Danny Earl Thompson didn't say, or do anything
to Ms. Marjorie Freeman.



GOVERNMENT
EXHIBIT
N

91

(2.)

On or around January 13, 2004 I was once again a victim of Ms. Marjorie Freeman. She continue to be aggressive toward me for no apparent reason, However, I was locking up the section and accidentally cut off the lights while she was in her workstation. Then I instantly apologized to Ms. Marjorie Freeman but she didn't except my apology because she immediately went off on me, by hollering, loud talking, *and again inviting me to her backside, by telling me to kiss her black ass. At this time I felt scared, threatening, and defenseless,* because Ms Marjorie Freeman is a woman. (Female) I reported the incident to my supervisor Mr. Patrick Reidy and Mr. Robert Bishop but they retaliated against me because they gave me a letter warning for a *(15 minutes) AWOL Charge that was unjustified.*

Thank you for your cooperation and concern in resolving the above captured matter.

Thank you

_____ Date: _____
Mr. Thomas D. Brown, Sr., *Photoengraver*
3610 Neighbor Lane, Cheverly.
Landover Hills, Maryland, 20785
301-919-4499 or 202-927-3805

Cc: Ms. Renata P. Robinson, *Senior EEO Specialist*
    Mr. Ross Morress, Manager
    Mr. Robert Bishop, Foreman
    Mr. Patrick Reidy, Assistant Foreman

92

## MEMO

3/5/04

To: Thomas D. Brown
From: Patrick Reidy
       Assistant Photoengraving Supervisor

Re: MEMO, dated 3/5/04 - Job Print Order #2066-04 - BEP Facts Template

The memo I gave you on Thursday, March 4, 2004 at 1:00 pm contained some incorrect dates. I dated this memo as I was looking at the month of February rather than March. The date of issuance and due date were incorrect. The actual date of issuance was March 4, 2004. The due date of the job should have read Monday, March 8, 2004.

Also, since you were issued the first memo, you have submitted a request for 3 ½ hours of leave without pay, which is subject to a Manager's approval, for March 8, the date the job was due. Therefore, the new information concerning this now reads as follows:

On the morning of February 23, 2004 you were given an assignment to impose files, produce a paper proof and output film negatives for the above referenced job. Along with this assignment you were given a sample paper proof and written instructions that outlined what was to be done and what was required. The next day, February 24, the specs for the job changed. I verbally informed you of this and told you new instructions would soon follow. On the morning of February 25, 2004, I gave you the new written instructions, went over the changes, lent assistance at your workstation and discussed what was required. A copy of these instructions is attached to this memo.

As of this time, you have not turned in this assignment. As I explained, this job needs to be completed. You have had this job for about six and one-half days. Of that time, you were off for one entire day, 5 hours one day, spent approximately 3 hours detailed to Mr. Brabitz's unit and spent another 4 hours with Mr. Brabitz's unit through miscommunication. Even with this excused time away from this job you have had approximately 28 working hours to complete this assignment.

This assignment is due to me by 9:00 am, Tuesday, March 9, 2004, and it must satisfy the requirements as outlined in the revised written instructions. If you require further clarification of what is required, see me.

*Patrick J Reidy*

cc: Ross Morres
    Robert Bishop



44

Job # 2066-04 BEP FactsTemplates - <u>Revised Instructions</u>

File to use: **BEP FactsTemplate_2pg**

Job is 2 page document
Job prints 1 color (PMS 540), both sides (1/1)
Trim size: 8.5 x 11
Bleed size 8.625 x 11.125
Sheet size: 23 x 35

1. Save document page as eps with .125 bleed all sides.
2. Set up job as work/turn. Strip 4 up, 8 out. Set up for each position to have 1/16"
   (.0625) bleed on each side.
3. Create layout at 1 inch larger on width than sheet size, i.e., create layout at
   23 x 36. Layout should include all marks: trim marks, center of sheet marks, and
   side guide marks. All marks should be set up in registration color. Register marks
   and color bar are **not** necessary on this job.
4. Strip single page eps. Place eps into each position at co-ordinates x= -.0625,
   y= -.0625. If picture box is created at correct size and eps file is created with .125
   bleed, this offset will result in correct bleed for each page. See plotter of guide.
5. Print plotter proof and rule up.
6. After approval, output RRED negs, 150 line screen, 2540 dpi.

45

BEP FORM 2360-1
REV. 4-96

# BUREAU OF ENGRAVING AND PRINTING
## EMPLOYEE PERFORMANCE APPRAISAL

| | | | |
|---|---|---|---|
| EMPLOYEE NAME | Sidney Burch | RATING PERIOD | 10/1/02 to 9/30/03 |
| SSN | | OFFICE | Engraving |
| TITLE | Photoengraver | PAY PLAN/GRADE | WE 4425 |

## PART 1-PERFORMANCE PLAN DEVELOPED AND APPROVED
(ATTACH A COPY OF THE PERFORMANCE PLAN, TO INCLUDE EACH ELEMENT AND THE STANDARDS TO BE ACHIEVED.)

RATING OFFICIAL _Robt E. Bixler_ DATE _11-4-03_

REVIEWING OFFICIAL _____ DATE _11/4/03_

EMPLOYEE _Sidney R. Burch_ DATE _11/4/03_

(EMPLOYEE SIGNATURE INDICATES RECEIPT OF THE PLAN AND DOES NOT NECESSARILY CONSTITUTE AGREEMENT.)

## PART II-APPRAISAL OF PERFORMANCE–ELEMENTS
(MOST PERFORMANCE PLANS CONTAIN FEWER ELEMENTS THAN PROVIDE FOR BELOW. USE THE NUMBER OF LINES NEEDED TO MATCH THE PERFORMANCE PLAN.)

### ELEMENT NUMBER

### RATING (CHECK ONE BOX FOR EACH ELEMENT)

| Element | EXCEEDED STANDARDS | ACHIEVED STANDARDS | UNACCEPTABLE-DID NOT ACHIEVE STANDARDS |
|---|---|---|---|
| 1 | ☐ | ☒ | ☐ |
| 2 | ☐ | ☒ | ☐ |
| 3 | ☒ | ☐ | ☐ |
| 4 | ☐ | ☒ | ☐ |
| 5 | ☐ | ☒ | ☐ |

GOVERNMENT EXHIBIT
P

## PART III-APPRAISAL OF PERFORMANCE–NARRATIVE

Mr. Burch worked in the digital photography area from Oct 2002 to May 2003 and he participated in the on-the-job training in Offset Platemaking (wet and dry) from May 2003 to August 2003.
While in the digital photography area, Mr. Burch continued to be a dependable, competent photographer and received compliments from outside customers (photos for OPM website) for his services. He continued to display a very cooperative manner with his co-workers, his supervisor and to the BEP's other components.

198

MRH

Mr. Burch consistently conducted himself in a professional manner, which is most important in his role as a Bureau photographer. He arrived at all assignments on time and had a clear understanding of what was needed by the customer.

He exhibited progress in his Offset Platemaking training and this will continue to be monitored.

He performed as expected regarding safety, security, environmental and housekeeping issues.

## PART IV–SUMMARY RATING

CHECK ONE:

| | | |
|---|---|---|
| ☐ | **EXCEEDED STANDARDS** | (ONE-HALF OR MORE OF ELEMENTS RATED EXCEEDED STANDARDS AND NO ELEMENTS RATED UNACCEPTABLE) |
| ☒ | **ACHIEVED STANDARDS** | (LESS THAN ONE-HALF OF ELEMENTS RATED EXCEEDED STANDARDS AND NO ELEMENTS RATED UNACCEPTABLE) |
| ☐ | **UNACCEPTABLE–DID NOT ACHIEVE STANDARDS** | (ONE OR MORE ELEMENTS RATED UNACCEPTABLE) |

RATING OFFICIAL  *Robert E. Bishop*     DATE  11-4-03

REVIEWING OFFICIAL  *Greg Mount*     DATE  11/4/03

EMPLOYEE  *Sidney R. Burch*     DATE  11/4/03
(EMPLOYEE SIGNATURE ONLY INDICATES THAT THE APPRAISAL DISCUSSION TOOK PLACE AND DOES NOT NECESSARILY CONSTITUTE AGREEMENT WITH THE APPRAISAL.)

FORM 2360-1 (BACK)

199